1  BENJAMIN TAYLOR (State Bar No. 240636)
   btaylor@taylorlawfirmpc.com
2  DIANE BANI-ESRAILI (State Bar No. 321269)
   dbani@taylorlawfirmpc.com
3  THE LAW OFFICES OF BENJAMIN TAYLOR
   A Professional Corporation
4  1880 Century Park East, Suite 714
   Los Angeles, California 90067
5  Telephone:   (310) 201-7600
   Facsimile:   (310) 201-7601
6
   Attorneys for Plaintiffs
7  Charif Kazal, Tony Kazal, Adam Kazal and
   Karl Kazal
8
9              UNITED STATES DISTRICT COURT

10        FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12  CHARIF KAZAL, an individual; ADAM          CASE NO: 2:18-cv-08655-R-E
    KAZAL, an individual; TONY KAZAL, an
13  individual; and KARL KAZAL, an
    individual,                                **FIRST AMENDED COMPLAINT**
14
                    Plaintiffs,
15
    v.                                         JURY TRIAL DEMANDED
16
17  MATTHEW PRICE, an individual; RYAN
    WELLS, an individual; MICHAEL HATCH,
18  an individual; PAUL KOLESA, an
    individual; and DOES 1 through 20,
19  inclusive,
20                  Defendants.

21

22

23

24

25

26

27

28

# FIRST AMENDED COMPLAINT

Plaintiffs Charif Kazal, Adam Kazal, Tony Kazal and Karl Kazal (collectively, "Plaintiffs" or the "Kazal Brothers,"), by and through their undersigned counsel, hereby complain and allege against Defendants Matthew Price, Paul Kolesa, Ryan Wells, and Michael Hatch (collectively, "Defendants"), as follows:

## Nature of Action

1.      This is a case of a continuous and systematic effort by a group of employees of Thunder Studios, Inc. to intimidate, harass, and vilify a prominent Australian family of Middle-Eastern heritage on the Internet by creating websites in their names and falsely linked members of the family to international terrorism and criminal misconduct. Defendants accomplished this purpose by creating, maintaining and publicizing five websites on which Defendants posted incendiary, false and misleading information about Plaintiffs.

2.      Defendants' unlawful conduct has disparaged Plaintiffs, is destroying the sterling business reputations built up over two generations in Australia by the Kazal family, and is interfering with their business opportunities.  Specifically, the Kazal Brothers have been denied business loans and have had deals fail to close as a result of Defendants' outrageous actions.  The false information conveyed by Defendants over the Internet has also created a security threat to the Kazal family, an assessment confirmed by a returned Australian police officer who is a respected security expert.  The false information on the websites and the resulting security concerns have engendered severe emotional distress for the entire Kazal family, including young children.  And critically, these young children are subject to ridicule and harassment in Australia, including taunts accusing them of being terrorists. The taunts have escalated in frequency to the point that the emotional and physical well-being of the children is at risk.

3.      Therefore, Plaintiffs bring this action to obtain relief for the damages Defendants' repugnant conduct has caused Plaintiffs with respect to their business and financial affairs, with respect to their physical safety and with respect to the emotional well-being of the Kazal family, including the young children of the family.

4.     Plaintiffs seek a Temporary Restraining Order and Preliminary Injunction, and ultimately a permanent injunction against Defendants. Unless Defendants are permanently restrained and enjoined, they will engage, and continue to engage in the acts, practices, and patterns of behavior set forth in this Complaint and in acts, practices, and patterns of behavior of a similar type and nature.

5.     Plaintiffs additionally seek compensatory and punitive damages against Defendants.

6.     By this action, Plaintiffs seek to hold Defendants accountable for the substantial damage that they have, and continue to, inflict on Plaintiffs and Plaintiffs' families, including young children, and put an end to Defendants' untrue, harassing, harmful, and disparaging statements.  In other words, Plaintiffs seek to restore a sense of normalcy to their day to day lives.

**The Parties**

7.     Plaintiff Charif Kazal is a foreign national whom at all relevant times is domiciled in the Commonwealth of Australia.

8.     Plaintiff Adam Kazal is a foreign national whom at all relevant times is domiciled in the Commonwealth of Australia.

9.     Plaintiff Tony Kazal is a foreign national whom at all relevant times is domiciled in the United Arab Emirates.

10.    Plaintiff Karl Kazal is a foreign national whom at all relevant times is domiciled in the Commonwealth of Australia.

11.    Defendant Matthew Price is an individual, and a resident of the State of California.

12.    Defendant Ryan Wells is an individual, and a resident of the State of California.

13.    Defendant Paul Kolesa is an individual, and a resident of the State of California.

FIRST AMENDED COMPLAINT

14.     Defendant Michael Hatch is an individual, and a resident of the State of California.

**Jurisdiction and Venue**

15.     Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332, as each of the Plaintiffs is a foreign national and Defendants are United States citizens and residents of the State of California.

16.     Pursuant to 28 U.S.C. § 1332, the value of the damages and injunctive relief sought exceeds $75,000, exclusive of interest and costs.

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this District, a substantial part of the events giving rise to this matter occurred in this District, and/or Defendant is subject to the general personal jurisdiction of this Court.

**Factual Allegations**

**The Kazal Family**

18.     Plaintiffs Charif Kazal, Adam Kazal, Tony Kazal, and Karl Kazal emigrated with their parents in the 1980's from Lebanon to Sydney, Australia when they were young children.  They were then raised, educated, and through hard work prospered in Australia.

19.     From humble beginnings in a new country, their father started a small food service establishment which the Kazal Brothers, after reaching adulthood, helped to grow into a successful and recognized Australian restaurant business.

20.     The family business eventually also pivoted into real estate development and international business consulting.  The Kazal Brothers have operated a number of successful restaurant & café businesses on Sydney Harbour around Circular Quay, The Rocks Sydney, and Darling Harbour for the better part of the past twenty-five years.  They have also undertaken a number of commercial property and investments up and down the New South Wales and Queensland coasts that have generated jobs and economic growth to these areas. The Kazal Brothers are also active in political and charity causes in Australia.

21.     The Kazal Brothers regularly seek opportunities to expand their current businesses or to create new business opportunities, including through financing arrangements

-4-

1  with banks and other partners.

2      22.    Accordingly, they rely heavily on their established reputations in the

3  Australian business community to create relationships with lenders and business partners.

4                          **Defendants' Creation of the Websites**

5      23.    Defendant Matthew Price ("Price") works in the information technology field,

6  and has provided I.T. services through his company United Technology Group Incorporated.

7      24.    Additionally, Price served for a time as the Chief Technology Officer of

8  Thunder Studios, Inc. ("Thunder Studios") in the State of California.

9      25.    Defendant Paul Kolesa has at all times relevant hereto been employed by

10 Thunder Studios, in charge of content security.

11     26.    Defendant Michael Hatch has at all times relevant hereto been employed as

12 social media manager for Thunder Studios.

13     27.    Defendant Ryan Wells has at all times relevant hereto been employed by

14 United Technology Group Incorporated as a senior engineer providing outside I.T. services

15 to clients, including Thunder Studios.

16     28.    Thunder Studios is owned by an individual, Rodric David ("David"), with

17 whom some of the Kazal Brothers have had previous business dealings, and with whom they

18 are or have been embroiled in separate litigations in California, the Commonwealth of

19 Australia and the Cayman Islands.

20     29.    Price and David have had a longstanding professional and personal

21 relationship.

22     30.    Sometime around the first quarter of 2016, Price, who has testified under oath

23 that he has never met, spoken with, or had any personal knowledge of or contact of any kind

24 with any of the Kazal Brothers, and otherwise has had no personal feud or dispute of any

25 kind with any of the Kazal Brothers, registered and created five new websites:

26 www.kazalfamilytruth.com,  www.charifkazal.com, www.karlkazal.com,

27 www.adamkazal.com, and www.tonykazal.com (collectively, the "Websites").  On the

28 Websites, Price, by his own admission, collected, assembled, published, and disseminated

adverse, inflammatory, and vilifying information that is demonstrably false about the Kazal family.

31.   In a discovery proceeding filed in the Middle District of Florida, *Adam Kazal v. Matthew Price*, Case No. 8:17-cv-02620-VMC-JSS, Adam Kazal sought and obtained discovery from Price in relation to a pending matter before an Australian court.  As part of that discovery, Adam Kazal's counsel deposed Price, and obtained sworn testimony regarding his creation and maintenance of the Websites.  A copy of the Transcript of Deposition of Matthew Price, dated November 9, 2017, is attached hereto as Exhibit A.

32.   At his deposition, Price testified that he created the Websites after learning of the disputes and litigation between the Kazal Brothers and David.  Price further testified that he harbored "animosity" towards the Kazal Brothers, even though he had never met or otherwise interacted directly with any of the Kazal Brothers.  Price testified that he created the Websites himself, was solely responsible for placing content on the Websites, and that he created and maintained the Websites in his personal capacity, rather than in the context of any employment relationship, and used his own personal funds for the registration and maintenance of the Websites.

33.   Documents received from the Websites' registrar confirm that Price is the registrant and owner of the five Websites.

34.   Price testified that he gathered all of the information that he posted on the Websites directly from other websites on the Internet.

35.   Plaintiffs have subsequently learned, through further discovery obtained from Dreamhost, which hosted the Websites, that notwithstanding his testimony to the contrary, Price did not act alone.  Indeed, the other individual defendants named herein – Ryan Wells, Michael Hatch, and Paul Kolesa – were all involved in the creation of and maintenance of the Websites.  Not coincidentally, all of them were employed by or working for Thunder Studios at the time, in various capacities all related to content, social media and the internet.

36.   Defendants took the information that they obtained online, and then distorted, twisted, embellished, and manipulated that information, including photos of the Kazal

Brothers that they purportedly obtained elsewhere, to cast, using the Websites and before a worldwide audience, the Kazal Brothers in a derogatory, false, and sensationalized light.

37.     In separate instances, Defendants posted photos of members of the Kazal Brothers and plastered derogatory and false captions and watermarks such as "Support [sic] Hezbollah," "guilty," "criminal," "corrupt," "intimidation," and "bribery" across their photos.  Defendants also created "memes" out of the original pictures of the Kazal Brothers, adding cartoon characters that are shown ridiculing the subjects of the photos, depicting the Kazal Brothers in a highly offensive, insulting, and humiliating light.

38.     Still other pictures on the Websites falsely show the Kazal Brothers behind bars, which Defendants added on top of existing photos, another devious touch added by Defendants to mislead, misguide, and inflame the passions of the readers of the Websites.

39.     One of the most telling aspects of the inflammatory, sensationalized, and disparaging nature of the Websites is a digitally-manipulated image that resembles a police dossier, with photos of the Kazal Brothers and several of their relatives paper-clipped thereto.  Below the photo of each Kazal family member, Defendants set forth the individual's name, his former Arabic name (i.e., a variant of the name Hussein), date of birth, and country of birth in the Middle East (i.e., Lebanon).  The clear, incendiary, and false implication is that the Kazal Brothers are under investigation by law enforcement authorities in connection with international terrorism.

40.     The Websites also include a stock photo of a handcuffed individual dressed in business attire and holding United States dollar bills.  This image once again conveys the false impression that the Kazal Brothers are criminals.

41.     The Websites additionally include the image of a gavel with the word "GUILTY" overlaid.  On the Websites, the image appears next to the text: "Why are the Kazals laundering money?"  The image, juxtaposed with the text, falsely and maliciously implies that the Kazal Brothers have been adjudged guilty of the crime of money laundering.

42.     Despite Price's testimony that he simply sourced open information from the

Internet, Defendants in fact purposefully distorted and manipulated the text and images to place the Kazal Brothers in a false and derogatory light. The creation and maintenance of the Websites is an outrageous campaign of intentional misrepresentation, deception, and outright race-baiting and Islamophobia designed to falsely link the Kazal Brothers to terrorist and criminal wrongdoing.

43.    Moreover, the Websites regularly and automatically re-post the disparaging information in an effort to make the content appear new. As Price testified in his deposition, this is a tactic to ensure that the Websites continue to appear first in Internet search results for the names of the Kazal Brothers or their businesses, and so that Defendants' outrageously untrue statements about the Kazal Brothers can reach as wide an audience as possible.

### Damage to the Kazal Brothers' Personal and Business Interests

44.    The Kazal Brothers' various successful businesses in Australia have sustained losses due to the negative publicity generated by the inflammatory, untrue, and vilifying information on the Websites.

45.    Before these false allegations were widely publicized and circulated by the Websites, banks had competed vigorously to be the lender of choice for the Kazal Brothers' businesses, given their impeccable reputations and highly-valued business locations on the Sydney Harbour. However, the dissemination by Defendants of the false statements and inflammatory images on the Websites has severely damaged the ability of the Kazal Brothers and their businesses to sustain and obtain funding from local banks and finance companies for normal, existing business operations. Since the establishment of the Websites, the Kazal Brothers have been denied loans by the banks in many instances.

46.    The business partners of the Kazal Brothers have also walked away from deals as a result of the negative information propagated by the Websites. *See* Affidavit of Charif Kazal, attached hereto as Exhibit B, ¶¶ 7–9; Affidavit of Manuel Magoulias, attached hereto as Exhibit C, ¶ 5. This has cost the Kazal Brothers business revenue and has created cash flow difficulties for the family.

**Damages to the Emotional and Physical Well Being of the**

**Kazal Brothers and their Families**

47.     The Websites have taken a significant emotional and physical toll on the Kazal Brothers and their families, including their spouses and minor children.  The whole family is fearful for its safety and is emotionally distraught.  A respected security expert with over thirty years of experience on the Australian police force has determined that the Kazal family faces a real security threat due to the false accusations of terrorism and other criminal conduct on the Internet.  *See* Affidavit of Craig Sheridan, attached hereto as <u>Exhibit D</u>, ¶¶ 8– 10.

48.     The minor children of Plaintiff Tony Kazal, aged nine and twelve respectively, have been harassed by schoolmates who have seen the false information on the Websites about their father and uncles.  They have been specifically taunted as terrorist supporters. This has created severe emotional distress to the children and their mother, the wife of Tony Kazal, who was forced to consult a security expert and to seek psychiatric counseling.  *See* Affidavit of Rania Kazal, attached hereto as <u>Exhibit E</u>, ¶¶ 3–5, 9–10.

**First Claim for Relief - Tortious Interference with Business Relationships**

49.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 48 as if fully alleged herein.

50.     Prior to the publication of untrue, disparaging, and highly offensive information on Defendants' Websites, the Kazal Brothers had numerous fruitful and ongoing business dealings and opportunities in Australia and in the United Arab Emirates.  In addition, banks in Australia also vigorously competed to be lender of choice for the Kazal Brothers.

51.     As Price stated in his deposition testimony, he was aware of the Kazal Brothers and their business operations in Australia, and accordingly knew, or should have known, of the likely adverse effects of his outrageous actions on their business interests.

52.     Through the publication of the disparaging, false and vilifying statements on the Websites, without justification or privilege, Defendants have intentionally and

-9-

1   unjustifiably interfered with, and still are intentionally and unjustifiably interfering with, the

2   business relationships of the Kazal Brothers.

3       53.    As a direct and proximate result of Defendants' unlawful interference, the

4   Kazal Brothers have been denied loans by local banks and finance companies which in the

5   past competed to be the lender of choice for the Kazal Brothers.  *See* Affidavit of Tim Lowe,

6   attached hereto as Exhibit F.

7       54.    Also as a direct and proximate result of Defendants' unlawful interference, the

8   Kazal Brothers have lost opportunities to consummate new business deals and as a result

9   have lost revenue.  Further, the Kazal Brothers have suffered decreased profits at their

10  existing businesses due to the reluctance of customers to patronize businesses with supposed

11  ties to terrorism and criminal conduct.

12      55.    Plaintiffs are entitled to actual damages sustained as a result of Defendants'

13  unlawful conduct in an amount to be determined at trial.

14      56.    Defendants had actual knowledge of the wrongfulness of their conduct and the

15  high probability that injury or damages would ensue from that conduct.  Notwithstanding this

16  knowledge, Defendants still intentionally pursued that course of conduct resulting in

17  damages and injury to Plaintiffs.  Plaintiffs are therefore also entitled to an award of punitive

18  damages.

19  **Second Claim for Relief – Intentional Infliction of Emotional Distress**

20      57.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 48 as if

21  fully alleged herein.

22      58.    Defendants acted intentionally, or in the alternative recklessly, when they

23  published false and disparaging statements as described above in order to inflict mental

24  distress on the Kazal Brothers.

25      59.    As noted above, Price stated under oath that he harbored "animosity" towards

26  the Plaintiffs.  Therefore, he knowingly published false information when he added captions

27  such as "Support Hezbollah," "guilty," and "criminal" to the pictures of the Kazal Brothers

28  on the Websites.

60.     Defendants knew or should have known that the published content was untrue. While Defendants re-posted some articles from existing media sources, they also made incendiary assertions that they knew or should have known lacked basis in fact, and which they knew or should have known would inflict emotional distress on Plaintiffs and their families.

61.     The actions of Defendants, including naked race-baiting and appeals to Islamophobia, are extreme, outrageous, and beyond what should be acceptable in a civilized society.

62.     In particular, Defendants' attempt to create an association between Plaintiffs and Hezbollah, a known terrorist organization, when Defendants know that no such association exists, is utterly intolerable.  Hezbollah has been classified as a terrorist organization by the U.S. government and other governments around the world.  It is well-known to the general public worldwide as an organization supporting terrorism and has been linked to the multiple acts of terrorism in which innocent civilians were killed.

63.     The intentional or reckless wrongful conduct of the Defendants has caused the following damages to the Kazal Brothers: severe personal stress, mental anguish, emotional distress, embarrassment, fears for the safety of the family's minor children, and public humiliation, as well as irreparable damage to their professional and personal reputations, including future potential business opportunities and earning capacity as previously well-respected, hard-working members of the Australian business community.

64.     Plaintiffs are entitled to actual damages sustained as a result of Defendants' unlawful conduct in an amount to be determined at trial.

65.     Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damages would ensue from that conduct.  Notwithstanding this knowledge, Defendants still intentionally pursued that course of conduct resulting in damages and injury to Plaintiffs.  Plaintiffs are therefore also entitled to an award of punitive damages.

////

**Third Claim for Relief – Injunctive Relief**

66.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 48 as if fully alleged herein.

67.     Defendants have repeatedly and wrongly made false statements through the Websites, intentionally inflicted emotional distress on Plaintiffs and their family members, and interfered with Plaintiffs' ongoing business relationships to the significant financial detriment of the Kazal family.

68.     In particular, Defendants' outrageous conduct has placed the safety and well-being of the entire Kazal family, including young minor children, at immediate risk.

69.     Defendants' intentional, reckless, and ongoing conduct has caused and will continue to cause, irreparable harm to Plaintiffs and their family members, including young children.

70.     In order to stop Defendants from continuing their outrageous and harmful conduct, Plaintiffs seek entry of a temporary restraining order and an injunction requiring Defendants to remove false contents from the Websites, cease inflicting emotional distress on Plaintiffs, cease creating safety threats for Plaintiffs and cease interfering with Plaintiffs' business relationships.

**Prayer for Relief**

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants, as follows, on all causes of action:

a.      A Temporary Restraining Order and Preliminary Injunction restraining Defendants from publishing, via the Internet or other means, statements that Kazal Brothers are involved in terrorism, criminal misconduct or fraud, or causing or aiding others to do the same;

b.      A permanent injunction enjoining Defendants from publishing, via the Internet or other means, statements that Kazal Brothers are involved in terrorism, criminal misconduct or fraud, or causing or aiding others to do the same;

c.      Compensatory and punitive damages, in an amount to be determined at trial;

1    d.    Punitive damages, in an amount to be determined at trial; and

2    e.    Such other and further relief as this Court deems just and proper.

3

4    DATED:  March 14, 2019                    THE LAW OFFICES OF BENJAMIN TAYLOR
                                               A Professional Corporation
5

6                                              By:_____

7                                                 BENJAMIN TAYLOR

8                                                 Attorneys for Plaintiffs
                                                  Charif Kazal, Tony Kazal,
                                                  Adam Kazal, and Karl Kazal
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

# EXHIBIT A

```
1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
2                       TAMPA DIVISION

3
     ADAM KAZAL,
4
          Petitioner,
5
     -vs-                       Case No.: 8:17-cv-2620 T33JSS
6
     MATTHEW PRICE,
7
          Respondent.
8    _____/

9
                    DEPOSITION OF MATTHEW PRICE
10                    Pages 1 through 108

11

12

13

14
                       November 9, 2017
15                  9:08 a.m. - 11:38 a.m.
         U.S. Legal Support, Inc. - New Port Richey
16                   Trinity Meeting Center
                     7813 Mitchell Boulevard
17                         Suite 106
                   New Port Richey, FL 34655
18

19

20

21

22

23              Stenographically Reported By:
                       Teresa R. Cruise
24            Notary Public, State of Florida
                   U.S. Legal Support, Inc.
25                     (813) 876-4722
                       Job #1652623
```

Page 2

1  APPEARANCES:
2
   On Behalf of the Plaintiff:
3
        Robins Kaplan L.L.P.
4       711 5th Avenue S
        Suite 201
5       Naples, FL 34102
        (239) 430-7070
6       Mwhitt@robinskaplan.com
        BY:  MICHAEL R. WHITT, ESQUIRE
7
   On Behalf of the Defendant:
8
        The Brad Sohn Law Firm, PLLC
9       2600 South Douglas Road
        Suite 1007
10      Coral Gables, FL 33134
        (786) 708-9750
11      Brad@sohn.com
        BY:  BRAD R. SOHN, ESQUIRE
12
        Raines Feldman, L.L.P.
13      1800 Avenue of the Stars
        12th Floor
14      Los Angeles, CA 90067
        (310) 440-4100
15      Sgebelin@raineslaw.com
        BY:  STEVEN T. GEBELIN, ESQUIRE
16           (Via Telephone)
17
18
19              INDEX OF PROCEEDINGS
20  Deposition of MATTHEW PRICE           Page
21  Examination by Mr. Whitt                 4
    Stipulations                           104
22  Certificate of Oath                    105
    Certificate of Reporter                106
23  Witness Review Letter                  107
    Errata Sheet                           108
24
25

Page 3

1              INDEX TO EXHIBITS
2  PLAINTIFF'S EXHIBITS:
3
   NO.  DESCRIPTION                        PAGE
4  1     Subpoena.............................    9
   2     Internet Printout Packet.................   22
5  3     DreamHost Printout.......................   78
6
7  DEFENDANT'S EXHIBITS:
8
   NO.  DESCRIPTION                        PAGE
9
10              (NO EXHIBITS MARKED)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1   The deposition of MATTHEW PRICE was taken pursuant to
2       notice for the Plaintiff on
3   Thursday, November 9, 2017, commencing at 9:08 a.m. at
4   U.S. Legal Support, Inc., 7813 Mitchell Boulevard,
5       Suite 106, New Port Richey, FL 34655
6   Said deposition was reported by Teresa R. Cruise,
7       Notary Public, State of Florida at Large.
8            - - - - - - - - -
9            THE COURT REPORTER:  Sir, would you please
10      raise your right hand?
11           Do you swear or affirm the testimony you're
12      about to give will be the truth, the whole truth,
13      and nothing but the truth so help you God?
14           THE WITNESS:  I do.
15  THEREUPON:
16                MATTHEW PRICE,
17  having been first duly sworn, was examined and
18  testified as follows:
19                EXAMINATION
20  BY MR. WHITT:
21      Q.   All right.  If you'll state your full name,
22  please?
23      A.   Matthew David price.
24      Q.   And, Mr. Price, you are currently residing
25  here in Florida; is that correct?

Page 5

1       A.   Yes.
2       Q.   Where do you reside?
3       A.   Land O'Lakes.
4       Q.   What is your address there?
5       A.   3019 Linwood Court.
6       Q.   And how long have you lived there?
7       A.   A few months.
8       Q.   How long?  Can you tell --
9            MR. SOHN:  Asked and answered.
10           MR. WHITT:  Don't --
11  BY MR. WHITT:
12      Q.   Can you tell me the month?
13      A.   June -- July 1st.
14      Q.   Of 2017?
15      A.   Yes.
16      Q.   Do you own the home or rent it?
17      A.   Rent.
18      Q.   Who's the landlord?
19      A.   A private doctor.  I don't --
20           MR. SOHN:  And you know before.
21           THE WITNESS:  -- know his name.
22           MR. SOHN:  I'm sorry.  Finish your answer
23  first.
24           THE WITNESS:  I don't recall his name.
25           MR. SOHN:  Before we proceed any further, I

Page 6

1    want to first just renew and incorporate
2    objections in the subpoena, and further state
3    that this should be a very narrow scope today in
4    terms of your examination of the witness.
5          And, you know, if you want to ask him
6    questions related to the websites, go ahead,
7    but -- and I realize you need a little bit of
8    latitude there, but we believe that should be
9    sufficient for today.
10         MR. WHITT:  I appreciate your comments and
11   objections.  Noted on the record.
12   BY MR. WHITT:
13   Q.    Did you previously live in California,
14   Mr. Price?
15   A.    Yes.
16   Q.    How long?
17   A.    I've lived there a total of 14 years.
18   Q.    Do you have plans to return to California or
19   is Florida going to be your new home?
20   A.    Florida.
21   Q.    When did you leave California and come to
22   Florida?
23   A.    The exact date I don't know.  Roughly, the
24   middle of June 2017.
25   Q.    Are you married?

Page 7

1    A.    I am.
2    Q.    What's your spouse's name?
3    A.    Harmonie.
4    Q.    And that's H-a-r-m-o-n-i-e; is that correct?
5    A.    Yeah.
6    Q.    All right.  Are you on any medication or
7    have any physical or mental impairment that would
8    prevent you from understanding my questions today or
9    testifying accurately to questions that are put to
10   you today?
11   A.    I am Type 1 diabetic, but no.
12   Q.    Okay.  So my name is Michael Whitt.  I work
13   with the law firm of Robins Kaplan, and we've been
14   retained as counsel for Adam Kazal for purposes of
15   taking your deposition here today.
16         So as part of that process, we obtained a
17   subpoena from Federal court, which was served upon
18   you just a few days ago, you recall that?
19   A.    Uh-huh.
20         MR. SOHN:  Objection.
21   BY MR. WHITT:
22   Q.    And that subpoena required you to appear
23   here on Tuesday of this week at 10:00 a.m.
24         Do you recall that?
25         MR. SOHN:  Calls for a legal conclusion.

Page 8

1    BY MR. WHITT:
2    Q.    You can answer the question?
3          MR. SOHN:  If you understand.
4          MR. WHITT:  Counsel, there's not a whole lot
5    of speaking objections allowed under the Rules of
6    Middle District, and we're not going to have a
7    day filled with you try to steer the witness in
8    his answers.
9          MR. SOHN:  Counsel, I would never do that.
10   But as we both know the Middle District
11   Rules require that I object with a certain amount
12   of specificity to preserve properly.
13   BY MR. WHITT:
14   Q.    So you can answer.
15         It required you to be here Tuesday, correct?
16         MR. SOHN:  Same objection.
17         THE WITNESS:  I don't believe I read that,
18   but if that's what it says, that's what it said.
19   BY MR. WHITT:
20   Q.    Why did you not appear for your deposition
21   on Tuesday?
22         MR. SOHN:  Asked and answered.
23   BY MR. WHITT:
24   Q.    You can answer?
25         MR. SOHN:  Well, he's not a lawyer, counsel.

Page 9

1          THE WITNESS:  I didn't know I had to.
2    BY MR. WHITT:
3    Q.    Okay.  Did you bring the subpoena that was
4    served upon you?  Did you bring that with you today?
5    A.    No.
6    Q.    I happen to have copies.
7    A.    Oh, good.
8          MR. WHITT:  Let's have this marked as
9    Plaintiff's Exhibit Number 1 to the deposition,
10   please.
11         (Plaintiff's Exhibit No. 1 was marked for
12   identification.)
13   BY MR. WHITT:
14   Q.    Okay.  I've presented you with a copy of the
15   subpoena to testify at a deposition at a civil
16   action, addressed to you.  See your name and address
17   there on the subpoena, sir, Exhibit Number 1?
18   A.    I see.
19   Q.    Okay.  And about halfway down, you'll see
20   there's a paragraph that has a box that's checked
21   that says, "Production."  Do you see that?
22   A.    Yes.
23   Q.    And it says that you or your representatives
24   must bring with you to the deposition the following
25   documents:  "Electronically stored information or

Page 10

1  objects, and must permit inspection copying, testing,
2  or sampling of the following material."
3        Do you see that?
4  A.    Yeah.
5  Q.    Okay.  And then there's typed in the
6  following language: "All documents and communication
7  concerning the creation, posting, and maintenance of
8  the following websites."
9        And then it lists one, two three, four --
10 five websites.  Do you see that language typed in
11 there?
12 A.    Yes.
13 Q.    Did you bring any documents with you today
14 responsive to this request?
15 A.    No.
16 Q.    Do you have in your possession documents
17 responsive to this request?
18 A.    No.
19 Q.    Okay.  You don't have any documents
20 concerning the creation, posting, and maintenance of
21 any of these five websites; is that correct?
22     MR. SOHN:  Objection.
23     THE WITNESS:  Correct.
24 BY MR. WHITT:
25 Q.    Do they exist?

Page 11

1      MR. SOHN:  Calls for speculation.
2  BY MR. WHITT:
3  Q.    You can answer.
4      MR. WHITT:  I'm just going to -- I'm going
5  to make a statement here.  Your counsel is going
6  to object throughout the day to the questions
7  that I ask.
8      THE WITNESS:  Uh-huh.
9      MR. WHITT:  And unless he instructs you not
10 to answer that question, you can answer the
11 question --
12     THE WITNESS:  Okay.
13     MR. WHITT:  -- okay?  He's just noting
14 objections for the court reporter to take down
15 for future reference if deposition is used for
16 any purpose or whatever, okay?
17     THE WITNESS:  Okay.
18     MR. WHITT:  So unless he directs you not to
19 answer, you can go ahead and answer the question.
20 That way I don't have to tell you every time,
21 "You can answer," "You can answer," "You can
22 answer."
23     THE WITNESS:  Okay.
24     MR. WHITT:  So if that hadn't been covered
25 with you, I just kind of wanted to cover that

Page 12

1  kind of housekeeping matter.
2      THE WITNESS:  Okay.
3      MR. WHITT:  Fair enough?
4      THE WITNESS:  Got it.
5  BY MR. WHITT:
6  Q.    Okay.  So do these records exist, to your
7  knowledge?
8  A.    What records?
9  Q.    The records that I just read to you off of
10 the subpoena, sir?
11     MR. SOHN:  Vague and ambiguous.
12 BY MR. WHITT:
13 Q.    Shall I read it again?
14 A.    There are no documents.
15 Q.    Well, is there electronically stored
16 information related to the creating, posting, and
17 maintenance of the five websites listed on the
18 subpoena?
19     MR. SOHN:  Speculative, vague and ambiguous.
20     THE WITNESS:  When you register a domain,
21     it's all electronic.  The hosting company may
22     have documents.
23 BY MR. WHITT:
24 Q.    Other than the hosting company having a
25 document or documents, or electronically stored

Page 13

1  information related to these five websites, do you
2  know of any documents that exist related to the
3  creation, posting, and maintenance -- well, let me
4  start that question again.
5        Do you know of any documents,
6  communications, or electronically-stored information
7  that exist related to the creation, posting, and
8  maintenance of the five listed websites?
9  A.    So the information on the website exists in
10 the cloud with probably with the hosting company.
11 Q.    Are you aware of any emails, texts, or other
12 communications concerning the five websites or where
13 in the websites listed on the subpoena would have
14 been discussed?
15     MR. SOHN:  Vague, ambiguous.
16     THE WITNESS:  No.
17 BY MR. WHITT:
18 Q.    So to clarify my question:  Have you ever
19 sent any texts or emails referring to any of the five
20 websites listed on the subpoenas?
21     MR. SOHN:  Same objection.
22     THE WITNESS:  Not that I recall.
23 BY MR. WHITT:
24 Q.    Okay.  Have you ever received any texts or
25 emails regarding any of the five websites listed on

Page 14

1  the subpoena?
2       MR. SOHN:  Same objection.
3       THE WITNESS:  Not that I recall.
4  BY MR. WHITT:
5       Q.    Do you know a gentleman named Rodric David?
6       A.    Yes.
7       Q.    Have you had any communications with
8  Mr. David regarding any of the five websites?
9       A.    Well, we're being sued by the Kazal's
10 together over these five websites, so I believe
11 that's --
12      MR. SOHN:  Yeah.
13      THE WITNESS:  -- privileged.
14      MR. SOHN:  And that was just what I was
15   going to say.
16      Outside the presence of counsel, right?
17 BY MR. WHITT:
18      Q.    Yeah.  Let's deal with email or texts
19 communications between -- first of all, between you
20 and Mr. Rodric, that's R-o-d-r-i-c, lasted name
21 David, D-a-v-i-d, regarding any or all of the five
22 websites listed on the subpoena Exhibit 1.
23      MR. SOHN:  Yeah, I don't think you can
24   answer that.  I think that falls within the scope
25   of privileged.

Page 15

1       I mean, he's an employee of a corp that's
2  facing litigation and is talking -- if such
3  communications were to exist.
4       MR. WHITT:  What privilege would that be?
5       MR. SOHN:  Well, there's potential common
6  interest privilege based on the California
7  action.
8       MR. WHITT:  Okay.  I disagree --
9       MR. SOHN:  I don't think that's crazy, but I
10 understand you may disagree --
11      MR. WHITT:  Are you instructing him not to
12 answer the question if he and Rodric David have
13 had any email or texts communications --
14      MR. SOHN:  No.
15      MR. WHITT:  -- concerning any of these five
16 websites?
17      MR. SOHN:  No.  The knowledge and existence
18 of communications, no, I don't think that that's
19 privileged.  I'm just --
20      MR. WHITT:  Well, you just asserted a
21 privilege.
22      MR. SOHN:  I think --
23      MR. WHITT:  So are you withdrawing your
24 objection based on privilege?
25      MR. SOHN:  Counsel, I believe you asked a

Page 16

1  slightly different question.
2       MR. WHITT:  No, no, that was -- that was a
3  question.
4       MR. SOHN:  But if the question is whether
5  the witness is aware and he has recollection and
6  he is aware, then absolutely.
7       MR. WHITT:  Okay.  All right.  You may not
8  make your flight today if this is the way this
9  depo's going to go.
10 BY MR. WHITT:
11      Q.    So do you remember my question or shall I
12 ask it for the fourth time?
13      A.    Repeat it, please.
14      Q.    Okay.  Have you had email or text
15 communications with Rodric David regarding any one or
16 all of the five websites listed on the subpoena
17 Exhibit 1?
18      A.    Email or text.  We've talked about them with
19 Steven together.  I'm not sure if there's emails or
20 texts, that I'm aware of.
21      Q.    Okay.  Have you had email or text
22 communication with Ryan Wells concerning any one of
23 or all five of the websites listed on the subpoena
24 Exhibit 1?
25      A.    Not that I'm aware of.

Page 17

1       Q.    Before I move on, I want to just make sure
2  that I have a full and complete understanding as to
3  the question of the requested documents in the
4  subpoena.  Since you have brought no records with you
5  as commanded by the subpoena -- let me ask this
6  question.
7       Do you know of any document, piece of paper,
8  or do you know of any communication as set out in the
9  request -- which would be, let's say, an email, text,
10 or other type of written communication -- or the
11 existence of any electronically-stored information
12 concerning the creation, hosting, or maintenance of
13 any or all of the five websites?
14      MR. SOHN:  Objection.
15      THE WITNESS:  I mean, there's electronically
16   stored articles on the website.
17 BY MR. WHITT:
18      Q.    Outside of -- I'm going to call it the
19 content, I'm not much of a techie (sic), okay?
20      A.    Okay.
21      Q.    Outside of the content that appears when you
22 go to these websites, and outside of something that
23 may be maintained by the hosting company, okay,
24 you've referenced those two --
25      A.    Uh-huh.

Page 18

1    Q.    -- things to me, outside of that, are you
2  aware of any document, electronically-stored
3  information, written communication, et cetera, that
4  may exist concerning any one or all five of the list
5  of websites?
6    A.    I don't believe so, no.
7    Q.    Okay.  Now, some time ago you were sued by
8  Adam Kazal -- well, no, I take that back -- I believe
9  that was Charif Kazal in an action in California,
10  correct?
11    A.    Uh-huh.
12    Q.    You just made reference to that in one of
13  your answers --
14    A.    Yep.
15    Q.    -- right?
16        Did you have an attorney defending you in
17  that action?
18    A.    Yeah, Steven.
19    Q.    And that would be Mr. Gebelin, who's on the
20  phone with us?
21    A.    Yes.
22    Q.    Who paid your attorney's fees for
23  Mr. Gebelin's defense of you in that action?
24    A.    Rodric David.
25    Q.    Who's paying for your attorney's fees for

Page 19

1  your defense in this action, the one that we're here
2  on today in this subpoena?
3        MR. SOHN:  Objection.
4        THE WITNESS:  Rodric.
5  BY MR. WHITT:
6    Q.    Is there any written agreement that exists
7  between you and Rodric David about his paying for
8  your defense costs, legal fees?
9    A.    No.
10    Q.    Have you ever had any conversations with
11  Mr. David -- well, I think there may be other
12  Davids -- with Rodric David regarding his paying any
13  judgment that may be entered against you in any
14  action related to these websites?
15        MR. SOHN:  That's going to be privileged.
16        MR. WHITT:  What?  What privilege would
17  it --
18        MR. SOHN:  There's clearly a common interest
19  privilege there.
20        MR. WHITT:  Okay.  That's not what a common
21  interest is.
22        MR. SOHN:  Well --
23        MR. WHITT:  That would be --
24        MR. SOHN:  -- that's not for us to figure
25  out.

Page 20

1        MR. WHITT:  Okay.  Well, if you're going to
2  direct the witness not to answer -- a common
3  interest privilege would extend to communications
4  jointly between Mr. David and Mr. Price and
5  counsel, okay?  But it does not extend to
6  communications between Mr. David and Mr. Price.
7        MR. SOHN:  That's definitely not true.
8        MR. WHITT:  Well, particularly, if there's
9  an agreement for him to indemnify him, hold him
10  harmless from any judgment that may be entered
11  against him, that certainly would go to bias,
12  among a number of other issues.
13  BY MR. WHITT:
14    Q.    So my question is whether such an agreement
15  exists where Rodric David has agreed to pay any
16  judgment that may be against you in any proceeding
17  related to these websites?
18        MR. SOHN:  Don't answer that.
19        MR. WHITT:  Okay.  If you'll note that and
20  mark that series and of questions and objections.
21        THE COURT REPORTER:  Certify it?
22        MR. WHITT:  And your -- yeah, please.
23        MR. SOHN:  On the basis of -- yes, sorry to
24  cut you off -- but on the basis of a common
25  interest privilege, that's correct.

Page 21

1  BY MR. WHITT:
2    Q.    Are you currently employed, Mr. Price?
3    A.    No.
4        MR. SOHN:  And let me further state on the
5  basis of privileged communication belonging to
6  Thunder Studios as well.
7        Continue counsel, sorry.
8        MR. WHITT:  Well, let make sure I ask that
9  question then.
10  BY MR. WHITT:
11    Q.    Is there any agreement between you and
12  Thunder Studios -- and let me stop.
13        You're familiar with Thunder Studios,
14  correct --
15    A.    Yes.
16    Q.    -- in California?
17        You used to work for --
18    A.    Yes.
19    Q.    -- Thunder Studios in California?
20        We'll get to that in a few minutes?
21        So that the record's clear, is there any
22  agreement between you and Thunder Studios wherein
23  Thunder Studios would indemnify or agree to pay any
24  judgment that may be entered against you related to
25  these websites, these five websites listed in the

Page 22

1  subpoena?
2       MR. SOHN:  And, again, don't answer that on
3  the basis of the attorney-client privileged
4  objections that I've already lodged.
5  BY MR. WHITT:
6       Q.  Oh, I was asking you about your current
7  employment, and you said you're not currently
8  working; is that correct?
9       A.  Correct.
10      Q.  Have you been employed at all in Florida
11  since you arrived here in June of 2017?
12      A.  No.
13      Q.  Are you receiving any income from any work
14  consulting work, et cetera, that you may be doing
15  currently for Mr. Rodric David or Thunder Studios?
16      A.  No.
17      MR. WHITT:  Is it Number 2?
18      THE COURT REPORTER:  Yes.
19       (Plaintiff's Exhibit No. 2 was marked for
20  identification.)
21  BY MR. WHITT:
22      Q.  I've shown you a packet of materials.  If
23  you look at the top, it says page one of 25.  If
24  you'll turn to the last page and make sure you have
25  25 of 25.

Page 23

1       A.  Yeah.
2       Q.  Okay.  Now, on the bottom left-hand of the
3  Exhibit Number 2, there are some letters there that
4  begin with h-t-t-p-s.  Do you see that?
5       A.  Yes.
6       Q.  Okay.  And the list of letters and/or
7  markings there, that's commonly referred to as what?
8       A.  A URL.
9       Q.  Okay.  And the URL shows a name
10  www.AdamKazal -- K-a-z-a-l-- .com, right?  You see
11  that?
12      A.  Yes.
13      Q.  Okay.  So this would be, basically, the URL,
14  be like the website address; is that correct?
15      A.  Yes.
16      Q.  All right.  So if you type that into some
17  type of web browser, Google or, you know, Yahoo or
18  some other search engine, you could come up to this
19  website, correct?
20      A.  Uh-huh.
21      Q.  All right.  Have you seen the Exhibit 2
22  before?
23      A.  Yes.
24      Q.  Have you been on the AdamKazal.com web page
25  before?

Page 24

1       MR. SOHN:  Form.
2       THE WITNESS:  Yes.
3  BY MR. WHITT:
4       Q.  Have you been on the www.CharifKazal.com
5  website?
6       A.  Yes.
7       Q.  How about the www.TonyKazal.com website?
8       MR. SOHN:  Form.
9       THE WITNESS:  Yes.
10  BY MR. WHITT:
11      Q.  And how about the www.Kari (sic) -- that's
12  K-a-r-i -- KariKazal.com website?
13      MR. SOHN:  Form.
14      THE WITNESS:  I have never heard of Kari
15  Kazal, nor have I been to a Kari Kazal website.
16  BY MR. WHITT:
17      Q.  And then how about www.KazalFamilyTruth.com
18  website?
19      A.  Yes.
20      Q.  So you've been on these websites, other than
21  the one you've said you've not heard of?
22      A.  Yes.
23      Q.  Oh, I'm sorry, I guess it's a typo, or maybe
24  it's my eyes are bad.  I guess that would be Karl,
25  K-a-r-l, correct?

Page 25

1       A.  (No audible response.)
2       Q.  So you've been on the www.Karl -- K-a-r-l
3  K-a-z-a-l.com website, right?
4       A.  Yes.
5       Q.  Do the Charif Kazal, Tony Kazal, Karl Kazal,
6  and Adam Kazal websites, when you go to those
7  websites, do they direct you over to the Kazal Family
8  Truth site?
9       MR. SOHN:  Objection.
10      Answer if you know.
11      THE WITNESS:  I think they're independent.
12  BY MR. WHITT:
13      Q.  Okay.
14      A.  I don't believe they forward.
15      Q.  Did you create the CharifKazal.com website?
16      A.  Yes.
17      Q.  Did you create the TonyKazal.com website?
18      MR. SOHN:  Form.
19      THE WITNESS:  Yes.
20  BY MR. WHITT:
21      Q.  Did you create the KarlKazal.com website?
22      MR. SOHN:  Form.
23      THE WITNESS:  Yes.
24  BY MR. WHITT:
25      Q.  Did you create the AdamKazal.com website?

Page 26

1      MR. SOHN:  Form.
2      THE WITNESS:  Yes.
3  BY MR. WHITT:
4      Q.    And did you create the KazalFamilyTruth.com
5  website?
6      MR. SOHN:  Form.
7      THE WITNESS:  Yes.
8  BY MR. WHITT:
9      Q.    When did you create those five websites?
10     MR. SOHN:  Form.
11     THE WITNESS:  I don't have the exact date
12     but 2016, Q1, maybe, I believe.  I don't have the
13     exact dates with me.
14  BY MR. WHITT:
15     Q.    Okay.
16     A.    I can get that.  It's public info.
17     Q.    For purposes of streamlining a little bit
18  today, particularly if you look back at Exhibit
19  Number 1, the subpoena, these websites are listed out
20  there, all five of them.
21     A.    Yeah.
22     Q.    So when I say collectively, what I may refer
23  to them as the five websites --
24     A.    Okay.
25     Q.    -- okay?

Page 27

1      A.    Uh-huh.
2      Q.    So if I refer to the "five websites," you
3  understand what websites I'm referring to, right?
4      A.    Yes.
5      Q.    So for purposes of this, we don't have to
6  list them all out time and again --
7      A.    Yes.
8      Q.    -- okay.  Fair enough?
9      A.    Yes.
10     Q.    All right.  In your answer back to me, if
11  you refer to "the websites," okay, quote/unquote, or
12  "the five websites," I'll understand you to be
13  referring to these --
14     A.    Okay.
15     Q.    -- that are listed in Exhibit 1, fair
16  enough?
17     A.    Got it.
18     Q.    Okay.  Good.
19     Q.    So you created these in -- sometime
20  around first quarter of 2016, best of your
21  recollection, correct?
22     A.    Yes.
23     Q.    Where were you living at the time?
24     A.    Los Angeles.
25     Q.    And where were you employed at the time?

Page 28

1      A.    United Technology Group, and I believe
2  Thunder Studios, as well.
3      Q.    When you create a website, you do that on
4  the computer, correct?
5      A.    Yes.
6      Q.    Okay.  When you created these five websites,
7  were they created on your, Matthew Price's, personal
8  computer or were they created on a computer belonging
9  to United Technology Group?
10     A.    That's my company.
11     Q.    Okay.  United Technology Group?
12     A.    My computer.
13     Q.    Your, Matthew Price's, personal computer?
14     A.    Yes.
15     Q.    Okay.  So when you created these five
16  websites, was it done at some point when you were
17  working for Thunder Studios and at work for Thunder
18  Studios, or would it have been created when you were
19  on your own personal time?
20     A.    On my own time.
21     Q.    When you create a website and you have these
22  URL's, as we just went through -- let's just pick the
23  one we looked at www.AdamKazal.com -- you have to
24  register that -- I think it's called a domain name,
25  right?

Page 29

1      A.    Uh-huh.  Yes.
2      Q.    Okay.  You have to register that domain
3  name, right?
4      A.    Yes.
5      Q.    All right.  And just quickly explain that
6  process to me in maybe, you know, two or three broad
7  steps.
8          So if someone wants to register a website
9  and register that name and kind of reserve that name,
10  how do you go about doing that?
11     A.    You go to a -- any domain registrar, type in
12  the name, it will tell you if it's available or not;
13  and, if it is, you click to purchase.
14     Q.    Okay.  So you have to purchase the domain
15  name?
16     A.    Yes.
17     Q.    Okay.  So each of these five names, then,
18  were separately purchased?
19     A.    Yes.
20     Q.    Were these purchased by you?
21     A.    Yes.
22     Q.    Okay.  You, personally, Matthew Price?
23     A.    Yes.
24     Q.    Okay.  And you paid for the domain
25  registration out of your own personal fiances?

Page 30

1    A.    Yes.
2    Q.    And I think you called it a domain
3  registrar, right?
4    A.    Uh-huh.
5    Q.    What domain registrar did you use with whom
6  did you file these domain names?
7    A.    DreamHost.
8    Q.    And is that one word, DreamHost?
9    A.    Uh-huh.  DreamHost, L.L.C., I believe.
10    Q.    Now, when you purchase domain names like
11  this from a web registrar, such as DreamHost, do they
12  last forever?
13    A.    No.
14    Q.    So you have to renew the registration at
15  some point, kind of, you know, kind of reup (sic),
16  maybe pay a fee.  How does that work?
17    A.    Yes.
18    Q.    And how often does that happen?
19          MR. SOHN:  Form.
20          THE WITNESS:  Depends.  You're asked how
21  long you want it for.
22  BY MR. WHITT:
23    Q.    Okay.  Again, I'm not a techie guy.
24    A.    Okay.
25    Q.    These aren't -- these aren't trick

Page 31

1  questions, okay?  I'm trying to find out so I can
2  ask, you know, non-silly-sounding questions of you,
3  okay?
4    A.    Okay.
5    Q.    If you'll indulge me a little bit.
6  Seriously, I'm not trying to play games.  I don't
7  know a lot of this stuff.  Okay.  And I appreciate --
8  I appreciate that.  That helps me out.
9          Okay.  So when you register these, I guess
10  it could be for a year, three years, five years,
11  something like that, correct?
12    A.    Yes.
13    Q.    Okay.  So when you initially registered
14  these, do you recall how long the registration were?
15    A.    One year.
16    Q.    Okay.
17    A.    Typical.
18    Q.    All right.  So that would have been sometime
19  first quarter of 2016, and we're now at the end of
20  2017; and I just pulled the Adam Kazal site up.  So I
21  assume that the domain registrations have been
22  renewed, correct?
23    A.    Correct.
24    Q.    And did you renew these five domain
25  registrations?

Page 32

1    A.    Yes.
2    Q.    You personally?
3    A.    Yeah.
4    Q.    And you paid personal funds?
5    A.    Yep.
6    Q.    And when did you do that?
7    A.    Probably Q1 of 2017 would be the one --
8  you're point.
9    Q.    Had you been sued in California at the time
10  regarding these five websites when you renewed them?
11    A.    I believe so.
12    Q.    Okay.  Now, when you -- when you set up
13  these websites -- so you've registered the name,
14  that's fine.  So you, in essence, own the name
15  AdamKazal.com, right?
16    A.    (No audible response.)
17    Q.    Even though you're not Adam Kazal --
18    A.    (No audible response.)
19    Q.    -- right?  You're Matthew Price?
20    A.    That's correct.
21    Q.    You've registered the name and we've got --
22  each of these five.  That's what we're concerned
23  with, right?
24    A.    (No audible response.)
25    Q.    Then the name just sits out there until you

Page 33

1  post something on the internet, right?  You do
2  something with that page?
3    A.    Uh-huh.
4    Q.    All right.  So let's talk about that.  And,
5  again, I'm going to use the word "content," and if
6  you want to educate me and help me out on what is the
7  better term to call it.
8          But at some point you started posting or
9  uploading content on each of these five websites; is
10  that correct?
11          MR. SOHN:  Form.
12          THE WITNESS:  Correct.
13  BY MR. WHITT:
14    Q.    Okay.  And would that have been -- well, let
15  me just ask you.
16          You registered these sometime around first
17  quarter of 2016.  In relation to that, the domain
18  registrations, when did you start posting content to
19  these five websites?
20    A.    I don't know.  Within a few months after --
21    Q.    Okay.
22    A.    -- I'm guessing.
23    Q.    So sometime maybe late spring, early
24  summer --
25    A.    Sure.

Page 34

```
1      Q.    -- of 2016?
2            All right.  And did anyone else assist you
3    when you started putting this information and posting
4    this information on each of these five sites?
5      A.    No.
6      Q.    Did Ryan Wells have any hand in that?  Did
7    he help you at all?
8      A.    No.
9      Q.    Okay.  Let's go -- let's talk about the
10   five -- the five sites.  And we can kind of probably
11   just handle it collectively; and, again, help me if
12   there's a better term to use.
13           But the content that was -- I'm going to use
14   the word "posted," I don't know if that's right or if
15   you call it uploading or posting whatever -- to these
16   sites, where did you get the content to post onto
17   these site?
18     A.    From the internet.  It was all public
19   information.
20     Q.    And if it's on the internet, it has to be
21   true, right?
22           MR. SOHN:  Objection.
23           MR. WHITT:  That was a joke.  Okay.
24           MR. SOHN:  Well, unfortunately, we've got a
25   written record so we can't be funny.
```

Page 35

```
1            MR. WHITT:  Okay.  He's smiling.  I am just
2      teasing.
3            So we'll get to that question a little bit
4      later about what you may have done or not done to
5      try to determine the truth or falsity of any of
6      that information.
7    BY MR. WHITT:
8      Q.    So the information that you uploaded you got
9    purely from the internet, is that --
10     A.    Right.
11     Q.    Okay.  Did you receive any information,
12   documents, information, photographs, et cetera, from
13   any third person to post on the internet --
14           MR. SOHN:  Form.
15   BY MR. WHITT:
16     Q.    -- excuse me -- on these five websites?
17           MR. SOHN:  Form.
18           THE WITNESS:  No.
19   BY MR. WHITT:
20     Q.    So Rodric David never gave you any
21   information?
22     A.    No.
23     Q.    And said, you know, "Hey, you know, Matthew,
24   you know, you're putting this stuff up, why don't you
25   consider putting XYZ up"?
```

Page 36

```
1      A.    No.
2      Q.    Mr. David never provided you with any
3    photographs?
4      A.    No.
5      Q.    And outside of Rodric David, any third
6    party -- did any third party provide you information,
7    communication, photos, et cetera?
8            MR. SOHN:  I mean, that's impossibly vague,
9      right?
10           MR. WHITT:  No, no, no, no.
11           MR. SOHN:  I mean, the internet's a third
12     party, right, potentially?
13           MR. WHITT:  No, no, no, no.  I mean,
14     directly.  I think the witness understood my
15     question.  But let me make it clear for counsel.
16   BY MR. WHITT:
17     Q.    Did any third person -- I asked you about
18   Rodric David, you said no.
19     A.    Yeah.
20     Q.    Did any third person -- okay.
21           Ryan Wells, David Singh, you know, Rodric
22   David's second cousin, did anybody else, another
23   person, provide you any information, photographs, et
24   cetera, to post on these five websites?
25     A.    No.
```

Page 37

```
1      Q.    Okay.  So the way the record stands -- I'm
2    going move on -- the way the record stands:  The
3    information that you got that you posted on these
4    websites you got purely from the internet, other
5    websites, correct?
6      A.    Yes.
7      Q.    Okay.  Now, when you set up a website and
8    then you put information on the website -- I guess
9    that would be the reason to have it, you know, for
10   the most part, so you put things out there where
11   people can search and go to the website and see
12   information -- is there anything else that you'd need
13   to do to kind of maintain a website?
14           MR. SOHN:  Form.
15           THE WITNESS:  Depends who the client is.
16     Some people change content daily and some change
17     it never.  So it depends.
18   BY MR. WHITT:
19     Q.    Okay.
20     A.    The maintenance of a website, no.  It --
21   websites just run.
22     Q.    Okay.  So as long as you pay the renewal --
23     A.    Uh-huh.
24     Q.    -- right -- to keep that name registered,
25   that content's going to be there on the internet,
```

Page 38

1 correct?
2      A.    Yes.
3      Q.    All right.  So the term -- and I'm doing air
4 quotes, the court reporter can't see that -- I'm
5 going to say quote "maintenance" close quote of a
6 website means what to someone like you who's kind of
7 in the tech industry?  What does that mean?
8      A.    Replacing content, changing forms, updating
9 addresses, swapping banners, pictures, et cetera.
10     Q.    So if I refer to changes to or the posting
11 of additional information to these five websites,
12 would it be fair to categorize that then as the
13 maintenance of these website?
14           MR. SOHN:  Form.
15           THE WITNESS:  Sure.
16 BY MR. WHITT:
17     Q.    Okay.  Because I'm going to ask you some
18 questions --
19     A.    Okay.
20     Q.    -- about additional content that's been
21 posted on there so just, you know, help me --
22     A.    Okay.
23     Q.    -- if there's a different term, okay --
24     A.    Okay.
25     Q.    -- that I need to employ --

Page 39

1      A.    Okay.
2      Q.    -- okay?  Fair enough?
3      A.    Yep.
4      Q.    Okay.  So you -- within a couple of months
5 of the first quarter of 2016, I think we said
6 sometime maybe late spring/early summer 2016, you
7 started posting content, you personally, on each of
8 these five websites, right?
9           MR. SOHN:  Form.
10          THE WITNESS:  (No audible response.)
11 BY MR. WHITT:
12     Q.    Right?
13     A.    Okay.
14     Q.    She can't take down the nod.
15     A.    Oh.
16     Q.    That's okay.
17     A.    I thought you were still going.
18     Q.    Oh, no, no.  I'm trying to break it down.  I
19 hate having big, long rambling questions.
20     A.    Okay.
21     Q.    So you start posting stuff on the website,
22 that's 2016; we're now late 2017.  So between 2016
23 and now November 9th of 2017, there have been changes
24 to the five websites, right?
25          MR. SOHN:  Form.

Page 40

1           THE WITNESS:  Yes.
2 BY MR. WHITT:
3      Q.    Okay.  And the change would include posting
4 of additional information, maybe additional
5 photographs, changing the layout, et cetera, of
6 websites, correct?
7           MR. SOHN:  Objection.
8           THE WITNESS:  Yes.
9 BY MR. WHITT:
10     Q.    Has anyone other than you been involved in
11 the maintenance of these five websites?
12     A.    No.
13     Q.    So between the 2016 and initial posting --
14 as I'm going to call it --
15     A.    Uh-huh.
16     Q.    -- and today, the information that has gone
17 onto the websites has been posted solely by you,
18 correct?
19     A.    Yes.
20     Q.    And if you look at Exhibit 2 -- let me find
21 the right page.
22           MR. SOHN:  Is that within the same -- oh,
23           this is -- I forget about the subpoena.  Excuse
24           me.
25           MR. WHITT:  Yeah, Exhibit Number 2.

Page 41

1 BY MR. WHITT:
2      Q.    Look at page -- if you look at the top right
3 corner, it has the page numbers -- page 12 of 25.
4 Okay.  Do you have that page?
5      A.    Uh-huh.
6      Q.    I'm going to look to -- okay.  That's the
7 same page I have.
8           There is a photograph that appears at --
9 toward the top.  I'm not talking about the one that's
10 cut off and you can see somebody's belt buckle, I'm
11 talking about the one of someone's upper torso and
12 face.
13           Do you see that there?
14     A.    Uh-huh.
15     Q.    And above it there's writing that says,
16 "Support Hezbollah!"  Do you see that?
17     A.    Uh-huh.
18     Q.    Whose photograph is that?  Who is that
19 person?
20           MR. SOHN:  Objection.
21 BY MR. WHITT:
22     Q.    If you know.
23     A.    One of the Kazal's.  I mean, I don't know
24 the individual, but one of the Kazal brothers.
25     Q.    Okay.  Did you post that photograph?

Page 42

1    A.    Yeah.
2    Q.    Now, you said you got all the information
3  off of the internet.  When you -- did you find this
4  photograph on the internet?
5    A.    Yeah.
6    Q.    Did it say "Support Hezbollah!" at the top
7  when you found it on the internet?
8    A.    I don't believe so.
9    Q.    So you then -- I think they call it
10  clipping -- you clipped this photograph and then
11  posted it on this website and you typed in the words
12  "Support Hezbollah!," correct?
13        MR. SOHN:  Form.
14        THE WITNESS:  Yeah.
15        MR. WHITT:  What?
16        MR. SOHN:  Form.
17  BY MR. WHITT:
18    Q.    Okay.  Don't lose page 12, go back to page
19  12.  There's one other thing I would point out to
20  you.
21        If you look at the typewritten paragraphs
22  underneath the Kazal photograph, it looks like the --
23  maybe the second paragraph, it reference to a hunting
24  and fishing trip, and then it refers to Tarek,
25  T-a-r-e-k, quote "Tony", close quote, Kazal.  Do you

Page 43

1  see that?
2    A.    Uh-huh.
3    Q.    Would that photograph be of Tony Kazal.
4  Does that help refresh your recollection?
5    A.    Probably.
6    Q.    Okay.  Now, if you look a little bit farther
7  down, you'll see a date of "November 8, 2017."  Do
8  you see that?
9    A.    Yeah.
10    Q.    That was yesterday, right?
11    A.    Yes.
12    Q.    Did you post this and type this language and
13  put it on the website yesterday?
14    A.    No.  It's just an automated poster, I guess.
15  It's a plug in on a website.
16    Q.    Okay.  You have to explain that to me.  And
17  before we do, let me explain the reason that I'm
18  asking.
19        Above that, you'll see it says, "Republished
20  by Blog Post promoter."  Do you see that language?
21    A.    Yep.
22    Q.    I'm going to ask you about that.  So -- and
23  then we have a date.  And if you turn to the next
24  page, page 13 of 25 of Exhibit Number 2, you'll see
25  that same language toward the bottom left.

Page 44

1    A.    Uh-huh.
2    Q.    See it?
3    A.    Uh-huh.
4    Q.    You'll see a date of November 7th.
5    A.    Yep.
6    Q.    Turn to page two.  Page 14 of 25 of Exhibit
7  2, you'll see the same language toward the bottom
8  with a date of November 6.
9    A.    Uh-huh.
10    Q.    See that?
11    A.    Uh-huh.
12        MR. WHITT:  Are you getting his response?
13        THE COURT REPORTER:  Yes.
14  BY MR. WHITT:
15    Q.    All right.  So I'm going to ask you a
16  question and, again, not trying to be tricky, I'm
17  just trying to understand.
18        Explain to me -- if counsel will give me
19  that latitude so I don't have to fumble around for
20  ten minutes -- explain to me what the phrase there
21  quote, "Republished by Blog Post Promoter," close
22  quote, what that means?
23    A.    So that's a plug in to a Word Press website.
24  So in order to maintain link authority, domain
25  authority so that you stay up on number one, this app

Page 45

1  is just reposting.  So it's -- it's just an automated
2  process that happens on the back end of a website to
3  maintain link authority.
4    Q.    Okay.  And that link authority -- and you
5  had another phrase that you referred to in your
6  answer -- priority or something?  Domain something?
7  I mean, you're trying to make sure --
8    A.    Domain authority.
9    Q.    You're trying to make sure when somebody
10  types in Adam Kazal, or whatever, that you're going
11  to be one of the first websites that come up,
12  correct?
13        MR. SOHN:  Objection.
14  BY MR. WHITT:
15    Q.    Is that correct?
16    A.    Yes.
17    Q.    Okay.  So if I understand, you weren't --
18  you Matthew Price --
19    A.    Correct.
20    Q.    -- weren't personally --
21    A.    Correct.
22    Q.    -- going in yesterday --
23    A.    Correct.
24    Q.    -- or as set out on page 13 on the 7th or
25  the page 14 on the 6th --

Page 46

1    A.    That's correct.
2    Q.    -- and retyping this stuff in, correct?
3    A.    That's correct.
4    Q.    There's an application that causes this to
5   repost --
6    A.    Correct.
7    Q.    -- this information?
8    A.    Correct.
9    Q.    All right.  Thank you.  I understand that
10  now.  I thought you were busy yesterday typing this
11  stuff in, sir.
12   A.    No.
13   Q.    Okay.  All right.  Now, I'm going direct you
14  to the first page of Exhibit Number 2.  There are
15  eight photographs that appear right on the first
16  page.  Do you see those photographs?
17   A.    Uh-huh.
18   Q.    Okay.  And I believe, if I understand, there
19  are eight Kazal brothers; is that right?
20   A.    That's my understanding.
21   Q.    Okay.  And these are the photographs of the
22  eight Kazal brothers, correct?
23   A.    As far as I know.
24   Q.    Okay.  I'm going to ask you a series of
25  questions about each of these -- each of these

Page 47

1   gentlemen, so I'm going to go through their names.
2         Do you personally know Karl Kazal?
3    A.    No.
4         (A discussion off the record was held.)
5   BY MR. WHITT:
6    Q.    Okay.  I was asking you about the brothers.
7   So I had asked you if you personally know or had ever
8   met Karl Kazal, and your answer was no.
9    A.    Correct.
10   Q.    Next -- same questions for each of these
11  brothers.
12        Same question for Tony Kazal?
13   A.    No, I've never met any of them.
14   Q.    Adam -- I just want to make sure the
15  record's clear -- Adam Kazal?
16   A.    No.
17   Q.    Jimmy Kazal?
18   A.    No.
19   Q.    I don't know how you -- France Dion?
20   A.    No.
21   Q.    Oscar Kazal?
22   A.    No.
23   Q.    Charif Kazal?
24   A.    Nope.
25   Q.    And Abe Kazal?

Page 48

1    A.    No.
2    Q.    Have you ever had any -- any trouble -- let
3   me stop there.
4         Outside of the California lawsuit and
5   outside of us seeking the deposition today, have you
6   ever had any -- any trouble with any of the eight
7   Kazal -- let's refer to them the eight Kazal
8   brothers -- that are shown here on the first page of
9   Exhibit Number 2?
10        MR. SOHN:  Form.
11        THE WITNESS:  Well, there's a stalking
12      lawsuit against them that incorporates myself and
13      Rodric.  So indirectly, yes.
14  BY MR. WHITT:
15   Q.    Okay.  When was that filed, that lawsuit
16  that you're referring to?
17        MR. SOHN:  Form.
18        THE WITNESS:  Steven, do you --
19        MR. SOHN:  No.
20  BY MR. WHITT:
21   Q.    No, no, if you recall.
22   A.    Oh, I don't know.
23   Q.    Let me just stop so counsel doesn't have to
24  object every time.
25        Every one my questions should have tagged on

Page 49

1   to it at the end, and in your mind, if you know.
2    A.    Okay.
3    Q.    It's perfectly acceptable for you to say,
4   you know, "Mr. Whitt, I don't know."
5    A.    Okay.
6    Q.    Okay.
7    A.    I don't know.
8    Q.    "I don't know."  "I don't recall."
9         Okay.  So, you know, if I ask you about a
10  date just like we did with first quarter --
11   A.    Yeah.
12   Q.    -- I'm not trying to nail you down to a day.
13   A.    Yeah, yeah, okay.
14   Q.    So --
15   A.    It's public info.
16   Q.    No, no, no, no.
17   A.    That date's out there.  I just don't know
18  what it is.
19   Q.    I'm just asking because I have a kind of
20  series of follow-up questions --
21   A.    Okay.
22   Q.    -- on that.
23        You said that you set these sites up
24  registered the domains in first quarter 2016 --
25   A.    Uh-huh.

Page 50

1    Q.  -- then along late spring/summer of 2016,
2  you started loading content up on the website.
3        At that point in time, either, you know,
4  first quarter into maybe early summer of 2016, had
5  you had any trouble, any fight, any feud, any -- you
6  know, any problem with any of the eight Kazal
7  brothers?  You personally?
8    A.  I don't believe so.
9    Q.  So the troubles between you and the Kazal
10  brothers have come -- or some of the Kazal brothers
11  have come after these website were set up.  Is that
12  fair to say?
13        MR. SOHN:  Objection.
14        THE WITNESS:  Yes.
15  BY MR. WHITT:
16    Q.  Okay.  Now, I asked you if you had ever met
17  them or really knew them.  I just want to make sure
18  I'm clear.
19        You're not friends with any of the eight
20  Kazal brothers, correct?
21    A.  Correct.
22    Q.  Do you harbor any hatred toward any or all
23  of the eight Kazal brothers?
24    A.  A hatred?  No.
25    Q.  Animosity?  Do you harbor animosity against

Page 51

1  any or all of the eight Kazal brothers?
2    A.  Animosity.  I'd say so.
3    Q.  Okay.  I guess the curiosity to me -- and
4  I'll phrase the question this way:  If you've not
5  ever met any of the eight Kazal brothers, and you've
6  never -- prior to your posting all of this
7  information -- had not ever had any trouble, fight,
8  or feud with any or all the eight Kazal brothers, why
9  did you create these websites and post this content
10  on the internet?
11    A.  Because I saw what they were doing to a good
12  friend of mine; and the stories that existed were
13  very lopsided from their self-published website.
14        So I took articles published from reputable
15  news places, like Sydney Morning Herald and made them
16  accessible.
17    Q.  Okay.  And that good friend of yours would
18  be whom?
19    A.  Rodric David.
20    Q.  Now, I told you a little earlier I was going
21  to get back to this question.  I'm just going to
22  refer to it broadly as the, you know, content that's
23  on each and all of the five websites that we've
24  identified.
25        What, if anything, did you ever do to

Page 52

1  investigate or authenticate any of the information
2  that you have posted on the five websites?
3        MR. SOHN:  Form, asks for a legal
4    conclusion.
5        THE WITNESS:  I just Googled the names and
6    saw existing news articles and reposted them.
7  BY MR. WHITT:
8    Q.  So let's turn back, for example, to page 12
9  of 25.  The photograph that you posted of Tony Kazal
10  where you've typed in "Support Hezbollah!," did that
11  come from a news agency?
12        MR. SOHN:  Objection.
13        THE WITNESS:  The article?
14        MR. SOHN:  I think he already testified that
15    he didn't know where it came from, right?
16        MR. WHITT:  No.  He testified that he got
17    the photograph off of the internet --
18        MR. SOHN:  Okay.
19        MR. WHITT:  -- and that he typed the words,
20    "Support Hezbollah!"
21  BY MR. WHITT:
22    Q.  So the photograph and the "Support
23  Hezbollah!," that didn't come from the Sydney Morning
24  Herald or any other -- to use your term -- reputable
25  news source, correct?

Page 53

1        MR. SOHN:  The photograph or the comment?
2  BY MR. WHITT:
3    Q.  Both, together.
4        MR. SOHN:  Form.
5        THE WITNESS:  Articles, absolutely.  The
6    pictures are from the internet as well.  I don't
7    know if they were with the article or not.
8  BY MR. WHITT:
9    Q.  So -- but the commentary -- if you'll allow
10  me that term -- of "Support Hezbollah!," was yours.
11  You put that on the photograph, correct?
12    A.  Yes.
13    Q.  Let me just circle back for a moment.
14        When we were talking about the initial
15  registration of the domain names and then the renewal
16  in Q1 in 2017, and you testified that you paid for
17  the registration and the renewal of those domain
18  names, do you recall that question and answer?
19    A.  Yes.
20    Q.  Okay.  Do you recall how you made those
21  payments?
22    A.  Credit card.
23    Q.  So you phrased that more of a question than
24  an answer.
25        Did you pay for it by credit card?

Page 54

1     A.   I believe so.
2     Q.   Okay.  So you would have those records
3  available for the credit card payments that were made
4  in first quarter 2016, and the payment or payments
5  that were made in the first quarter 2017 for the
6  renewal, correct?
7          MR. SOHN:  Form.
8          THE WITNESS:  Yes.
9          MR. WHITT:  Why don't we take just a
10  five-minute break?  Sound good?
11         MR. SOHN:  Yeah.
12         (A recess was held at 10:06 a.m. and the
13  foregoing deposition resumed at 10:22 a.m.)
14         MR. WHITT:  Okay.  We're ready to start
15  back.
16         Steven, you back on?
17         MR. GEBELIN:  Yes.
18         MR. WHITT:  Okay.  We're back on the record
19  after a short break.  I'll just remind you you're
20  still under oath to tell the truth, okay?  You
21  understand that?
22         THE WITNESS:  Yes.
23  BY MR. WHITT:
24     Q.   All right.  So right before we broke, you
25  had mentioned, in response to one of the questions I

Page 55

1  asked you, that you had posted these sites because of
2  some things that you felt were unfair about one of
3  yours friends who you identified as Rodric David.
4          So I have some questions for you about
5  Mr. David, okay?
6     A.   Okay.
7     Q.   So if I ask a question and refer to
8  "Mr. David," I'm referring to Rodric David, okay?
9     A.   Okay.
10         MR. SOHN:  Why don't you say "Rodric David"
11  since there are other Davids?
12         MR. WHITT:  Okay.
13         MR. SOHN:  I mean, I'm not telling you how
14  to do it, but it just --
15         MR. WHITT:  Okay.  Well -- but in case I
16  slip and ask the question about Mr. David,
17  just -- I do not know any other Davids, nor do I
18  find any --
19         THE WITNESS:  Okay.
20         MR. WHITT:  -- other Davids to be relevant
21  to, you know, the proceedings and my questions
22  here today.
23         THE WITNESS:  Yeah.
24         MR. WHITT:  So if I refer to, you know,
25  "Mr. David," it's Rodric David.

Page 56

1  BY MR. WHITT:
2     Q.   All right.  So let's go ahead and start on
3  that line of questioning.
4          So you say he's a friend of yours.  How did
5  you and Mr. David meet?
6     A.   Through kids at school, really.  Friends at
7  school, yeah.
8     Q.   Okay.  So this, I assume, would have been
9  when you were living in California?
10     A.   Yes.
11     Q.   Okay.  So you're living in Los Angeles,
12  Mr. David is in Los Angeles, correct?
13     A.   Yes.
14     Q.   And your children went to the same school --
15     A.   Yes.
16     Q.   -- is that right?
17     A.   Yeah.
18     Q.   All right.  And y'all became friends?
19     A.   Uh-huh.
20     Q.   Would you characterize yourself as good
21  friends?
22     A.   Yeah.
23     Q.   Would you characterize your relationship
24  with Mr. Rodric David as being like family?
25         MR. SOHN:  Objection.  I have family I like

Page 57

1  and don't like.  I think that's vague.
2          THE WITNESS:  I -- like family?  I --
3  BY MR. WHITT:
4     Q.   Well, let me ask it this way:  Do you view
5  your relationship with Rodric David where you say,
6  "He's like my brother"?
7          MR. SOHN:  Again, same objection.
8          THE WITNESS:  I've never said that.  He's a
9  good friend.
10  BY MR. WHITT:
11     Q.   Well, how would you characterize your
12  relationship or friendship with Rodric David, if you
13  had to put it into words?
14         MR. SOHN:  I think he just did.  Asked and
15  answered.
16         THE WITNESS:  He's a good friend of mine.
17  BY MR. WHITT:
18     Q.   Okay.  You can answer it.
19     A.   He's a good friend of mine.
20     Q.   Good friend?
21     A.   Yep.
22     Q.   Okay.  When you were living in Los Angeles,
23  did you and Rodric David socialize?
24     A.   Yes.
25     Q.   Tell me a little bit about what you did

Page 58

1   together.
2          MR. SOHN:  Objection.
3          THE WITNESS:  I thought this was about the
4   creation publishing and maintenance --
5   BY MR. WHITT:
6      Q.    It is.
7      A.    -- of websites?
8          My relationship with him should be
9   irrelevant, what we did socially.
10     Q.    Uh-huh.
11         Well, I'll tell you -- I will tell you this:
12  One of the things to maybe kind of help you so you
13  understand the reason for my questions is one of the
14  key -- one of the key things that a factfinder,
15  whether it's a judge or jury would look at is a
16  witness's potential bias.
17         Okay.  So the relationship, the type of
18  relationship, the level of the relationship would go
19  to the issue of bias, okay?  So that's the reason for
20  my question.
21         I'm not going to do a deep dive into this
22  but I believe that it's fair inquiry for us just to
23  try to understand the nature of your friendship and
24  relationship with Mr. David, okay?
25         So that's -- which is a little unusual, but

Page 59

1   I'll go out on a limb and answer, you know, the
2   witness's, you know, kind of question about the
3   relevance and why we believe it's relevant, okay.
4          So just, you know, you have said you guys
5   socialized.  Let me just -- I will ask you a series
6   of questions.
7          MR. SOHN:  Well, counsel he actually -- I
8      mean, he stated that he considers him a good
9      friend --
10         MR. WHITT:  I understand.
11         MR. SOHN:  -- talking about Rodric David.  I
12     mean -- go ahead --
13         MR. WHITT:  I understand.
14         MR. SOHN:  -- and ask your question, but I
15     do think a limited amount of latitude is
16     appropriate here.
17  BY MR. WHITT:
18     Q.    Okay.  How often would you socialize?
19     A.    Can you define "socialize"?
20     Q.    Go out to dinner, go out to lunch together
21  go out for beers after work, go to sporting events,
22  go to a concert, go to one's home, you know.
23         And just however you feel most comfortable
24  in trying to, you know, to identify what that may
25  look like.  Once a week or, you know, a few times,

Page 60

1   whatever that may be.
2      A.    Occasionally.
3      Q.    Okay.  Have you been to Rodric David's home?
4      A.    Yes.
5      Q.    How many times?
6          MR. SOHN:  Objection.
7          THE WITNESS:  I'm not sure.
8   BY MR. WHITT:
9      Q.    Since you've moved to Florida, have you and
10  Mr. David stayed in contact?
11     A.    Yes.
12     Q.    How would you characterize that contact?
13  Close contact?
14         MR. SOHN:  Form.  I don't know how that's
15     relevant, actually.  I don't think --
16         THE WITNESS:  We talk to each other.
17  BY MR. WHITT:
18     Q.    How often do you and Mr. David talk, or
19  text, or communicate with each other through the
20  week?
21     A.    A couple times.
22     Q.    Were your wives' friends?
23     A.    Yes.
24     Q.    When you received the subpoena in this case,
25  did you let Mr. David know?

Page 61

1          MR. SOHN:  Don't answer that.
2          MR. WHITT:  Are you asserting a privilege?
3          MR. SOHN:  Yes.
4          MR. WHITT:  What privilege would that be?
5          MR. SOHN:  I'm asserting multiple layers of
6      privilege.  Again, common interest,
7      attorney-client.
8          MR. WHITT:  Well, I'm not asking for any
9      communications with any attorneys.
10  BY MR. WHITT:
11     Q.    Did you communicate directly with Rodric
12  David when you got served with the subpoena for
13  appearing for this deposition today?
14         MR. SOHN:  Don't answer.
15         MR. WHITT:  Okay.  Well, list any
16     privileges; and certify it.
17         MR. SOHN:  I just did.
18         MR. WHITT:  So attorney-client and common
19     interest?
20         MR. SOHN:  Attorney-client, common interest.
21  BY MR. WHITT:
22     Q.    Okay.  All right.  So let's go back to the
23  time frame when you were in California and you met
24  Rodric David through your kids attending the same
25  school.

Page 62

```
1            And at some point, did you have -- well, did
2   you -- did you develop a working relationship with
3   Rodric David?
4       A.   Yes.
5       Q.   And how did that get started?
6       A.   Talking about IT work.
7       Q.   And -- well, let's try to put this in a time
8   frame, okay, kind of like box this in.
9            When did you first meet Rodric David and
10  you-all get to be friends?
11      A.   I met him shortly after he moved to the
12  United States.  I don't remember what the date is,
13  but I'm sure it's public information.
14      Q.   I have no idea.  Can you help me with a year
15  when you guys would have met?
16      A.   2012 or 2013.
17      Q.   Okay.  All right.  And, at some point, you
18  developed a working relationship with Mr. David, with
19  Rodric David, or his company Thunder Studios, right?
20      A.   Yeah.
21      Q.   Did you ever become an employee of Thunder
22  Studios?
23      A.   We've already discussed this.
24      Q.   Well, I'm now going to try to get into this
25  in more -- in more detail.  Well, let me ask you
```

Page 63

```
1   this, okay, and I'll just cut to the chase.
2            As I understand it, you had a company when
3   you were in California called United Technology
4   Group, correct?
5       A.   Uh-huh.
6       Q.   Yes?
7       A.   Yes.
8       Q.   All right.  Do you still have that
9   corporation?  Is it still active?
10      A.   It's being dissolved.
11      Q.   All right.  So through United Technology
12  Group, did you have any type of working relationship
13  with Rodric David or Thunder Studios?
14      A.   I maintained some of their systems, yes.
15      Q.   When you say "their systems," you're
16  referring to Thunder Studios?
17      A.   Yeah.
18      Q.   United Technology Group, you basically owned
19  and controlled the company?
20      A.   Yes.
21      Q.   Did the company have any other employees?
22      A.   Yes.
23      Q.   How many?
24      A.   At what point.
25      Q.   Well, let's talk 2013.  I'm going to talk
```

Page 64

```
1   about the time frame now --
2       A.   Two or three.
3       Q.   -- of -- okay.
4            When you met Mr. David and when you
5   developed then working relationship with United
6   Technology Group, and we're going to get into, then,
7   when you actually went to work for Thunder Studios,
8   okay?  So that's where we're going.
9       A.   Okay.
10      Q.   I'm just trying to walk down that path --
11      A.   Okay.
12      Q.   -- and find out when the relationship got
13  started, what you did, all of that stuff, okay?
14      A.   Sure.
15      Q.   So no secrets here.  So that's where we're
16  headed.
17           Okay.  So you had two or three employees.
18  Was one of those employees Ryan Wells?
19      A.   Not at that time.
20      Q.   When did Ryan Wells join United Technology
21  Group?
22      A.   I believe 2016.
23      Q.   And let's just talk about him for a minute.
24           When he worked for United Technology Group,
25  what was his role?
```

Page 65

```
1       A.   Senior engineer and -- yeah.
2       Q.   What were his duties?
3       A.   Fulfill ticket requests as they come in,
4   maintain system alerts.
5       Q.   So what type of business in this time frame,
6   2013 to let's say -- well, maybe until you came here,
7   you know, early 2017 or mid-2017 -- what type of
8   business is United Technology Group?
9       A.   Outsourced IT.
10      Q.   All right.  Is Ryan Wells in any way related
11  to you?
12      A.   No.
13      Q.   Do you know where Ryan Wells lives now?  Is
14  he still in California?
15      A.   Yes.
16      Q.   Do you stay in touch with him?
17      A.   Occasionally.
18      Q.   Do you know if he still does work for
19  Thunder Studios or Rodric David?
20      A.   He does not, that I'm aware of.
21      Q.   Okay.  So United Technology Group, is that
22  how the first working relationship between you and
23  Mr. David got started?
24      A.   That's where I was working.  But, yeah, we
25  never contractually had an agreement to do work
```

Case 8:17-cv-02045-SDM-AAS   Document 112-17   Filed 11/07/17   Page 35 of 91   PageID 683

Page 66

1  through the company.  But I maintained some of their
2  systems.
3          I helped him out, he helped me out --
4      Q.    Okay.
5      A.    -- how about that?
6      Q.    Okay.  So just to make sure I understand, so
7  the way I understand your answer to that last
8  question is even though you had United Technology
9  Group, his company, you, personally, Matthew Price,
10 would help out your friend, Mr. David, and would
11 maintain some of the systems at Thunder Studios; is
12 that correct?
13         MR. SOHN:  Objection, mischaracterizes prior
14 testimony.
15 BY MR. WHITT:
16     Q.    You can answer.  I'm not trying to
17 mischaracterize, I'm trying to understand it.
18         Is that accurate?
19     A.    Yeah.
20     Q.    Okay.  So you didn't have any formal
21 contractual relationship --
22     A.    Correct.
23     Q.    -- United Technology Group for the sum of X
24 dollars?

Page 67

1      A.    Correct.
2      Q.    Is going to do this outsourced IT work for
3  Thunder Studios, right?
4      A.    Correct.
5      Q.    All right.  So it was a little more
6  informal --
7      A.    Uh-huh.
8      Q.    -- right?
9          Just kind of, you know, a business deal --
10     A.    Uh-huh.
11     Q.    -- between friends.  Is that fair?
12         MR. SOHN:  Form.
13         THE WITNESS:  Uh-huh.  Sure.
14 BY MR. WHITT:
15     Q.    All right.  And how long did that go on --
16 I'm going to just call it the informal work
17 relationship -- before you started work for Thunder
18 Studios?
19     A.    Maybe a year, year and a half.
20     Q.    So you went to work for Thunder Studios in
21 maybe mid-2014?
22     A.    No, '15, I believe.
23     Q.    Okay.  All right.  So sometime in 2015 you
24 go to work for Thunder Studios.
25         What was your -- your title, if you had a

Page 68

1  title?
2      A.    Chief technology officer.
3      Q.    Okay.  And who did you report to?
4      A.    Rodric David.
5      Q.    Did Thunder Studios have other -- did they
6  have other employees other than you?
7          MR. SOHN:  Yeah, calls for speculation.
8  Answer if you know.
9          THE WITNESS:  Yeah.
10 BY MR. WHITT:
11     Q.    How big of a company was it?  How many
12 employees, roughly, did they have?
13     A.    Twenty -- fifteen, twenty.
14     Q.    Okay.
15     A.    I don't know.  It fluctuates.
16     Q.    Okay.  So you were hired by Rodric David and
17 reported to Rodric David --
18     A.    Yes.
19     Q.    -- as the chief technology officer?
20     A.    Yes.
21     Q.    What was his title or role with Thunder
22 Studios?
23     A.    CEO.
24         MR. SOHN:  Form.
25 BY MR. WHITT:

Page 69

1      Q.    Did you have an employment agreement with
2  Thunder Studios?
3      A.    I believe so, yeah.
4      Q.    Okay.  So a written employment contract?
5      A.    I believe so, yeah.
6      Q.    Do you have a copy of that employment
7  contract still?
8      A.    I doubt it.
9      Q.    Do you have it maintained on your computer?
10         MR. SOHN:  Asked and answered.
11         THE WITNESS:  I -- no.
12 BY MR. WHITT:
13     Q.    Well, I wanted to make clear so you didn't
14 think I was just narrowing it down to a paper copy.
15     A.    Oh.
16     Q.    I would think a chief technology officer's
17 probably going to go as paperless as he can.
18         Okay.  So you don't believe you have a copy
19 of that maintained either anywhere on a computer or
20 in a file anywhere or anything, correct?
21     A.    I may have a paper company, actually, at
22 Thunder but I --
23     Q.    You don't have it here in Florida?
24     A.    -- don't have my files here.
25         No.

Page 70

1    Q.   Do you recall, in that contract, if -- if it
2  had a confidentiality provision in there?
3    A.   I have no idea.
4    Q.   To your understanding, as you sit here
5  today, are you under any type of confidentiality
6  restriction that would prevent you from, you know,
7  testifying about Thunder Studios and your work at
8  Thunder Studios?
9         MR. SOHN:  Objection -- well, you're
10  asking -- that's fine.
11        MR. WHITT:  If you --
12        MR. SOHN:  Go ahead.  Go ahead.
13        MR. WHITT:  If you know.
14        MR. SOHN:  Go ahead.  If you know.
15        THE WITNESS:  That's a good question.  I
16  would have to look at that contract.  I'm not
17  sure.
18  BY MR. WHITT:
19    Q.   Okay.
20    A.   I mean, I know it -- I couldn't discuss
21  trade secrets like any company, but I'm not there, I
22  don't know what the time frame.  I'm not sure.  I'd
23  have to find that out.  Would be good to know,
24  actually.
25    Q.   All right.  As chief technology officer at

Page 71

1  Thunder Studios, what were your duties?
2    A.   Developing a strategy for streaming
3  programming globally.
4    Q.   That kind of begs a question about, then,
5  Thunder Studios and what that company did that would
6  then tie into what your role and duties were at the
7  company.  So do you understand my question?
8         What was the business of Thunder Studios
9  that would require those types of services from you?
10    A.   It was -- I don't know if it was a separate
11  company, but Thunder TV was the maybe sub-company or
12  the establishment of streaming content globally.
13        So contents made at Thunder -- Thunder TV is
14  the distribution network or company behind it.
15    Q.   Okay.  All right.  How about internet sites,
16  web design anything like that?  Was that part of what
17  your duties were, your role with Thunder Studios?
18  Were you involved in that type of work?
19        MR. SOHN:  Objection.
20        THE WITNESS:  Somewhat.
21  BY MR. WHITT:
22    Q.   Okay.
23    A.   I oversaw it.  It all wrapped up under me,
24  yes.
25    Q.   And how long did you work for Thunder

Page 72

1  Studios?  When did you leave the employ of Thunder
2  Studios?
3    A.   June.
4    Q.   Of this year?
5    A.   Yep.
6    Q.   And we talked earlier -- I'm not trying to
7  pry, just I think it's important, you know, for the
8  record.
9         You left Thunder Studios, you moved to
10  Florida right?
11    A.   Yes.
12    Q.   You moved to this area, Land O'Lakes?
13    A.   Yes.
14    Q.   New port Richey area?
15    A.   Yep.
16    Q.   And your father was ill, as I understand it,
17  correct?
18    A.   Correct.
19    Q.   And you had come to Florida to take care of
20  your father --
21    A.   Right.
22    Q.   -- who has since passed?
23    A.   Correct.
24    Q.   Now, I'm going to circle back.  I'm going to
25  kind of ask you questions about the five websites.

Page 73

1  So -- and those were the ones that were listed on
2  Exhibit 1 to your deposition.
3    A.   So back to what we're here for.
4    Q.   Back to -- well, it's all about what we're
5  here for.
6         But the five websites, did you do any work,
7  any design, any posting of information, anything like
8  that on the five websites while you were at Thunder
9  Studios?  In other words, through Thunder Studios, on
10  Thunder Studios' computers, on their computers, et
11  cetera?
12        MR. SOHN:  Vague, ambiguous.
13        THE WITNESS:  I don't believe so.  Never had
14  a Thunder computer.
15  BY MR. WHITT:
16    Q.   That's an interesting question -- that's an
17  interesting question.  I didn't think about it.
18        Okay.  So when you were -- yeah -- United
19  Technology Group, then you went to work as CTO for
20  Thunder Studios, just to make sure I understand, they
21  didn't provide you with a company laptop or anything
22  like that to work on as chief technology officer?
23    A.   I had my own.
24    Q.   So any work-related email or any
25  work-related stuff that you were doing on the

Page 74

1 internet site or for streaming, any of that stuff,
2 everything that you were doing work-related for
3 Thunder Studios you were doing on your personal
4 computer, correct?
5          MR. SOHN:  Well, objection, vague and also
6     compound.  I think you've got to break that out.
7     It's pretty broad.
8          MR. WHITT:  Well, let him answer first and
9     then I'll break it down.
10         MR. SOHN:  Same objection.
11         THE WITNESS:  Most of the work I do is
12    servers that they owned.  So the work for Thunder
13    on servers, they owned.  The computer that I
14    worked off was mine.
15 BY MR. WHITT:
16    Q.   Okay.  So -- all right.  They should have
17 sent someone with more of a technology background to
18 asks questions of a CTO.
19         Okay.  As I understand it, then, you had
20 your laptop computer and you were -- the work you
21 were using, that was the tool to access the servers
22 that were owned and maintained by Thunder Studios; is
23 that correct?
24    A.   Yeah.
25    Q.   So were you -- were you putting any content

Page 75

1 on -- for Thunder Studios and doing work for Thunder
2 Studios on -- I don't know the best way to ask it --
3 on your personal computer?  In other words, were you
4 doing Thunder Studios business on your personal
5 laptop?
6          MR. SOHN:  Objection.
7          THE WITNESS:  No.
8 BY MR. WHITT:
9    Q.   So just so we can nail this down, you had
10 testified earlier, but it was before we got into all
11 of the questions about your involvement with
12 Mr. David and the UTG work and then you ultimately
13 coming to work for them, the five websites was any of
14 that directed by Thunder Studios?  Any of the
15 content, any of the -- let me break that down into
16 questions.
17         The registering of the five domain names
18 that we see here on Exhibit 1, was that directed by
19 Rodric David?
20    A.   No.
21    Q.   Obtaining the five websites that are on
22 Exhibit 1, was that in any way directed for you to do
23 that by Thunder Studios?
24    A.   No.
25    Q.   The posting of the content on any of the

Page 76

1 five websites, was that requested of you or were you
2 directed by Rodric David to do that?
3    A.   No.
4    Q.   And the same question for Thunder Studios?
5    A.   No.
6    Q.   When you registered the five domain names,
7 and then in late spring earlier summer of 2016 you
8 put the content up there, did you make Rodric David
9 aware of what you had done?
10    A.   No.
11    Q.   Did you tell anyone else at Thunder Studios
12 that you had done this?
13         MR. SOHN:  Objection, mischaracterizes the
14    testimony.  He just said -- you said anyone else.
15         MR. WHITT:  Well, I thought we'd identified
16    that Rodric David --
17         MR. SOHN:  Well, I suppose anybody else
18    excluding --
19         MR. WHITT:  -- is CEO.
20 BY MR. WHITT:
21    Q.   Yeah.  Anyone other Rodric David.
22         Did you tell anyone else at Thunder Studios,
23 other than Rodric David, that you had done this?
24    A.   I don't believe so.
25    Q.   So did anybody know that you had done this

Page 77

1 or did you keep it secrete?
2          MR. SOHN:  Objection.
3 BY MR. WHITT:
4    Q.   Let me define "this".
5          Did anybody know that you had registered
6 these five domain names and had put this content up,
7 or did you keep it secret?
8    A.   Not that --
9          MR. SOHN:  Objection.
10         THE WITNESS:  Not that I'm aware of.
11 BY MR. WHITT:
12    Q.   Just so we can drive the nails:  Did you
13 ever receive any compensation from Rodric David
14 compensating you for registering these names and
15 putting these websites up on the internet?
16    A.   No.
17    Q.   Did you ever receive any compensation from
18 Thunder Studios for registering these names or
19 putting the content up on the internet related to
20 these five website?
21    A.   No.
22    Q.   So you've not been paid --
23    A.   Nope.
24    Q.   -- in any way for getting the names or
25 putting the stuff up on the internet, correct?

Page 78

1    A.    Correct.
2         MR. WHITT:  I'm going to show you a document
3    marked as Exhibit 3.
4         (Plaintiff's Exhibit No. 3 was marked for
5    identification.)
6    BY MR. WHITT:
7    Q.    You mentioned before a company called
8    DreamHost, and I think you called them a -- what was
9    it?  A domain --
10   A.    Registrar.
11   Q.    -- registrar?
12   A.    Yep.
13   Q.    So you have Exhibit 3 before you.  Have you
14   seen that document before?
15   A.    I don't believe I have.
16   Q.    DreamHost is the registrar.  Do they call
17   that like -- I guess it's called DreamHost.  Do they
18   call that like the host, the hosting company or the
19   host?
20   A.    Uh-huh.
21   Q.    Okay.
22   A.    They call it a registrar and a hosting --
23   which is also a hosting company.
24   Q.    Okay.  All right.  So it shows it has your
25   name and has an address there, an Olympic Boulevard

Page 79

1    address there.  Do you recognize that address?
2    A.    I sure do.
3    Q.    Okay.  And what address is that?
4    A.    My old office, one of them.
5    Q.    Okay.  So that is your old office at Thunder
6    Studios?
7    A.    No.  That's United Technology Group --
8    Q.    Okay.
9    A.    -- in Santa Monica.
10   Q.    Okay.  So the 3019 Olympic is the former
11   address for United Technology Group?
12   A.    One of them, yes.
13   Q.    Okay.  How many offices did United
14   Technology Group have?
15   A.    I think we have three addresses, maybe four.
16   Q.    All right.  Did you have actual, physical
17   offices?
18   A.    No.  I was in a building that we moved
19   around in that gave you a new address when you did
20   so.
21   Q.    Oh.
22   A.    Then we moved the office, then we moved it,
23   finally, in its last place into Thunder Studios,
24   which is that address you see at the bottom.
25   Q.    Okay.  Yeah, I was going to ask you about

Page 80

1    that.
2    A.    You got that?
3    Q.    Now, this shows -- I understand this
4    document from DreamHost, where it shows your name,
5    organization, the address, et cetera, that -- that
6    you would be the owner of the domain names that are
7    listed.
8    A.    Correct.
9    Q.    CharifKazal.com, TonyKazal.com,
10   KarlKazal.com, AdamKazal.com and
11   KazalFamilyTruth.com, correct?
12   A.    Correct.
13   Q.    All right.  And I think you've admitted
14   you're the owner -- you, personally, Matthew Price,
15   are the owner of those five domain names, right?
16   A.    It says it right there (indicating).
17   Q.    Okay.  Well, I'm just making sure that I
18   understand what this document purports to be, right?
19   A.    Yes.
20        MR. SOHN:  Objection.
21   BY MR. WHITT:
22   Q.    Well, look, in fairness you didn't prepare
23   it --
24   A.    This is not my document.
25   Q.    I'm --

Page 81

1    A.    So --
2    Q.    Right, right.  That's what I'm --
3    A.    So, I'm --
4    Q.    That's what I'm trying --
5    A.    I'm assuming that's --
6    Q.    I'm trying to make sure I understand it
7    correctly and don't mischaracterize it.
8    A.    Okay.
9    Q.    Okay.  That's they way you understand it as
10   it's showing you as the owner of those five --
11   A.    Yep.
12   Q.    -- five domain names, right?
13   A.    Yeah.
14   Q.    All right.  Now, it was has down here
15   DreamHost account contact info and it has Mr. Ryan
16   Wells with an address and email, you see that?
17   A.    Uh-huh.
18   Q.    Okay.  And I think you said Santa Fe Avenue,
19   Long Beach, California, that's Thunder Studios --
20   A.    Main address, yeah.
21   Q.    -- address?
22   A.    Okay.  Why Ryan Wells as the account
23   contact?
24   A.    So when you register a domain, you have
25   three contacts:  You have an administrative contact,

Page 82

1  you have a technical contact and you have -- what's
2  the third -- a third contact.  He is listed as my
3  technical contact --
4      Q.   Okay.
5      A.   -- which is why he's in here.
6      Q.   Okay.  But if I understand correctly, he had
7  nothing to do with registering it, right?
8      A.   Correct.
9      Q.   Paying for it --
10     A.   Correct.
11     Q.   -- right?
12          Or putting any of the content up --
13     A.   Right.
14     Q.   -- right?
15     A.   Yep.
16     Q.   Did he know that he had been listed as the
17 technical contact?
18     A.   Yeah.  I mean, I have tons of domains that
19 he is aware of.
20     Q.   Well, was he aware of these?
21     A.   No.
22          MR. SOHN:  Form.
23          THE WITNESS:  No.
24 BY MR. WHITT:
25     Q.   Okay.

Page 83

1      A.   No.  He was managing my client.
2      Q.   Okay.  That's fair enough.  I'm just -- you
3  had said that before.  I'm just trying to make sure
4  now --
5      A.   Yeah.
6      Q.   -- based on seeing this document --
7      A.   Yep.
8      Q.   -- if it helped refresh your memory --
9      A.   Nope.
10     Q.   -- hey, you know what, Mr. Whitt, I did tell
11 Ryan about this because I have him listed as the
12 technical contact on it.
13     A.   No.
14     Q.   So even though -- okay.  And you said no, so
15 I think I understand the answer to that
16 poorly-phrased question.
17     A.   Yep.
18     Q.   But just to make sure I get it:
19 Notwithstanding that his name shown on Exhibit 3, you
20 do not recall having any conversations with Ryan
21 Wells or telling him about the registration --
22     A.   No.
23     Q.   -- of these domain names?
24          MR. WHITT:  Okay.  You got that answer?
25          THE COURT REPORTER:  Yes.

Page 84

1  BY MR. WHITT:
2      Q.   Do you know a gentleman named David Singh?
3  I think it's S-i-n-g-h.
4      A.   No.
5      Q.   Have you ever heard the name?
6      A.   Yes.
7      Q.   Okay.  Who do you know him to be?
8      A.   A defendant in a lawsuit.  I don't know -- I
9  don't know the guy.
10     Q.   Okay.  You've never met him?
11     A.   No.
12     Q.   Have no -- did he ever --
13     A.   Couldn't even tell you what he looks like.
14     Q.   Okay.  I can probably eliminate this with
15 one or two questions.
16          Did he have any involvement whatsoever in
17 your registering the five domain names or putting the
18 content up in the five websites?
19     A.   No.
20     Q.   He didn't direct you to do that?
21     A.   No.
22     Q.   You never talked to him or told him you were
23 doing it?
24     A.   Never.
25     Q.   All right.

Page 85

1      A.   I heard he had a hell of a protest in
2  Australia, though.  You should read all about it.
3      Q.   I'll have to do that.
4          We have talked about another lawsuit.  That
5  lawsuit arose in California, correct, the lawsuit
6  that you're referring to?
7          MR. SOHN:  Objection.
8  BY MR. WHITT:
9      Q.   Let me make it -- let me make it clear:  You
10 were sued in a lawsuit in California, correct?
11     A.   That's my understanding.  I've never been
12 served.
13     Q.   Okay.  Do you know if Rodric David got
14 served with the lawsuit filed by Charif Kazal in
15 California?
16     A.   You'd have to ask him.
17     Q.   Well, he was asked, and he recounted a
18 conversation that he had with you when he got served
19 with that lawsuit.
20          Do you recall having a conversation with
21 Rodric David where he came to you and told you he had
22 been served with a lawsuit about these five websites?
23     A.   Oh, yes.
24     Q.   Okay.  Was anybody else present for that
25 conversation or was it just you and Rodric David?

Page 86

1     A.    I believe it was just us.
2     Q.    And do you recall that the conversation
3  started with him advising you that he had been served
4  with the lawsuit about the five websites?
5           MR. SOHN:  Objection.
6           THE WITNESS:  I believe so, yeah.
7  BY MR. WHITT:
8     Q.    And what did you discuss in that
9  conversation initially with Rodric David?
10          MR. SOHN:  Can we go off the record for one
11  second?
12          THE COURT REPORTER:  Counsel?
13          MR. WHITT:  Sure.
14          (A recess was held at 10:59 a.m. and the
15          foregoing deposition resumed at 11:01 a.m.)
16  BY MR. WHITT:
17    Q.    Okay.  Yeah.  My question is focused on a
18  conversation that took place --
19    A.    Yeah.
20    Q.    -- between you and Rodric David when he got
21  served with a lawsuit relating to the five website
22  that was filed out in California.
23    A.    Yep.
24    Q.    Okay.  You recall that the conversation took
25  place?

Page 87

1     A.    If I recall correctly, it was, "I got served
2  about these websites.  I don't want to know anything
3  about it."  And that was it.
4     Q.    And did you tell him anything about it?
5     A.    No.
6     Q.    So even after the lawsuit was filed, just to
7  be clear, you had no -- no further communications and
8  relayed no information to Rodric David about the five
9  website, correct?
10    A.    No.
11    Q.    Is that correct?  Your answer is no, you did
12  not or no, my question's not correct?
13    A.    Oh, that's correct.
14    Q.    Gotcha.
15          THE WITNESS:  You can read all about my role
16  in number seven.
17          MR. WHITT:  I don't know what you're
18  referring to.
19          THE WITNESS:  Oh, okay.
20          MR. SOHN:  These long silences sometimes
21  mean we're close to being done.
22          THE WITNESS:  I'm a Type 1 diabetic and I
23  need to eat before too long.
24          MR. WHITT:  We should be finished up pretty
25  quickly I would think.

Page 88

1          (A discussion off the record was held.)
2  BY MR. WHITT:
3     Q.    Have you had any conversations at any time
4  with Rodric David about the Kazal -- any of the eight
5  Kazal brothers?
6     A.    Sure.
7     Q.    Okay.  How many conversations do you think
8  you've had?
9     A.    Not many.
10    Q.    Okay.  I'm not going to ask you about any --
11  so your attorneys don't get nervous -- I'm not going
12  to ask you about any questions about any
13  conversations that you had with him, were there any
14  attorneys present or, you know, anything like that.
15          Okay.  Did he ever discuss with you his
16  business dealings with the Kazal?
17    A.    I don't believe so.  Yeah.  I read about it
18  all online.
19    Q.    Okay.  Well, I'm interested in conversations
20  that you and Rodric David had about any of the
21  Kazal -- any of the eight Kazal brothers.
22    A.    So -- I'm sorry.  I thought we were here --
23          THE WITNESS:  Steven, is this right?
24    A.    -- for the creation, publishing, an
25  maintenance of the website.  That has nothing to do

Page 89

1  with it.
2     Q.    That's not the sole limitation.  We wanted
3  documents related to that.
4          MR. SOHN:  Which don't exist.
5          MR. GEBELIN:  Is this connected to some sort
6  of proceeding in Australia?
7          MR. WHITT:  I'm sorry?
8          MR. GEBELIN:  So the connection here is what
9  to this proceeding in Australia?
10          MR. WHITT:  The question is whether he had
11  conversations with Rodric David about the Kazals.
12  He has answered that he has had conversations
13  with Rodric David about the Kazals.
14          MR. GEBELIN:  Okay.
15          MR. WHITT:  So my questions are going to be
16  what the conversations were and when they took
17  place and what he told you.
18          MR. GEBELIN:  And how do those conversations
19  have anything to do with Adam Kazal's contempt of
20  court?
21          MR. WHITT:  Are you lodging an objection?
22          MR. GEBELIN:  I'm asking a question.
23          MR. WHITT:  Okay.  We'll you're not part of
24  the proceeding, Mr. Gebelin.  You're listening --
25  you're listening in.  So I'm not --

Page 90

1      MR. GEBELIN:  Right.  And I --
2      MR. WHITT:  So, no, I'm not responding to
3  you.  If you want hang on --
4      MR. SOHN:  No, no.
5      MR. WHITT:  -- and be quiet --
6      MR. SOHN:  We understand you object, but the
7  bottom line --
8      MR. WHITT:  I'm in mid sentence.
9      MR. SOHN:  The bottom --
10     MR. WHITT:  I'm in mid sentence.  I'm in mid
11 sentence.
12     MR. SOHN:  No, you concluded a sentence.
13     MR. WHITT:  No, I didn't.
14     THE COURT REPORTER:  Counsels, I can only
15 take one at a time.
16     MR. SOHN:  I think we're more than happy to
17 give you a little bit of latitude here as I have
18 tried to do.
19     But I do think the question becomes, at this
20 time, what connection or nexus does this have to
21 any proceeding that's going to on in Australia
22 that justifies the ex parte motion --
23     MR. GEBELIN:  That we still don't have.
24     THE COURT REPORTER:  What was that, sir?
25     MR. SOHN:  That we still don't have.

Page 91

1      MR. WHITT:  Okay.  I'm not answering
2  Mr. Gebelin's questions.
3      Mr. Gebelin, you're --
4      MR. SOHN:  He didn't ask it.  The question
5  was posed by me.
6      MR. WHITT:  Okay.  Well, I'm not answering
7  your questions.  I'm asking the witness
8  questions.  If you have objections that you would
9  like to make, you can make objections.
10     If you desire to instruct the witness not to
11 answer questions, you can certainly do that and
12 then we'll take it up with a magistrate judge,
13 okay?  So I appreciate, you know, your
14 communication.
15     Me asking questions of Mr. Price related to
16 conversations that Rodric David or that he had
17 with Rodric David about the Kazal brothers, I
18 believe, is very relevant.  I don't know what
19 he's going to tell me.
20     MR. SOHN:  Well, he's just told you he had
21 very few and basically --
22     MR. WHITT:  No, he didn't --
23     MR. SOHN:  He didn't really --
24     MR. WHITT:  No, he didn't --
25     MR. SOHN:  -- remember them anyway.  His

Page 92

1  testimony already establishes that.
2      THE WITNESS:  Seriously, that's not a --
3      MR. WHITT:  I'm not arguing.  I'm not
4  arguing.
5      MR. SOHN:  Take a little bit latitude, but
6  pretty quickly we're going to shut this down on
7  that end.
8      MR. WHITT:  You do whatever you want to do.
9  You don't control my quote "latitude" on
10 questions.
11     MR. GEBELIN:  No --
12     MR. WHITT:  The rules of procedure will and
13 a magistrate judge, if need, will guide that
14 question.
15     MR. GEBELIN:  And that's what we'll do if we
16 need to.  We're trying to work with you in a
17 friendly manner about this.
18     MR. WHITT:  That's fine.  I'm trying to, you
19 know, work with you in a friendly manner.  He has
20 not said that he didn't remember or it's only a
21 few.
22     THE WITNESS:  I did say it was a few.
23     MR. WHITT:  Okay.  All right.  I'm going to
24 ask you about those conversations that you had
25 with Rodric David about the Kazals, when they

Page 93

1  took place, and what was discussed about the
2  Kazals.
3      That may lead to further questions, it may
4  wrap it up in about three or four questions and
5  answers, okay?  But until I get there, I don't
6  know.
7      MR. SOHN:  Can we go off for one second?
8      MR. WHITT:  Sure.
9      MR. SOHN:  Why don't I just --
10     MR. WHITT:  Talk to Mr. Gebelin again.
11 That's fine.  We'll go off the record.
12     (A recess was held at 11:10 a.m. and the
13 foregoing deposition resumed at 11:12 a.m.)
14     MR. SOHN:  Okay.  Let's go back on.
15     We're not going to instruct the witness --
16 I'm not going to instruct the witness not to
17 answer questions that have a direct nexus to the
18 website.  But I'd ask the questions be focused
19 there as opposed to more general conversations.
20     MR. WHITT:  Okay.  And I understand that.
21 My intent is to try to stay focused on this
22 topic.  But until I know what the witness tells
23 me, I don't know.  Part of taking a deposition --
24     MR. SOHN:  That's always the argument,
25 right?

Page 94

1     MR. WHITT:  -- yeah -- is you find out
2  things, okay?
3     MR. SOHN:  Sure.
4     MR. WHITT:  And things that come when
5  witness's answer questions.  Another joke:  Funny
6  how that happens in depositions.
7     Okay.  So, again, I've tried all day to be
8  clear and tell you the path where I'm going,
9  okay?  I'm not trying to, you know -- to, you
10 know, obfuscate anything, or mischaracterize
11 anything, or, you know, anything of that nature.
12 I'm trying to be very direct and forthright with
13 you in my questions.
14    MR. SOHN:  No, no.  And we let you go as far
15 as asking about --
16    MR. WHITT:  And it depends on -- and it
17 depends on your answers.  Like I say, it could be
18 extremely narrow or it may lead to something that
19 I feel I may need to probe.
20    Let's just get there so we can try to finish
21 up for Mr. Price.  We're approaching the finish
22 line here, okay.
23    MR. SOHN:  We didn't object to a question
24 about the wives' friendships, so we're giving you
25 some latitude.

Page 95

1     MR. WHITT:  That's fine.
2     MR. SOHN:  Okay.
3     MR. WHITT:  And I think that helps define
4  the nature of the relationship.
5  BY MR. WHITT:
6     Q.   Okay.  So you say there were a few
7  conversations between you and Rodric David about the
8  Kazal brothers.
9     So my question to you is if you can tell me
10 when those conversations took place --
11    A.   No idea.
12    Q.   -- and -- and --
13    A.   I don't recall.
14    Q.   Okay.  And what the topics of conversations
15 would have been that Rodric David would have had with
16 you concerning the Kazals?
17    MR. SOHN:  That's highly speculative,
18 foundation.
19    THE WITNESS:  A bad business deal.
20 BY MR. WHITT:
21    Q.   I'm sorry.  I didn't hear your answer.
22    A.   A bad business deal.
23    Q.   Okay.  Did you have any conversations with
24 Mr. Kazal (sic) about your -- excuse me -- with
25 Mr. David, Rodric David, about your feeling,

Page 96

1  Mr. Price, that he was being treated unfairly by the
2  Kazals?
3     A.   I may have mentioned that to Rodric.
4     Q.   If I recall correctly, in response to one of
5  my questions, you know, quite a while ago as to why
6  you set up the domain names and posted all of this,
7  you said that you felt that a friend of yours was
8  being treated unfairly --
9     A.   Uh-huh.
10    Q.   -- by them and you wanted to respond to
11 that.
12    A.   Uh-huh.
13    Q.   Is that close enough?
14    A.   Yeah.
15    Q.   Okay.  So with that in mind, did you have
16 that type of conversation with Rodric David about the
17 Kazals?
18    A.   I don't recall.
19    Q.   Did you ever intimate, hint around to
20 Mr. David, Rodric David, that you personally were
21 going to try to do something maybe to make things
22 right --
23    A.   No.
24    MR. SOHN:  Foundation.
25 BY MR. WHITT:

Page 97

1     Q.   -- between him and the Kazals?
2     A.   No.
3     MR. SOHN:  Foundation.
4  BY MR. WHITT:
5     Q.   Okay.  Well, the foundation would be based
6  on your feeling that you felt he was being unfairly.
7     MR. SOHN:  About a hypothetical conversation
8  he doesn't recall and can't put a date on.
9  BY MR. WHITT:
10    Q.   Okay.  So your answer's no?
11    MR. SOHN:  No, his answer --
12    MR. WHITT:  Counsel, my gosh --
13    MR. SOHN:  -- is what he answers.
14    MR. WHITT:  Okay.  Look --
15    THE WITNESS:  I don't recall.
16    MR. WHITT:  Okay.  Object.  And you have a
17 one or two word thing, but, you know, starting to
18 testify for the witness is kind of beyond the
19 bounds, all right.
20    THE WITNESS:  I thought I already answered
21 this.
22    MR. WHITT:  All right.  Well, just read that
23 last question that I had.
24    (A portion of the record was read by the
25 reporter.)

Page 98

BY MR. WHITT:
Q.   So that question, if you could answer that question?
A.   I don't believe so.
Q.   Has Rodric David ever asked you to lie for him?
A.   No.
Q.   Has Rodric David ever asked you to conceal his involvement with anything?
A.   No.
     MR. SOHN:  Form.
BY MR. WHITT:
Q.   Has Rodric David ever asked you to conceal his involvement with these five websites that we've been talking about today?
A.   No.
Q.   Okay.  Did Rodric David ask you to not tell the truth about the five websites?
A.   No.
Q.   Has Rodric David ever threatened you if you came and told the truth about the five websites?
A.   No.
     MR. SOHN:  Form.
BY MR. WHITT:
Q.   Has Rodric David ever made an offer to you

Page 99

to pay you money or some other type of remuneration if you testified untruthfully about the five websites?
A.   No.
     MR. WHITT:  Okay.  All right.  I'm going to stop.  We're going to go off the record for a minute.  I think we're about done, so give me just a few minutes.  I'll step out give you a chance to talk.
     MR. SOHN:  Sure.
     MR. WHITT:  I'll look at my notes and come back.
     Okay.  Good to go off the record?
     MR. SOHN:  Sure.
     MR. WHITT:  Let's take a break, go off the record, we'll come back and should be able to finish up.
     (A recess was held at 11:19 a.m. and the foregoing deposition resumed at 11:34 a.m.)
     MR. WHITT:  Okay.  We're back on the record after a break.
     And so the record is clear, after further discussion between counsel where we've conferred about the issue of the existence of an indemnification agreement between Mr. Price and

Page 100

Mr. David and/or Thunder Studios, okay.
     So I think we may have reached some agreement on the issue, so I'm going to ask -- I'm going to ask Mr. Price this question.
     Okay.  And when I use the word agreement it can be either oral or in writing.  Okay.  So with that caveat ahead of time -- do you understand?
     THE WITNESS:  Yes.
     MR. WHITT:  So in my question when I use the word "agreement," it could be either orally or in writing, okay?
BY MR. WHITT:
Q.   Is there an agreement between you, Matthew Price, and Rodric David or Thunder Studios wherein Mr. David or Thunder Studios agrees to indemnify you -- and by that term, I mean where they would agree to pay judgment that would be entered against you related or paid defense costs -- related to the five websites?
A.   No.  I mean, he's paying for my legal fees which --
Q.   Which you've said?
A.   Yeah.
Q.   Okay.
A.   Outside -- no.

Page 101

Q.   So if a judgment gets entered against you for any amount of money related to the five websites, you do not have any agreement with Rodric David or Thunder Studios that they would pay that judgment on your behalf --
A.   That's correct.
Q.   -- correct?
     MR. WHITT:  Okay.  Then the other questions.  I'm not going to press, we're fine.  We're good.
     THE COURT REPORTER:  Do you still want the questions certified?
     MR. WHITT:  No, no, no, not necessary.
     Okay.  So, with that, I have no further questions.  I don't know if counsel will have any questions for Mr. Price.
     MR. SOHN:  I have nothing.
     MR. WHITT:  Okay.  I don't know what you want to do about, you know, reading, waiving, you know, whatever.
     The transcript is going to be prepared --
     MR. SOHN:  Read and sign.
     MR. WHITT:  -- on an expedited basis.  So will she communicate with you -- madam court reporter will communicate with you for you to get that transcript to Mr. Price?  Do you want her to

Page 102

1  communicate with Mr. Price directly to get it to
2  him?  How would you like that to happen?
3       THE COURT REPORTER:  Are you ordering a copy
4  of this transcript today?
5       MR. SOHN:  Are we ordering a copy, Steven?
6       MR. GEBELIN:  Yeah, we'll need a copy.
7       THE COURT REPORTER:  Then my read and sign,
8  I'll put in my letter to have him read your copy.
9       MR. SOHN:  Okay.
10      MR. WHITT:  Okay.  While we're still on the
11 record before we go off, as I believe, at least,
12 counsel is aware, there is a pending proceeding
13 in Australia, I believe Sydney, involving
14 Mr. Kazal, time is of the essence for us to get
15 this transcript prepared and get to Mr. Kazal's
16 counsel.  So just be --
17      MR. SOHN:  In preparation for the status
18 conference?
19      MR. WHITT:  I don't -- I don't know.  I
20 don't know what you're talking about there.
21      MR. SOHN:  That's the proceeding that time
22 would be of essence.
23      MR. WHITT:  I don't know what it is.  I know
24 there was a proceeding that was set for
25 November 10th --

Page 103

1       MR. SOHN:  And moved to the 17th.
2       MR. WHITT:  -- Australia --
3       MR. SOHN:  Right.
4       MR. WHITT:  -- and they were talking getting
5  that reset, whatever.
6       So my only point is just be sensitive to
7  that.
8       MR. SOHN:  Yes.
9       MR. WHITT:  We have ordered this expedited,
10 so you're going to read and sign.  Try to make
11 that happen as quickly as we can and then we'll
12 get that all done and you can get that over to
13 us.
14      THE COURT REPORTER:  And as far as the
15 exhibits, do you need those today?
16      MR. WHITT:  The exhibits you can send
17 electronically to us tomorrow, would be fine.
18      THE COURT REPORTER:  And I will have the
19 transcript to you today.
20      MR. WHITT:  Yes, that's good.
21      Okay.  That's it.  We're done.
22      (The foregoing proceedings were concluded at
23 11:38 a.m.)
24      (Reading and signing of the deposition was
25 not waived by the witness and all parties.)

Page 104

1              S T I P U L A T I O N S
2
3
4    It was stipulated by and between counsel for the
5  respective parties herein that:
6    1.  Reading and signing of the deposition by the
7  deponent are reserved.

Page 105

1               CERTIFICATE OF OATH
2  STATE OF FLORIDA
3  COUNTY OF HILLSBOROUGH
4
5    I, Teresa R. Cruise, Notary Public, State of
6  Florida, certify that MATTHEW PRICE personally
7  appeared before me on the 9th day of November, 2017
8  and was duly sworn.
9
10      Signed this 9th day of November, 2017.
11
12
13
14
15
                        _____
16                      TERESA R. CRUISE,
                        Notary Public - State of Florida
                        Commission Number: FF203811
17                      Expiration Date:  02/25/19

## Page 106

```
 1            C E R T I F I C A T E
 2
 3   State of Florida
     County of Hillsborough
 4
 5        I, Teresa R. Cruise, Court Reporter,
     certify that I was authorized to and did
 6   stenographically report the deposition of MATTHEW
     PRICE, pages 1 through 108; that a review of the
 7   transcript was requested; and that the transcript is
     a true record of my stenographic notes.
 8
 9        I further certify that I am not a relative,
     employee, attorney, or counsel of any of the parties,
10   nor am I a relative or employee of the parties'
     attorney, nor am I financially interested in the
11   action.
12
          Dated this 9th day of November, 2017.
13
14
15
16
     _____
     TERESA R. CRUISE
17
18
19
20
21
22
23
24
25
```

## Page 107

```
 1   November 9, 2017
 2
 3
     Matthew Price
 4   c/o Brad Sohn, Esquire
     The Brad Sohn Law Firm, PLLC
 5   2600 South Douglas Road
     Suite 1007
 6   Coral Gables, FL 33134
 7
     In Re:  Adam Kazal v. Matthew Price
 8           Deposition taken on November 9, 2017
             U.S. Legal Support Job No.:  1652623
 9
10   The transcript of the above-referenced proceeding has
     been prepared and is being provided to your office
11   for review by the witness.
12   We respectfully request that the witness complete
     their review by a reasonable time and return the
13   errata sheet to our office.
14
15
     Sincerely,
16
17
18
     Teresa Cruise
19   U.S. Legal Support, Inc.
     4350 West Cypress Street
20   Suite 701
     Tampa, Florida 33607
21   (813) 876-4722
22
     CC via transcript:
23   Michael Whitt, Esquire
     Brad Sohn, Esquire
24
25
```

## Page 108

```
 1              ERRATA SHEET
 2   DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES ON THIS
                          PAGE
 3
             IN RE: Adam Kazal v. Matthew Price
 4          Deposition of:  MATTHEW PRICE
                   November 9, 2017
 5            U.S. Legal Job No.: 1652623
 6
     Page No.  Line No.        Change          Reason
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20   Under penalties of perjury, I declare that I have
     read the foregoing document and that the facts stated
21   in it are true.
22
23   _____    _____
     Date                 MATTHEW PRICE
24
25
```

_____

**1**
_____

**1**  7:11 9:9,
  11,17 14:22
  16:17,24
  26:19 27:15
  73:2 75:18,22
  87:22
**106**  4:5
**10:00**  7:23
**10:06**  54:12
**10:22**  54:13
**10:59**  86:14
**10th**  102:25
**11:01**  86:15
**11:10**  93:12
**11:12**  93:13
**11:19**  99:18
**11:34**  99:19
**11:38**  103:23
**12**  41:3
  42:18,19 52:8
**13**  43:24
  45:24
**14**  6:17 44:6
  45:25
**15**  67:22
**17th**  103:1
**1st**  5:13

_____

**2**
_____

**2**  22:17,19
  23:3,21
  40:20,25
  43:24 44:7
  46:14 48:9
**2012**  62:16
**2013**  62:16
  63:25 65:6
**2015**  67:23
**2016**  26:12
  27:20 31:19
  33:17 34:1
  39:5,6,22

  40:13 49:24
  50:1,4 54:4
  64:22 76:7
**2017**  4:3 5:14
  6:24 22:11
  31:20 32:7
  39:22,23 43:7
  53:16 54:5
  65:7
**25**  22:23,25
  41:3 43:24
  44:6 52:9

_____

**3**
_____

**3**  78:3,4,13
  83:19
**3019**  5:5
  79:10
**34655**  4:5

_____

**6**
_____

**6**  44:8
**6th**  45:25

_____

**7**
_____

**7813**  4:4
**7th**  44:4
  45:24

_____

**8**
_____

**8**  43:7

_____

**9**
_____

**9**  4:3
**9:08**  4:3
**9th**  39:23

_____

**A**
_____

**a.m.**  4:3 7:23
  54:12,13

  86:14,15
  93:12,13
  99:18,19
  103:23
**Abe**  47:25
**able**  99:16
**about**  4:12
  9:19 16:18
  19:7 22:6
  24:7,11,17
  29:10 33:4
  34:9 35:4
  36:17 38:20
  40:23 41:9,11
  43:22 46:25
  47:6 49:9
  53:14 55:2,4,
  16 57:25 58:3
  59:2,11 62:6
  64:1,23 66:5
  70:7 71:4,15
  72:25 73:4,17
  75:11 79:25
  83:11,21
  85:2,4,22
  86:4 87:2,3,
  4,8,15 88:4,
  10,12,17,20
  89:11,13
  91:17 92:17,
  24,25 93:1,4
  94:15,24
  95:7,24,25
  96:16 97:7
  98:15,18,21
  99:2,7,24
  101:18 102:20
**above**  41:15
  43:19
**absolutely**
  16:6 53:5
**acceptable**
  49:3
**access**  74:21
**accessible**
  51:16
**account**
  81:15,22

**accurate**
  66:19
**accurately**
  7:9
**action**  9:16
  15:7 18:9,17,
  23 19:1,14
**active**  63:9
**actual**  79:16
**actually**  59:7
  60:15 64:7
  69:21 70:24
**Adam**  7:14
  18:8 25:6
  31:20 32:17
  45:10 47:14,
  15 89:19
**Adamkazal.com**
  23:24 25:25
  32:15 80:10
**additional**
  38:11,20 40:4
**address**  5:4
  9:16 23:14
  78:25 79:1,3,
  11,19,24 80:5
  81:16,20,21
**addressed**
  9:16
**addresses**
  38:9 79:15
**administrative**
  81:25
**admitted**
  80:13
**advising**  86:3
**affirm**  4:11
**after**  33:20
  50:11 54:19
  59:21 62:11
  87:6 99:21,22
**again**  12:13
  13:4 22:2
  27:6 30:23
  33:5 34:11
  44:16 57:7
  61:6 93:10
  94:7

**against** 19:13
20:11,16
21:24 48:12
50:25 100:17
101:1
**agency** 52:11
**ago** 7:18 18:7
96:5
**agree** 21:23
100:17
**agreed** 20:15
**agreement**
19:6 20:9,14
21:11,22
65:25 69:1
99:25 100:3,
5,10,13 101:3
**agrees** 100:15
**ahead** 6:6
11:19 56:2
59:12 70:12,
14 100:7
**air** 38:3
**alerts** 65:4
**all** 4:21 7:6
10:6 12:21
14:19,21
16:7,16,23
17:13 18:4
22:10 23:16,
21 26:20
27:6,10 29:5
31:18 33:4
34:2,7,18
38:3 42:2
44:15 46:9,13
50:22 51:1,6,
8,23 54:24
56:2,18 61:22
62:17 63:8,11
64:13 65:10
67:5,15,23
70:25 71:15,
23 73:4 74:16
75:10 78:24
79:16 80:13
81:14 84:25
85:2 87:15

88:18 92:23
94:7 96:6
97:19,22 99:5
103:12,25
**allow** 53:9
**allowed** 8:5
**along** 50:1
**already** 22:4
52:14 62:23
92:1 97:20
**also** 74:5
78:23
**always** 93:24
**am** 7:1,11
35:1
**ambiguous**
12:11,19
13:15 73:12
**among** 20:12
**amount** 8:11
59:15 101:2
**and** 4:13,17,
24 5:6,9,20
6:1,2,5,7,10,
21 7:4,13,22
8:6,22 9:16,
19,23 10:1,5,
6,7,9,20
11:9,19
12:11,16,19
13:3,7 14:14,
20 15:2,12,17
16:5 17:2,22
18:19 19:7
20:4,6,19,20,
22 21:4,11,
12,22 22:2,7,
24 23:6,9
24:11,17 25:6
26:4 27:6,25
28:1,17,21
29:5,9,13,24
30:2,8,18
31:7,19,20,24
32:4,6,21
33:4,5,6,14
34:2,3,10,11,
20 35:23 36:5

37:7,11,16
38:3 39:23
40:3,13,16,20
41:10,11,15
42:10,11,24
43:12,16,22,
23 44:16 45:4
46:2,18,21
47:8,25 48:4,
12 49:1 50:9
51:3,5,9,12,
15,17,23
52:5,6,19,22
53:15,16,17,
18 54:4,12
55:7,16,21
56:2,5,14,18
57:1,14,23
58:4,23 59:1,
3,14,23 60:9,
18 61:16,18,
23 62:1,5,7,
9,17 63:1,19
64:4,6,12,23
65:1,22 66:11
67:15,19
68:3,16 69:10
70:7 71:5,6,
25 72:6,16,19
73:1 74:5,8,
20,22 75:1,12
76:4,7 77:6,
14 78:8,22,25
79:3 80:10,13
81:7,15,16,18
82:1 83:14
85:17,21,25
86:2,8,14,20
87:3,4,7,22
88:20 89:16,
17,18 90:1,5
91:11,21
92:12,15
93:1,4,12,20
94:4,8,12,14,
16 95:3,7,12,
14 96:6,10
97:1,8,16
98:21 99:11,

16,18,22,25
100:5,14,16
101:21 102:7,
15 103:1,4,
10,11,12,14,
18,24,25
**and/or** 23:6
100:1
**Angeles** 27:24
56:11,12
57:22
**animosity**
50:25 51:2
**another** 36:22
45:5 85:4
94:5
**answer** 5:22
8:2,14,24
11:3,10,19,
21,22 14:24
15:12 20:2,18
22:2 25:10
27:10 45:6
47:8 53:18,24
57:18 59:1
61:1,14 66:7,
17 68:8 74:8
83:15,24
87:11 91:11
93:17 94:5
95:21 97:11
98:2
**answer's**
97:10
**answered** 5:9
8:22 57:15
69:10 89:12
97:20
**answering**
91:1,6
**answers** 8:8
18:13 93:5
94:17 97:13
**any** 5:25 7:6,
7 10:13,19,21
11:16 13:2,5,
11,19,24,25
14:7,8,21

15:13,15
16:15,22
17:7,8,11,13
18:2,4 19:6,
10,12,13
20:10,15,16
21:11,21,23
22:13 29:11
34:6 35:5,11,
13,20 36:2,5,
6,17,20,23
47:13 48:2,6
50:5,6,19,22
51:1,5,7,8
52:1,24
55:17,18
61:8,9,15
63:12,21
65:10 66:21
70:5,21 73:6,
7,24 74:1,25
75:13,14,15,
22,25 77:13,
17,24 82:12
83:20 84:16
88:3,4,10,12,
13,20,21
90:21 95:23
101:2,3,14
**anybody** 36:22
76:17,25 77:5
85:24
**anyone** 34:2
40:10 76:11,
14,21,22
**anything**
37:12 51:25
69:20 71:16
73:7,21 87:2,
4 88:14 89:19
94:10,11 98:9
**anyway** 91:25
**anywhere**
69:19,20
**app** 44:25
**appear** 7:22
8:20 46:15
**appearing**
61:13

**appears** 17:21
41:8
**application**
46:4
**appreciate**
6:10 31:7,8
91:13
**approaching**
94:21
**appropriate**
59:16
**are** 4:24 6:25
7:6,9 12:14
13:11 15:11,
23 18:1 21:2
22:13 23:3
24:24 26:19
27:15 44:12
46:14,19,21
48:8 53:6
55:11 61:2
70:5 75:21
80:6,15
89:15,21
102:3,5
**area** 72:12,14
**aren't** 30:25
**arguing** 92:3,
4
**argument**
93:24
**arose** 85:5
**around** 27:20
33:16 44:19
79:19 96:19
**arrived** 22:11
**article** 52:13
53:7
**articles**
17:16 51:14
52:6 53:5
**as** 4:18 7:14,
16 8:10 9:8
17:2,5,8 21:6
23:7 26:23
28:2,22 30:11
37:22 38:12
40:14 45:24

46:23 51:22
53:6 55:3
56:20,24 63:2
65:3 68:19
69:17 70:4,25
72:16 73:19,
22 74:19 78:3
81:9,10,22
82:2,16 83:11
90:17 93:19
94:14,15 96:5
102:11
103:11,14
**ask** 6:5 11:7
16:12 17:5
21:8 31:2
33:15 38:17
43:22 44:15
46:24 49:9
55:7,16 57:4
59:5,14 62:25
72:25 75:2
79:25 85:16
88:10,12 91:4
92:24 93:18
98:17 100:3,4
**asked** 5:9
8:22 15:25
30:20 36:17
47:7 50:16
55:1 57:14
69:10 85:17
98:5,8,13
**asking** 22:6
43:18 47:6
49:19 61:8
70:10 89:22
91:7,15 94:15
**asks** 52:3
74:18
**asserted**
15:20
**asserting**
61:2,5
**assist** 34:2
**assume** 31:21
56:8
**assuming** 81:5

**at** 4:3,7 7:23
9:15 22:10,23
26:18 27:23,
25 28:16,17,
23 30:14
31:19 32:9
33:8 34:7
40:20 41:2,8
42:6,21 49:1
50:3 54:12,13
56:6 58:15
62:1,17 63:24
64:19 66:12
69:21 70:7,
16,25 71:6,13
73:8 76:11,22
79:5,24
86:14,15 88:3
90:15,19
93:12,13
99:11,18,19
102:11 103:22
**attending**
61:24
**attorney**
18:16
**attorney's**
18:22,25
**attorney-
client** 22:3
61:7,18,20
**attorneys**
61:9 88:11,14
**audible** 25:1
32:16,18,24
39:10
**Australia**
85:2 89:6,9
90:21 102:13
103:2
**authenticate**
52:1
**authority**
44:24,25
45:3,4,8
**automated**
43:14 45:1

**available**
29:12 54:3
**Avenue** 81:18
**aware** 13:11
16:5,6,20,25
18:2 65:20
76:9 77:10
82:19,20
102:12

**B**

**back** 18:8
26:18 27:10
42:18 45:2
51:21 52:8
53:13 54:15,
16,18 61:22
72:24 73:3,4
93:14 99:12,
16,20
**background**
74:17
**bad** 24:24
95:19,22
**banners** 38:9
**based** 15:6,24
83:6 97:5
**basically**
23:13 63:18
91:21
**basis** 20:23,
24 21:5 22:3
101:22
**Beach** 81:19
**became** 56:18
**because** 38:17
49:19 51:11
55:1 83:11
**become** 62:21
**becomes** 90:19
**been** 4:17
7:13 11:24
13:14 22:10
23:24 24:4,
15,20 25:2
28:18 31:18,
21 32:9 33:14

38:20 39:23
40:10,17 56:8
60:3 77:22
82:16 85:11,
22 86:3 95:15
98:15
**beers** 59:21
**before** 5:20,
25 17:1
23:22,25
43:17 54:24
67:17 75:10
78:7,13,14
83:3 87:23
102:11
**begin** 23:4
**begs** 71:4
**behalf** 101:5
**behind** 71:14
**being** 14:9
56:24 63:10
87:21 96:1,8
97:6
**believe** 6:8
8:17 14:10
15:25 18:6,8
25:14 26:12
28:1 30:9
32:11 42:8
46:18 50:8
54:1 58:22
59:3 64:22
67:22 69:3,5,
18 73:13
76:24 78:15
86:1,6 88:17
91:18 98:4
102:11,13
**belonging**
21:5 28:8
**belt** 41:10
**best** 27:20
75:2
**better** 33:7
34:12
**between** 14:19
19:7 20:4,6
21:11,22

39:22 40:13
50:9 65:22
67:11 86:20
95:7 97:1
99:23,25
100:13
**beyond** 97:18
**bias** 20:11
58:16,19
**big** 39:19
68:11
**bit** 6:7 26:17
31:5 35:3
43:6 57:25
90:17 92:5
**Blog** 43:20
44:21
**both** 8:10
53:3
**bottom** 23:2
43:25 44:7
79:24 90:7,9
**Boulevard** 4:4
78:25
**bounds** 97:19
**box** 9:20 62:8
**break** 39:18
54:10,19
74:6,9 75:15
99:15,21
**bring** 9:3,4,
24 10:13
**broad** 29:6
74:7
**broadly** 51:22
**broke** 54:24
**brother** 57:6
**brothers**
41:24 46:19,
22 47:6,11
48:8 50:7,10,
20,23 51:1,5,
8 88:5,21
91:17 95:8
**brought** 17:4
**browser** 23:17

**buckle** 41:10
**building**
79:18
**business**
65:5,8 67:9
71:8 75:4
88:16 95:19,
22
**busy** 46:10
**but** 4:13 6:7,
8 7:11 8:10,
18 15:9 16:4
20:5,24 26:12
33:8 34:13
36:15 41:24
53:9 55:14,15
58:22,25
59:14 62:13
65:24 66:1
69:22 70:21
71:11 73:6
75:10 82:6
83:18 90:6,19
92:5 93:5,18,
22 97:17
**by** 4:2,6,20
5:11 6:12
7:21 8:1,13,
19,23 9:2,13
10:24 11:2
12:5,12,23
13:17,23
14:4,9,17
16:10 17:5,
17,23 18:7
19:5 20:13
21:1,10 22:5,
21 24:3,10,16
25:12,20,24
26:3,8,14
29:20 30:22
33:13 35:7,
15,19 36:16
37:18 38:16
39:11 40:2,9,
17 41:1,21
42:17 43:20
44:14,21
45:14 47:5

48:14,20
50:15 52:7,21
53:2,8,25
54:23 56:1
57:3,10,17
58:5 59:17
60:8,17
61:10,21
66:16 67:14
68:10,16,25
69:12 70:18
71:21 73:15
74:15,22
75:8,14,18,23
76:2,20 77:3,
11 78:6 80:21
82:24 84:1
85:8,14 86:7,
16 88:2 91:5
95:5,20 96:1,
10,25 97:4,9,
24 98:1,12,24
100:12,16
103:25

---

**C**

---

**California**
6:13,18,21
15:6 18:9
21:16,19 32:9
48:4 56:7
61:23 63:3
65:14 81:19
85:5,10,15
86:22
**call** 17:18
33:7 34:15
40:14 42:9
67:16 78:16,
18,22
**called** 28:24
30:2 63:3
78:7,8,17
**calls** 7:25
11:1 68:7
**came** 52:15
65:6 85:21
98:21

**can** 5:8,12
8:2,14,24
11:3,10,19,21
14:23 26:16
31:1 34:10
37:11 41:10
57:18 59:19
62:14 66:17
69:17 75:9
77:12 84:14
86:10 87:15
90:14 91:9,11
93:7 94:20
95:9 100:6
103:11,12,16
**can't** 34:25
38:4 39:14
97:8
**card** 53:22,25
54:3
**care** 72:19
**case** 55:15
60:24
**categorize**
38:12
**causes** 46:4
**caveat** 100:7
**CEO** 68:23
76:19
**certain** 8:11
**certainly**
20:11 91:11
**certified**
101:11
**certify** 20:21
61:16
**cetera** 18:3
22:14 35:12
36:7,24 38:9
40:5 73:11
80:5
**chance** 99:9
**change** 37:16
40:3
**changes** 38:10
39:23
**changing** 38:8
40:5

**characterize**
56:20,23
57:11 60:12
**Charif** 18:9
25:5 47:23
85:14
**Charifkazal.
com** 25:15
80:9
**chase** 63:1
**checked** 9:20
**chief** 68:2,19
69:16 70:25
73:22
**children**
56:14
**circle** 53:13
72:24
**civil** 9:15
**clarify** 13:18
**clear** 21:21
36:15 47:15
50:18 69:13
85:9 87:7
94:8 99:22
**clearly** 19:18
**click** 29:13
**client** 37:15
83:1
**clipped** 42:10
**clipping**
42:10
**close** 38:5
42:25 44:21
60:13 87:21
96:13
**cloud** 13:10
**collectively**
26:22 34:11
**com** 23:10
**come** 6:21
23:18 45:11
50:10,11
52:11,23 65:3
72:19 94:4
99:11,16

**comfortable**
59:23
**coming** 75:13
**commanded**
17:5
**commencing**
4:3
**comment** 53:1
**commentary**
53:9
**comments** 6:10
**common** 15:5
19:18,20
20:2,24 61:6,
18,20
**commonly** 23:7
**communicate**
60:19 61:11
101:23,24
102:1
**communication**
10:6 16:22
17:8,10 18:3
21:5 36:7
91:14
**communications**
13:6,12 14:7,
19 15:3,13,18
16:15 20:3,6
61:9 87:7
**company**
12:21,24
13:10 17:23
28:10 62:19
63:2,19,21
66:1,9,10
68:11 69:21
70:21 71:5,7,
11,14 73:21
78:7,18,23
**compensating**
77:14
**compensation**
77:13,17
**complete** 17:2
**compound** 74:6
**computer**
28:4,8,12,13

69:9,19 73:14
74:4,13,20
75:3
**computers**
73:10
**conceal** 98:8,
13
**concerned**
32:22
**concerning**
10:7,20 13:12
15:15 16:22
17:12 18:4
95:16
**concert** 59:22
**concluded**
90:12 103:22
**conclusion**
7:25 52:4
**conference**
102:18
**conferred**
99:23
**confidentialit
y** 70:2,5
**connected**
89:5
**connection**
89:8 90:20
**consider**
35:25
**considers**
59:8
**consulting**
22:14
**contact**
60:10,12,13
81:15,23,25
82:1,2,3,17
83:12
**contacts**
81:25
**contempt**
89:19
**content**
17:19,21
33:5,9,18

34:13,16
37:16 38:8,20
39:7 50:2
51:9,22 71:12
74:25 75:15,
25 76:8 77:6,
19 82:12
84:18
**content's**
37:25
**contents**
71:13
**Continue** 21:7
**contract**
69:4,7 70:1,
16
**contractual**
66:22
**contractually**
65:25
**control** 92:9
**controlled**
63:19
**conversation**
85:18,20,25
86:2,9,18,24
96:16 97:7
**conversations**
19:10 83:20
88:3,7,13,19
89:11,12,16,
18 91:16
92:24 93:19
95:7,10,14,23
**copies** 9:6
**copy** 9:14
69:6,14,18
102:3,5,6,8
**copying** 10:1
**corner** 41:3
**corp** 15:1
**corporation**
63:9
**correct** 4:25
7:4 8:15
10:21,23
18:10 20:25
21:14 22:8,9

23:14,19
24:25 27:21
28:4 31:11,
22,23 32:20
33:10,12 37:5
38:1 40:6,18
42:12 45:12,
15,19,21,23
46:1,2,3,6,8,
22 47:9
50:20,21
52:25 53:11
54:6 56:12
63:4 66:13,23
67:1,4 69:20
72:17,18,23
74:4,23 77:25
78:1 80:8,11,
12 82:8,10
85:5,10 87:9,
11,12,13
101:6,7
**correctly**
81:7 82:6
87:1 96:4
**costs** 19:8
100:18
**could** 23:18
31:10 94:17
98:2 100:10
**couldn't**
70:20 84:13
**counsel** 4:2
7:14 8:4,9,25
11:5 14:16
15:25 20:5
21:7 36:15
44:18 48:23
59:7 86:12
97:12 99:23
101:14
102:12,16
**Counsels**
90:14
**couple** 39:4
60:21
**court** 4:9 5:5
7:17 11:14
20:21 22:18

38:4 44:13
83:25 86:12
89:20 90:14,
24 101:10,23
102:3,7
103:14,18
**cousin** 36:22
**cover** 11:25
**covered** 11:24
**crazy** 15:9
**create** 25:15,
17,21,25
26:4,9 28:3,
21 51:9
**created** 27:19
28:6,7,8,15,
18
**creating**
12:16
**creation**
10:7,20 13:3,
7 17:12 58:4
88:24
**credit** 53:22,
25 54:3
**Cruise** 4:6
**CTO** 73:19
74:18
**curiosity**
51:3
**current** 22:6
**currently**
4:24 21:2
22:7,15
**cut** 20:24
41:10 63:1

---

**D**

---

**D-A-V-I-D**
14:21
**daily** 37:16
**date** 6:23
26:11 43:7,23
44:4,8 49:10
62:12 97:8

date's 49:17
dates 26:13
David 4:23
  14:5,8,21
  15:12 16:15
  18:24 19:7,
  11,12 20:4,6,
  15 22:15
  35:20 36:2,5,
  18,21 51:19
  55:3,5,8,10,
  16,25 56:5,
  12,24 57:5,
  12,23 58:24
  59:11 60:10,
  18,25 61:12,
  24 62:3,9,18,
  19 63:13 64:4
  65:19,23
  66:11 68:4,
  16,17 75:12,
  19 76:2,8,16,
  21,23 77:13
  84:2 85:13,
  21,25 86:9,20
  87:8 88:4,20
  89:11,13
  91:16,17
  92:25 95:7,
  15,25 96:16,
  20 98:5,8,13,
  17,20,25
  100:1,14,15
  101:3
David's 36:22
  60:3
Davids 19:12
  55:11,17,20
day 8:7 11:6
  49:12 94:7
days 7:18
deal 14:18
  67:9 95:19,22
dealings
  88:16
deep 58:21
defendant
  84:8

defending
  18:16
defense 18:23
  19:1,8 100:18
define 59:19
  77:4 95:3
definitely
  20:7
depends 30:20
  37:15,17
  94:16,17
depo's 16:9
deposition
  4:1,6 7:15
  8:20 9:9,15,
  24 11:15 48:5
  54:13 61:13
  73:2 86:15
  93:13,23
  99:19 103:24
depositions
  94:6
design 71:16
  73:7
desire 91:10
detail 62:25
determine
  35:5
develop 62:2
developed
  62:18 64:5
Developing
  71:2
diabetic 7:11
  87:22
did 6:13,21
  8:20 9:3,4
  10:13 18:16
  25:15,17,21,
  25 26:4,9
  30:5,6 31:24
  32:6 33:18
  34:2,6,16
  35:11 36:6,
  17,20,22
  41:25 42:3,6
  43:12 49:10
  51:9,25 52:10

53:25 56:4
57:14,23,25
58:9 60:25
61:11,17
62:1,2,5,9,21
63:12,21
64:13,20
67:15 68:3,5,
12 69:1 71:5,
25 72:1 73:6
76:8,11,22,25
77:1,5,7,12,
17 79:13,16,
19 82:16
83:10 84:12,
16 86:8 87:4,
11 88:15
92:22 95:23
96:15,19
98:17
didn't 9:1
52:15,23
66:21 69:13
73:17,21
80:22 84:20
90:13 91:4,
22,23,24
92:20 94:23
95:21
different
16:1 38:23
dinner 59:20
Dion 47:19
direct 20:2
25:7 46:13
84:20 93:17
94:12
directed
75:14,18,22
76:2
directly
36:14 61:11
102:1
directs 11:18
disagree
15:8,10
discuss 70:20
86:8 88:15

discussed
  13:14 62:23
  93:1
discussion
  47:4 88:1
  99:23
dissolved
  63:10
distribution
  71:14
District 8:6,
  10
dive 58:21
do 4:11,14
  5:2,16 6:18
  7:24 8:9 9:21
  10:3,10,16,25
  12:6 13:1,5
  14:5 16:11
  17:7,8 23:4
  25:5,7 28:3
  29:10 30:11
  31:14 32:6
  33:1 37:13
  41:4,13,16
  42:25 43:7,
  17,20 46:16
  47:2 48:18
  50:22,25
  51:25 53:18,
  20 55:14,17
  57:4 58:21
  59:15 60:18
  63:8 65:13,
  16,18,25 67:2
  69:6,9 70:1
  71:7 73:6
  74:11 75:22
  76:2 78:16,17
  79:1,2 82:7
  83:20 84:2,7,
  20 85:3,13,20
  86:2 88:7,25
  89:18,19
  90:18,19
  91:11 92:8,15
  96:21 100:7
  101:3,10,18,
  25 103:15

doctor 5:19
document
 12:25 17:7
 18:2 78:2,14
 80:4,18,24
 83:6
documents
 9:25 10:6,13,
 16,19 12:14,
 22,25 13:2,5
 17:3 35:12
 89:3
does 20:5
 30:16,18 38:7
 43:4 65:18,20
 90:20
doesn't 48:23
 97:8
doing 22:14
 29:10 38:3
 51:11 73:25
 74:2,3 75:1,4
 84:23
dollars 66:25
domain 12:20
 28:24 29:2,
 11,14,24
 30:2,5,6,10
 31:21,24
 33:17 44:24
 45:6,8 53:15,
 17 75:17 76:6
 77:6 78:9
 80:6,15
 81:12,24
 83:23 84:17
 96:6
domains 49:24
 82:18
don't 5:10,
 19,24 6:23
 8:17 10:19
 11:20 14:23
 15:9,18 18:6
 20:18 22:2
 25:14 26:11,
 12 27:5 31:6
 33:20 34:14

35:24 41:23
42:8,18 44:19
47:19 48:22
49:4,7,8,17
50:8 53:6
54:9 55:10
57:1 60:14,15
61:1,14 62:12
68:15 69:18,
23,24 70:22
71:10 73:13
75:2 76:24
78:15 81:7
84:8,9 87:2,
17 88:11,17
89:4 90:23,25
91:18 92:9
93:5,9,23
95:13 96:18
97:15 98:4
101:14,17
102:19,20,23
done 28:16
 35:4 76:9,12,
 23,25 87:21
 99:7 103:12,
 21
doubt 69:8
down 9:19
 11:14 39:14,
 18 43:7 49:12
 64:10 69:14
 74:9 75:9,15
 81:14 92:6
Dreamhost
 30:7,8,9,11
 78:8,16,17
 80:4 81:15
drive 77:12
duly 4:17
duties 65:2
 71:1,6,17

_____

E

each 29:17
 32:22 33:9
 34:4 39:7

46:25 47:10
51:23 60:16,
19
earlier 51:20
 72:6 75:10
 76:7
early 33:23
 50:4 65:7
eat 87:23
educate 33:6
eight 46:15,
 19,22 48:6,7
 50:6,19,23
 51:1,5,8
 88:4,21
either 50:3
 69:19 100:6,
 10
electronic
 12:21
electronically
 9:25 12:15,25
 17:15 103:17
electronically
-stored 13:6
 17:11 18:2
eliminate
 84:14
else 34:2
 36:22 37:12
 76:11,14,17,
 22 85:24
email 14:18
 15:13 16:14,
 18,21 17:9
 73:24 81:16
emails 13:11,
 19,25 16:19
employ 38:25
 72:1
employed 21:2
 22:10 27:25
employee 15:1
 62:21
employees
 63:21 64:17,
 18 68:6,12

employment
 22:7 69:1,4,6
end 31:19
 45:2 49:1
 92:7
engine 23:18
engineer 65:1
enough 12:3
 27:8,16 39:2
 83:2 96:13
entered 19:13
 20:10 21:24
 100:17 101:1
essence 32:14
 102:14,22
establishes
 92:1
establishment
 71:12
even 32:17
 66:8 83:14
 84:13 87:6
events 59:21
ever 13:18,24
 19:10 47:7
 48:2,6 50:16
 51:5,7,25
 62:21 77:13,
 17 84:5,12
 88:15 96:19
 98:5,8,13,20,
 25
every 11:20
 48:24,25
everything
 74:2
ex 90:22
exact 6:23
 26:11,13
examination
 4:19 6:4
examined 4:17
example 52:8
excluding
 76:18
excuse 35:16
 40:23 95:24

| | | | |
|---|---|---|---|
| Exhibit 9:9, 11,17 14:22 16:17,24 22:19 23:3,21 26:18 27:15 40:20,25 43:24 44:6 46:14 48:9 73:2 75:18,22 78:3,4,13 83:19 | falls 14:24 falsity 35:5 familiar 21:13 family 25:7 56:24,25 57:2 far 46:23 94:14 103:14 farther 43:6 father 72:16, 20 Fe 81:18 | fine 32:14 70:10 92:18 93:11 95:1 101:9 103:17 finish 5:22 94:20,21 99:17 finished 87:24 firm 7:13 first 4:17 | FL 4:5 flight 16:8 Florida 4:7, 25 6:19,20,22 22:10 60:9 69:23 72:10, 19 fluctuates 68:15 focused 86:17 93:18,21 follow-up 49:20 |

exhibits
  103:15,16
exist  10:25
  12:6 13:2,7
  15:3 18:4
  89:4
existed  51:12
existence
  15:17 17:11
  99:24
existing  52:6
exists  13:9
  19:6 20:15
expedited
  101:22 103:9
explain  29:5
  43:16,17
  44:18,20
extend  20:3,5
extremely
  94:18
eyes  24:24

———————

F

face  41:12
facing  15:2
factfinder
  58:14
fair  12:3
  27:8,15 38:12
  39:2 50:12
  58:22 67:11
  83:2
fairness
  80:22

Federal  7:17
fee  30:16
feel  59:23
  94:19
feeling  95:25
  97:6
fees  18:22,25
  19:8 100:20
felt  55:2
  96:7 97:6
feud  50:5
  51:8
few  5:7 7:18
  21:20 33:20
  59:25 91:21
  92:21,22 95:6
  99:8
fiances  29:25
fifteen  68:13
fight  50:5
  51:7
figure  19:24
file  30:6
  69:20
filed  48:15
  85:14 86:22
  87:6
files  69:24
filled  8:7
finally  79:23
find  31:1
  40:20 42:3
  55:18 64:12
  70:23 94:1

first  4:17
  5:23 6:1
  14:19 27:20
  31:19 33:16
  39:5 45:11
  46:14,15 48:8
  49:10,24 50:4
  54:4,5 62:9
  65:22 74:8
fishing  42:24
five  10:10,21
  12:17 13:1,8,
  12,19,25
  14:8,10,21
  15:15 16:16,
  23 17:13 18:4
  21:25 26:9,
  20,23 27:2,12
  28:6,15 29:17
  31:10,24
  32:10,22
  33:9,19 34:4,
  10 35:16
  36:24 38:11
  39:8,24 40:11
  51:23 52:2
  72:25 73:6,8
  75:13,17,21
  76:1,6 77:6,
  20 80:15
  81:10,12
  84:17,18
  85:22 86:4,21
  87:8 98:14,
  18,21 99:2
  100:19 101:2
five-minute
  54:10

following
  9:24 10:2,6,8
follows  4:18
for  4:2 6:9
  7:14,25 8:20
  9:11 11:1,14,
  15 16:12
  18:22,25
  19:7,24 20:9
  21:17 22:15,
  19 26:17 27:5
  28:17 29:24
  30:21 31:10
  36:15 37:9
  44:19 47:10,
  12 49:3 52:3,
  8 53:13,16,25
  54:3,5 55:4
  58:13,19,22
  59:21 61:8,
  12,13 64:7,
  23,24 65:18
  66:24 67:2,
  17,20,24 68:7
  71:2,25 72:7
  73:3,5,19
  74:1,2,12
  75:1,13,22
  76:4 77:14,
  18,24 78:4
  79:11 82:9
  85:24 86:10
  88:24 93:7
  94:21 97:18
  98:5 99:6
  100:20 101:2,

15,24 102:14,
17,24
**foregoing**
54:13 86:15
93:13 99:19
103:22
**forever** 30:12
**forget** 40:23
**Form** 24:1,8,
13 25:18,22
26:1,6,10
30:19 33:11
35:14,17
37:14 38:14
39:9,25
42:13,16
48:10,17 52:3
53:4 54:7
60:14 67:12
68:24 82:22
98:11,23
**formal** 66:21
**former** 79:10
**forms** 38:8
**forthright**
94:12
**forward** 25:14
**found** 42:7
**foundation**
95:18 96:24
97:3,5
**four** 10:9
79:15 93:4
**fourth** 16:12
**frame** 61:23
62:8 64:1
65:5 70:22
**France** 47:19
**friend** 51:12,
17 56:4 57:9,
16,19,20 59:9
66:11 96:7
**friendly**
92:17,19
**friends** 50:19
55:3 56:6,18,
21 60:22

62:10 67:11
**friendship**
57:12 58:23
**friendships**
94:24
**from** 7:8,17
20:10 22:13
30:11 34:18
35:9,12 37:4
51:13,14
52:11,15,23
53:6 70:6
71:9 77:13,17
80:4
**Fulfill** 65:3
**full** 4:21
17:2
**fumble** 44:19
**funds** 32:4
**funny** 34:25
94:5
**further** 5:25
6:2 21:4 87:7
93:3 99:22
101:13
**future** 11:15

---

**G**

**games** 31:6
**gave** 35:20
79:19
**Gebelin** 18:19
54:17 89:5,8,
14,18,22,24
90:1,23 91:3
92:11,15
93:10 102:6
**Gebelin's**
18:23 91:2
**general** 93:19
**gentleman**
14:5 84:2
**gentlemen**
47:1
**get** 21:20
26:16 34:16

35:3 51:21
62:5,10,24
64:6 83:18
88:11 93:5
94:20 101:24
102:1,14,15
103:12
**gets** 101:1
**getting** 44:12
77:24 103:4
**give** 4:12
44:18 90:17
99:7,8
**giving** 94:24
**globally**
71:3,12
**go** 6:6 11:19
16:9 17:22
20:11 25:6
29:10,11 34:9
37:11 42:18
47:1 56:2
58:18 59:1,
12,20,21,22
61:22 67:15,
24 69:17
70:12,14
86:10 93:7,
11,14 94:14
99:6,13,15
102:11
**God** 4:13
**going** 6:19
8:6 11:4,5
14:15 16:9
17:18 19:15
20:1 33:5
34:13 37:2,25
38:5,17 39:17
40:14 41:6
43:22 44:15
45:10,22
46:13,24 47:1
51:20,21
58:21 62:24
63:25 64:6,8
67:2,16 69:17
72:24 78:2
79:25 88:10,

11 89:15
90:21 91:19
92:6,23
93:15,16 94:8
96:21 99:5,6
100:3,4
101:9,20
103:10
**gone** 40:16
**good** 9:7
27:18 51:11,
17 54:10
56:20 57:9,
16,19,20 59:8
70:15,23
99:13 101:9
103:20
**Google** 23:17
**Googled** 52:5
**gosh** 97:12
**got** 12:4
27:17 32:21
34:24 35:8
37:3,4 42:2
52:16 61:12
64:12 65:23
74:6 75:10
80:2 83:24
85:13,18
86:20 87:1
**Gotcha** 87:14
**Group** 28:1,9,
11 63:4,12,18
64:6,21,24
65:8,21 66:9,
24 73:19
79:7,11,14
**guess** 24:23,
24 31:9 37:8
43:14 51:3
78:17
**guessing**
33:22
**guide** 92:13
**guy** 30:23
84:9
**guys** 59:4
62:15

## H

H-A-R-M-O-N-I-
E  7:4
h-t-t-p-s
  23:4
had  9:1 14:7
  15:13 16:14,
  21 19:10 32:9
  45:5 47:7
  48:2,6 50:4,
  5,16 51:7
  54:25 55:1
  57:13 63:2
  64:17 65:25
  66:8 67:25
  70:2 72:19
  73:13,23
  74:19 75:9
  76:9,12,23,25
  77:5,6 82:6,
  16 83:5,1,
  18,21 86:3
  87:7 88:3,8,
  13,20 89:10,
  12 91:16,20
  92:24 95:15
  97:23
hadn't  11:24
half  67:19
halfway  9:19
hand  4:10
  34:6
handle  34:11
hang  90:3
happen  9:6
  30:18 102:2
  103:11
happens  45:2
  94:6
happy  90:16
harbor  50:22,
  25
harmless
  20:10
Harmonie  7:3

has  9:20 16:5
  20:15 34:20
  40:10,16,17
  41:3 66:9
  72:22 78:24,
  25 81:14,15
  88:25 89:12
  92:19 98:5,8,
  13,20,25
hate  39:19
hatred  50:22,
  24
have  5:6 6:18
  7:7 8:6 9:6,8
  10:16,19
  11:20 12:22
  13:13,18,24
  14:7 15:12
  16:14,21
  17:2,4 18:16
  19:10 22:10,
  24 23:21,24
  24:4,14,15
  26:11,12 27:5
  28:18,21,23
  29:2,14 30:14
  31:18,21
  33:14 34:6
  35:4 37:9
  39:23 41:4,7
  43:16,23
  44:19 48:2,5,
  23,25 49:19
  50:10,11 52:2
  54:2 55:4
  56:8,25 59:4
  60:3,9 62:1,
  14,15 63:8,
  12,21 66:21
  68:5,6,12
  69:1,6,9,18,
  21,23,24
  70:3,16,23
  74:16 78:13,
  15 79:14,15,
  16 81:24,25
  82:1,18 83:11
  84:5,12,16
  85:3,4,16

88:3 89:19
  90:17,20,23,
  25 91:8 93:17
  95:15,23
  96:3,15 97:16
  100:2 101:3,
  13,14,16
  102:8 103:9,
  18
having  4:17
  12:24 39:19
  83:20 85:20
he  11:9,18
  15:12 16:5,6
  34:7 52:14,
  15,16,19
  57:14 59:7,8
  62:11 64:24
  65:14,18,20
  66:3,9 69:17
  76:14 82:2,6,
  16,19,20 83:1
  84:12,13,16,
  20 85:1,17,
  18,21 86:3,20
  88:15 89:10,
  12,17 91:4,
  16,20,22,23,
  24 92:19,20
  96:1 97:6,8,
  13
he's  8:25
  11:13 15:1
  35:1 56:4
  57:6,8,16,19
  82:5 91:19,20
  100:20
headed  64:16
hear  95:21
heard  24:14,
  21 84:5 85:1
held  47:4
  54:12 86:14
  88:1 93:12
  99:18
hell  85:1
help  4:13
  33:6 34:7,11

38:21 43:4
  58:12 62:14
  66:11
helped  66:3
  83:8
helps  31:8
  95:3
her  101:25
Herald  51:15
  52:24
here  4:25
  7:15,23 8:15
  11:5 19:1
  22:11 48:8
  55:22 59:16
  64:15 65:6
  69:23,24 70:4
  73:3,5 75:18
  81:14 82:5
  88:22 89:8
  90:17 94:22
hey  35:23
  83:10
Hezbollah
  41:16 42:6,12
  52:10,20,23
  53:10
highly  95:17
him  6:5 15:11
  20:9,11 58:8
  59:8 62:11
  64:23 65:16
  66:3 74:8
  83:11,21
  84:7,10,22
  85:16 86:3
  87:4 88:13
  97:1 98:6
  102:2,8
hint  96:19
hired  68:16
his  5:21,24
  8:8 19:7,12
  44:12 62:19
  64:25 65:2
  66:10 68:21
  83:19 88:15
  91:25 97:11

98:9,14
**hold** 20:9
**home** 5:16
  6:19 59:22
  60:3
**host** 78:18,19
**hosting**
  12:21,24
  13:10 17:12,
  23 78:18,22,
  23
**housekeeping**
  12:1
**how** 5:6,8
  6:16 24:7,11,
  17 29:10
  30:16,18,20
  31:14 47:19
  53:20 55:13
  56:4 57:11
  59:18 60:5,
  12,14,18 62:5
  63:23 65:22
  66:5 67:15
  68:11 71:15,
  25 79:13 88:7
  89:18 94:6
  102:2
**however** 59:23
**hunting** 42:23
**hypothetical**
  97:7

---

                  **I**

**I'D** 51:2
  70:22 93:18
**I'LL** 27:12
  51:4 54:19
  58:11 59:1
  63:1 74:9
  85:3 99:8,11
  102:8
**I'M** 5:22 11:4
  15:19 16:19,
  20,25 17:18,
  19 24:23 27:3
  30:23 31:1,6

33:5,22 34:13
37:1 38:3,4,
17 39:18
40:14 41:6,9,
10 43:17,22
44:15,16
46:13,24 47:1
49:12,19
50:18 51:21
55:8,13 58:21
60:7 61:5,8
62:13,24
63:25 64:10
65:20 66:17,
18 67:16
70:16,21,22
72:6,24 77:10
78:2 80:17,25
81:2,3,4,5,6
83:2,3 87:22
88:10,11,19,
22 89:7,22,25
90:2,8,10
91:1,6,7
92:3,18,23
93:16 94:8,9,
12 95:21 99:5
100:3,4 101:9
**I'VE** 6:17
9:14 22:4,22
47:13 57:8
85:11 94:7
**idea** 62:14
70:3 95:11
**identification**
9:12 22:20
78:5
**identified**
51:24 55:3
76:15
**identify**
59:24
**if** 4:21 6:5
8:3,18 11:15,
24 15:2,12
16:4,8,19
20:1,8,19
22:22,23
23:16 25:10

26:18 27:2,10
29:8,12,13
31:5 33:5
34:11,14,20
38:10,23
40:20 41:2,22
42:21 43:6,23
44:18 45:17
46:18 47:7
48:21 49:1,9
50:16 51:4,25
53:7,9 55:7,
24 57:12
65:18 67:25
68:8 70:1,11,
13,14 71:10
82:6 83:8
85:13 87:1
90:3 91:8,10
92:13,15 95:9
96:4 98:2,20
99:2 101:1,14
**ill** 72:16
**impairment**
7:7
**important**
72:7
**impossibly**
36:8
**in** 4:25 6:2,
3,13 8:7
10:5,10,16
13:9,13 17:3,
8 18:9,12,16,
23 19:1,2,13
20:16 21:16,
19,20,25
22:10,11
27:10,15,19
29:6,11 32:9,
14 33:17 34:6
38:7 40:10
42:11 43:15
44:23,24
45:5,10,22
46:2,11 49:1,
24 50:3 52:10
53:16 54:4,5,
25 55:15

56:9,11,12
57:22 59:24
60:10,24
61:23 62:7,8,
25 63:3 65:3,
5,10,14,16
67:20,23
69:20,23
70:1,2 71:18
73:9 75:3,22
76:7 77:24
79:9,18,19,23
80:22 82:5
84:8,16,18
85:1,5,10,14
86:8,22 87:16
88:19 89:6,9,
25 90:8,10,21
92:16,19 93:4
94:6,13 96:4,
15 100:6,9,10
102:8,13,17
**Inc** 4:4
**include** 40:3
**income** 22:13
**incorporate**
6:1
**incorporates**
48:12
**indemnificatio
n** 99:25
**indemnify**
20:9 21:23
100:15
**independent**
25:11
**indicating**
80:16
**indirectly**
48:13
**individual**
41:24
**indulge** 31:5
**industry** 38:7
**info** 26:16
49:15 81:15
**informal**
67:6,16

information
  9:25 12:16
  13:1,6,9
  17:11 18:3
  34:3,4,19
  35:6,8,11,12,
  21 36:6,23
  37:3,8,12
  38:11 40:4,16
  42:2 46:7
  51:7 52:1
  62:13 73:7
  87:8
initial  40:13
  53:14
initially
  31:13 86:9
inquiry  58:22
inspection
  10:1
instruct
  91:10 93:15,
  16
instructing
  15:11
instructs
  11:9
intent  93:21
interest  15:6
  19:18,21
  20:3,25 61:6,
  19,20
interested
  88:19
interesting
  73:16,17
internet  33:1
  34:18,20
  35:9,13 37:4,
  25 42:3,4,7
  51:10 52:17
  53:6 71:15
  74:1 77:15,
  19,25
internet's
  36:11
intimate
  96:19

into  23:16
  50:4 57:13
  58:21 62:24
  64:6 71:6
  75:10,15
  79:23
investigate
  52:1
involved
  40:10 71:18
involvement
  75:11 84:16
  98:9,14
involving
  102:13
irrelevant
  58:9
is  4:25 5:4
  6:19 7:4,12
  10:21 11:5,15
  12:15 15:2
  16:4,5,6,8
  19:6,21 20:14
  21:11,21
  22:8,17 23:14
  29:13 30:8
  33:6,9 35:9
  37:12,15
  40:22,23
  41:8,18 45:1,
  15 46:19
  49:18 50:11
  56:12,16
  58:6,13,15,25
  59:15 62:12
  63:9 65:8,10,
  13,21 66:8,
  12,19 67:2,11
  71:13 74:11,
  22 76:19
  78:16,23
  79:3,5,10,24
  80:24 82:2,5,
  19 86:17
  87:11 88:23
  89:5,8,10
  91:18 93:21
  94:1 95:9
  96:13 97:13,

  18 99:22
  100:13 101:20
  102:12,14,23
  103:6
issue  58:19
  99:24 100:3
issues  20:12
it  5:16 8:15,
  18 9:23 10:9
  12:4,13
  16:12,13
  17:18 19:17
  20:5,21
  22:17,23
  27:17,23
  27:17 28:16,
  18 29:12,13
  30:2,21 31:10
  33:7 34:11,
  15,18,20
  36:15 37:9,
  17,20 38:12
  39:18 40:14
  41:3,15 42:6,
  7,9,11,22,23,
  24 43:13,19
  44:2 49:1,18
  51:22 52:15
  53:25 55:14
  57:4,13,18
  58:6 61:16
  62:6 63:2,9
  65:9 66:18
  67:2,5,16
  68:11,15
  69:8,9,14,23
  70:1,20
  71:10,14,23
  72:16 73:17
  74:9,19 75:2,
  10 77:1,7
  78:9,22,24
  79:22 80:4,
  16,23 81:6,7,
  9,14,15 82:7,
  9 83:8,12,18
  84:23 85:2,9,
  25 86:1 87:1,
  3,4 88:17
  89:1 91:4,12

  92:22 93:3,4
  94:16,17,18
  100:5,10
  102:1,23
  103:21
it's  12:21
  24:23,24
  26:16 28:24
  29:12 34:20
  43:14,15 45:1
  49:3,15 55:25
  58:15,22 59:3
  62:13 63:10
  72:7 73:4
  74:7 78:17
  81:10 84:3
  92:20
its  79:23

                J

Jimmy  47:17
join  64:20
jointly  20:4
joke  34:23
  94:5
judge  58:15
  91:12 92:13
judgment
  19:13 20:10,
  16 21:24
  100:17 101:1,
  4
July  5:13
June  5:13
  6:24 22:11
  72:3
jury  58:15
just  6:1 7:18
  11:4,13,25
  12:9 14:14
  15:19,20 17:1
  18:12 28:22
  29:5 31:20
  32:25 33:15
  34:11 35:1
  37:21 38:21
  43:14 44:17

45:1 47:14
48:23 49:10,
17,19 50:17
51:21 52:5
53:13 54:9,19
55:14,17
57:14 58:22
59:4,5,23
61:17 63:1
64:10,23 66:6
67:9,16 69:14
72:7 73:20
75:9 76:14
77:12 80:17
83:2,3,18
85:25 86:1
87:6 91:20
93:9 94:20
97:22 99:8
102:16 103:6
**justifies**
90:22

## K

**K-A-R-I** 24:12
**K-A-R-L** 24:25
25:2
**K-A-Z-A-L--**
23:10
**K-A-Z-A-L.COM**
25:3
**Kaplan** 7:13
**Kari** 24:14,15
**Karikazal.com**
24:12
**Karl** 24:24
25:5 47:2,8
**Karlkazal.com**
25:21 80:10
**Kazal** 7:14
18:8,9 24:15
25:5,6,7
31:20 32:17
41:24 42:22,
25 43:3 45:10
46:19,22
47:2,8,12,15,

17,21,23,25
48:7 50:6,9,
10,20,23
51:1,5,8 52:9
85:14 88:4,5,
16,21 91:17
95:8,24
102:14
**Kazal's** 14:9
41:23 89:19
102:15
**Kazalfamilytru**
**th.com** 26:4
80:11
**Kazals** 89:11,
13 92:25 93:2
95:16 96:2,17
97:1
**keep** 37:24
77:1,7
**key** 58:14
**kids** 56:6
61:24
**kind** 11:25
12:1 29:9
30:15 34:10
37:13 38:6
49:19 58:12
59:2 62:8
67:9 71:4
72:25 97:18
**knew** 50:17
**know** 5:20,21
6:5,23 8:10
9:1 13:2,5
14:5 17:7,8
23:17 25:10
29:6 30:15
31:2,7 33:20
34:14 35:23,
24 36:21 37:9
38:21 41:22,
23 46:23
47:2,7,19
48:22 49:1,4,
7,8,9,17
50:3,6 51:22
52:15 53:7

55:17,21,24
59:1,2,4,22,
24,25 60:14,
25 65:7,13,18
66:9 67:9
68:8,15 70:6,
13,14,20,22,
23 71:10 72:7
75:2 76:25
77:5 82:16
83:10 84:2,7,
8,9 85:13
87:2,17 88:14
91:13,18
92:19 93:6,
22,23 94:9,
10,11 96:5
97:17 101:14,
17,18,19
102:19,20,23
**knowledge**
12:7 15:17

## L

**L.L.C.** 30:9
**Land** 5:3
72:12
**landlord** 5:18
**language**
10:6,10
43:12,20,25
44:7
**laptop** 73:21
74:20 75:5
**Large** 4:7
**last** 22:24
30:12 66:7
79:23 97:23
**lasted** 14:20
**late** 33:23
39:6,22 50:1
76:7
**later** 35:4
**latitude** 6:8
44:19 59:15
90:17 92:5,9
94:25

**law** 7:13
**lawsuit** 48:4,
12,15 84:8
85:4,5,10,14,
19,22 86:4,21
87:6
**lawyer** 8:25
**layers** 61:5
**layout** 40:5
**lead** 93:3
94:18
**least** 102:11
**leave** 6:21
72:1
**left** 43:25
72:9
**left-hand**
23:2
**legal** 4:4
7:25 19:8
52:3 100:20
**let** 13:3 17:5
21:4,8,12
33:14 36:15
40:20 43:17
48:2,23 53:13
57:4 59:5
60:25 62:25
74:8 75:15
77:4 85:9
94:14
**let's** 9:8
14:18 17:9
28:22 33:4
34:9 48:7
52:8 56:2
61:22 62:7
63:25 64:23
65:6 93:14
94:20 99:15
**letter** 102:8
**letters** 23:3,
6
**level** 58:18
**lie** 98:5
**like** 23:14
30:10 31:11
38:6 42:22

49:10 51:15
56:24,25
57:1,2,6
59:25 62:8
70:21 71:16
73:7,22
78:17,18
84:13 88:14
91:9 94:17
102:2
**limb** 59:1
**limitation**
89:2
**limited** 59:15
**line** 56:3
90:7 94:22
**link** 44:24
45:3,4
**Linwood** 5:5
**list** 18:4
23:6 27:6
61:15
**listed** 12:17
13:8,13,20,25
14:22 16:16,
23 21:25
26:19 27:15
73:1 80:7
82:2,16 83:11
**listening**
89:24,25
**lists** 10:9
**litigation**
15:2
**little** 6:7
26:17 31:5
35:3 43:6
51:20 57:25
58:25 67:5
90:17 92:5
**live** 6:13
**lived** 5:6
6:17
**lives** 65:13
**living** 27:23
56:9,11 57:22
**loading** 50:2

**lodged** 22:4
**lodging** 89:21
**long** 5:6,8
6:16 30:21
31:14 37:22
39:19 67:15
71:25 81:19
87:20,23
**look** 22:23
26:18 40:20
41:2,6 42:21
43:6 58:15
59:25 70:16
80:22 97:14
99:11
**looked** 28:23
**looks** 42:22
84:13
**lopsided**
51:13
**Los** 27:24
56:11,12
57:22
**lose** 42:18
**lot** 8:4 31:7
**lunch** 59:20

## M

**madam** 101:23
**made** 18:12
51:15 53:20
54:3,5 71:13
98:25
**magistrate**
91:12 92:13
**Main** 81:20
**maintain**
37:13 44:24
45:3 65:4
66:12
**maintained**
17:23 63:14
66:1 69:9,19
74:22
**maintenance**
10:7,20 12:17

13:3,8 17:12
37:20 38:5,13
40:11 58:4
88:25
**make** 11:5
16:8 17:1
21:8 22:24
36:15 45:7,9
47:14 50:17
66:6 69:13
73:20 76:8
81:6 83:3,18
85:9 91:9
96:21 103:10
**making** 80:17
**managing** 83:1
**manner** 92:17,
19
**many** 60:5
63:23 68:11
79:13 88:7,9
**mark** 20:20
**marked** 9:8,11
22:19 78:3,4
**markings** 23:7
**married** 6:25
**material** 10:2
**materials**
22:22
**matter** 12:1
**Matthew** 4:1,
16,23 28:7,13
29:22 32:19
35:23 45:18
66:10 80:14
100:13
**may** 12:21
15:10 16:7
17:23 18:4
19:11,13
20:10,16
21:24 22:14
26:22 35:4
59:24 60:1
69:21 93:3
94:18,19 96:3
100:2

**maybe** 24:23
26:12 29:6
30:16 33:23
39:6 40:4
42:23 50:4
58:12 65:6
67:19,21
71:11 79:15
96:21
**me** 5:12 13:3
17:5 18:1
21:4,12 26:13
27:10 29:6
31:5,8 33:6,
15 34:11
35:16 36:15
38:21 40:20,
24 43:16,17
44:18,20
48:3,23 51:3
53:10,13
57:4,25 59:5
62:14,25 66:3
71:23 75:15
77:4 85:9
91:5,15,19
93:23 95:9,24
99:7
**mean** 15:1
17:15 36:8,
11,13 38:7
41:23 45:7
55:13 59:8,12
70:20 82:18
87:21 100:16,
20
**means** 38:6
44:22
**medication**
7:6
**meet** 56:5
62:9
**memory** 83:8
**mental** 7:7
**mentioned**
54:25 78:7
96:3
**met** 47:8,13

50:16 51:5
61:23 62:11,
15 64:4 84:10
**Michael** 7:12
**mid** 90:8,10
**mid-2014**
67:21
**mid-2017** 65:7
**middle** 6:24
8:6,10
**mind** 49:1
96:15
**mine** 51:12
57:16,19
74:14
**minute** 64:23
99:7
**minutes** 21:20
44:20 99:8
**mischaracteriz**
**e** 66:18 81:7
94:10
**mischaracteriz**
**es** 66:14
76:13
**Mitchell** 4:4
**moment** 53:13
**money** 99:1
101:2
**Monica** 79:9
**month** 5:12
**months** 5:7
33:20 39:4
**more** 53:23
62:25 67:5
74:17 90:16
93:19
**Morning** 51:15
52:23
**most** 37:10
59:23 74:11
**motion** 90:22
**move** 17:1
37:2
**moved** 60:9
62:11 72:9,12
79:18,22

103:1
**Mr** 4:20,24
5:9,10,11,20,
22,25 6:10,
12,14 7:20,
21,25 8:1,3,
4,9,13,16,19,
22,23,25 9:2,
8,13 10:22,24
11:1,2,4,9,
13,18,24
12:3,5,11,12,
19,23 13:15,
17,21,23
14:2,4,8,12,
14,17,20,23
15:4,5,8,9,
11,14,15,17,
20,22,23,25
16:2,4,7,10
17:14,17
18:19,23
19:3,5,11,15,
16,18,20,22,
23,24 20:1,4,
6,7,8,13,18,
19,22,23
21:1,2,4,8,10
22:2,5,15,17,
21 24:1,3,8,
10,13,16
25:9,12,18,
20,22,24
26:1,3,6,8,
10,14 30:19,
22 33:11,13
34:22,23,24
35:1,7,14,15,
17,19 36:2,8,
10,11,13,16
37:14,18
38:14,16
39:9,11,25
40:2,7,9,22,
25 41:1,20,21
42:13,15,16,
17 44:12,14
45:13,14 47:5
48:10,14,17,

19,20 49:4
50:13,15
52:3,7,12,14,
16,18,19,21
53:1,2,4,8
54:7,9,11,14,
17,18,23
55:5,8,10,12,
13,15,16,20,
24,25 56:1,5,
12,24,25
57:3,7,10,14,
17 58:2,5,24
59:7,10,11,
13,14,17
60:6,8,10,14,
17,18,25
61:1,2,3,4,5,
8,10,14,15,
17,18,20,21
62:18 64:4
65:23 66:11,
14,16 67:12,
14 68:7,10,
24,25 69:10,
12 70:9,11,
12,13,14,18
71:19,21
73:12,15
74:5,8,10,15
75:6,8,12
76:13,15,17,
19,20 77:2,3,
9,11 78:2,6
80:20,21
81:15 82:22,
24 83:10,24
84:1 85:7,8
86:5,7,10,13,
16 87:17,20,
24 88:2 89:4,
5,7,8,10,14,
15,18,21,22,
23,24 90:1,2,
4,5,6,8,9,10,
12,13,16,23,
25 91:1,2,3,
4,6,15,20,22,
23,24,25

92:3,5,8,11,
12,15,18,23
93:7,8,9,10,
14,20,24
94:1,3,4,14,
16,21,23
95:1,2,3,5,
17,20,24,25
96:1,20,24,25
97:3,4,7,9,
11,12,13,14,
16,22 98:1,
11,12,23,24
99:5,10,11,
14,15,20,25
100:1,4,9,12,
15 101:8,12,
15,16,17,21,
22,25 102:1,
5,6,9,10,14,
15,17,19,21,
23 103:1,2,3,
4,8,9,16,20
**much** 17:19
**multiple** 61:5
**must** 9:24
10:1
**my** 7:8,12
13:18 16:11
20:14 24:24
28:10,12,20
36:14 46:20
48:25 55:21
57:6 58:8,13,
20 69:24 71:7
73:23 79:4
80:24 82:2
83:1 85:11
86:17 87:12,
15 89:15 92:9
93:21 94:13
95:9 96:5
97:12 99:11
100:9,20
102:7,8 103:6
**myself** 48:12

## N

nail  49:12
  75:9
nails  77:12
name  4:21
  5:21,24 7:2,
  12 9:16 14:20
  23:9 28:24
  29:3,9,12,15
  32:13,14,21,
  25 37:24
  78:25 80:4
  83:19 84:5
named  14:5
  84:2
names  29:17
  30:6,10 47:1
  52:5 53:15,18
  75:17 76:6
  77:6,14,18,24
  80:6,15 81:12
  83:23 84:17
  96:6
narrow  6:3
  94:18
narrowing
  69:14
nature  58:23
  94:11 95:4
necessary
  101:12
need  6:7
  37:12 38:25
  87:23 92:13,
  16 94:19
  102:6 103:15
nervous  88:11
network  71:14
never  8:9
  24:14 35:20
  36:2 37:17
  47:13 51:6
  57:8 65:25
  73:13 84:10,
  22,24 85:11

new  4:5 6:19
  72:14 79:19
news  51:15
  52:6,11,25
next  43:23
  47:10
nexus  90:20
  93:17
no  7:11 9:5,
  11 10:15,18
  12:14 13:16
  15:14,17,18
  16:2 17:4
  18:6,8 19:9
  21:3 22:12,
  16,19 25:1
  30:13 32:16,
  18,24 34:5,8
  35:18,22
  36:1,4,10,13,
  18,25 37:20
  39:10,18
  40:12 43:14
  46:12 47:3,8,
  13,16,18,20,
  22 48:1,19,21
  49:16 50:24
  52:16 62:14
  64:15 65:12
  67:22 69:11,
  25 70:3 75:7,
  20,24 76:3,5,
  10 77:16,21
  78:4 79:7,18
  82:21,23
  83:1,13,14,22
  84:4,11,12,
  19,21 87:5,7,
  8,10,11,12
  90:2,4,12,13
  91:22,24
  92:11 94:14
  95:11 96:23
  97:2,10,11
  98:7,10,16,
  19,22 99:4
  100:20,25
  101:12,13

nod  39:14
non-silly-
  sounding  31:2
Nope  47:24
  77:23 83:9
nor  24:15
  55:17
not  8:4,6,20,
  25 11:9,18
  13:22 14:3
  15:11 16:7,
  19,25 17:19
  19:20,24
  20:2,5,7 22:7
  24:21 29:12
  30:23 31:6
  32:17 35:4
  41:9 44:16
  49:12 50:19
  51:4,7 53:7
  55:13,17
  58:21 60:7
  61:8 64:19
  65:20 66:17
  70:16,21,22
  72:6 77:8,10,
  22 80:24
  83:20 87:12
  88:9,10,11
  89:2,23,25
  90:2 91:1,6,
  10 92:2,3,20
  93:15,16 94:9
  98:17 101:3,
  9,12 103:25
Notary  4:7
note  20:19
Noted  6:11
notes  99:11
nothing  4:13
  82:7 88:25
  101:16
notice  4:2
noting  11:13
Notwithstandin
g  83:19
November  4:3
  39:23 43:7

44:4,8 102:25
now  18:7 23:2
  30:10 31:19
  32:12 37:7
  39:22,23 42:2
  43:6 46:10,13
  50:16 51:20
  62:24 64:1
  65:13 72:24
  80:3 81:14
  83:4
number  9:9,17
  20:12 22:17
  23:3 26:19
  40:25 43:24
  44:25 46:14
  48:9 87:16
numbers  41:3

## O

O'LAKES  5:3
  72:12
oath  54:20
obfuscate
  94:10
object  8:11
  11:6 48:24
  90:6 94:23
  97:16
objection
  7:20 8:16
  10:22 13:21
  14:2 15:24
  17:14 19:3
  25:9 34:22
  40:7 41:20
  45:13 50:13
  52:12 56:25
  57:7 58:2
  60:6 66:14
  70:9 71:19
  74:5,10 75:6
  76:13 77:2,9
  80:20 85:7
  86:5 89:21
objections
  6:2,11 8:5

11:14 20:20
22:4 91:8,9
**objects** 10:1
**obtained** 7:16
**Obtaining**
75:21
**Occasionally**
60:2 65:17
**of** 4:1,7 5:14
6:4,7,17,24
7:13,14,16,23
8:5,12 9:14
10:2,7,20,21
11:25 12:1,9,
17 13:2,5,8,
11,19,25
14:8,16,19,
21,25 15:1,
15,18 16:16,
20,22,23,25
17:3,7,8,10,
11,12,13,18,
19,21,22
18:1,2,4,5,
12,23 20:12,
20,23,24 21:5
22:3,11,22,
23,25 23:2,6,
17 24:14,21
26:17,20
27:5,20 29:9,
17,25 30:15
31:2,7,19
32:7,22 33:9,
17 34:1,4,10
35:5 36:5
37:13,20
38:5,6,11,13
39:4,5,7,23
40:4,5,11
41:3,11,23,24
42:3 43:3,7,
24 44:4,6,8
45:2,11
46:14,21,24,
25 47:10,13
48:4,5,6,8
49:19,20
50:1,4,6,10,

19,23 51:1,5,
6,12,17,23
52:1,9,17
53:10,15,17,
23 54:25
55:1,2 56:3,4
57:16,19
58:7,12,13,
14,17,18,19,
23 59:2,6,15
61:5 62:8,21
63:12,14
64:3,13,18
65:5,7,20
66:1,12,24
67:9 68:11
69:6,19 70:5
71:4,8,9,12,
16,18 72:1,4,
19,25 73:7
74:1,11,17,18
75:11,13,14,
15,17,25
76:1,7,9
77:10 79:4,12
80:6,15 81:10
82:12,18,19,
20 83:23 85:1
88:4,20,21,25
89:6,19,23
90:17 91:15
92:12 93:23
94:11 95:4,14
96:4,6,7,16
97:18,24
99:1,24 100:7
101:2 102:4,
14,22 103:24
**off** 12:9
20:24 41:10
42:3 47:4
52:17 74:14
86:10 88:1
93:7,11 99:6,
13,15 102:11
**offer** 98:25
**office** 79:4,
5,22

**officer** 68:2,
19 70:25
73:22
**officer's**
69:16
**offices**
79:13,17
**often** 30:18
59:18 60:18
**oh** 9:7 22:6
24:23 39:15,
18 40:22
48:22 69:15
79:21 85:23
87:13,19
**okay** 7:12
9:3,14,19
10:5,19
11:12,13,16,
17,23 12:2,6
13:24 15:8
16:7,14,21
17:19,20,23
18:7 19:20
20:1,5,19
23:2,6,9,13
25:13 26:15,
24,25 27:8,
11,14,18,19
28:6,11,15
29:2,14,17,
22,24 30:23,
24 31:1,3,4,
7,9,13,16
32:12 33:14,
21 34:9,23
35:1,11 36:20
37:1,7,19,22
38:17,19,22,
23,24 39:1,2,
4,13,16,20
40:3 41:4,6,
25 42:18
43:6,16 45:4,
17 46:13,18,
21,24 47:6
48:15 49:2,5,
6,9,13,21
50:16 51:3,17

52:18 53:20
54:2,14,18,20
55:5,6,8,9,
12,15,19
56:8,11
57:18,22
58:17,19,24
59:3,18 60:3
61:15,22
62:8,17 63:1
64:3,8,9,11,
13,17 65:21
66:4,6,21
67:23 68:3,
14,16 69:4,18
70:19 71:15,
22 73:18
74:16,19
78:21,24
79:3,5,8,10,
13,25 80:17
81:8,9,18,22
82:4,6,25
83:2,14,24
84:7,10,14
85:13,24
86:17,24
87:19 88:7,
10,15,19
89:14,23
91:1,6,13
92:23 93:5,
14,20 94:2,7,
9,22 95:2,6,
14,23 96:15
97:5,10,14,16
98:17 99:5,
13,20 100:1,
5,6,11,24
101:8,13,17
102:9,10
103:21
**old** 79:4,5
**Olympic** 78:25
79:10
**on** 4:2 6:11
7:6,23 8:21
9:17 12:17
13:9,13,20,25

14:22 15:6,24
16:16,23
17:1,16 18:19
19:2 20:23,24
21:4 22:2
23:2,24 24:4,
20 25:2 28:3,
7,8,19,20
33:1,6,9
34:4,20
35:13,16
36:24 37:2,3,
8,25 38:21
39:7,21 42:4,
7,11 43:13,15
44:25 45:2,
24,25 46:15
48:8,25 49:22
50:2 51:10,23
52:2 53:11
54:16,18 56:2
59:1 67:15
69:9,19 73:1,
8,9,10,22,25
74:3,13 75:1,
2,3,4,18,21,
25 77:15,19,
25 83:6,12,19
86:17 90:3,21
92:6,9 93:14,
21 94:16,17
97:6,8 99:20
100:3 101:4,
22 102:10
**Once** 59:25
**one** 10:9
16:15,22
18:4,12 19:1
22:23 24:21
28:23 30:8
31:15 32:7
41:9,11,23,24
42:19 44:25
45:11 48:25
54:25 55:2
58:12,13,14
64:18 79:4,12
84:15 86:10
90:15 93:7

96:4 97:17
**one's** 59:22
**ones** 73:1
**online** 88:18
**only** 90:14
92:20 103:6
**onto** 34:16
40:17
**opposed** 93:19
**or** 4:11 5:16
6:18 7:6,7,8
9:23,25 10:2
11:16 12:25
13:6,11,12,
19,24 14:18,
21 15:13
16:11,14,15,
18,19,21,23
17:8,10,12,13
18:4 21:23
22:15 23:17
24:23 27:11
28:8,18 29:6,
12 33:8
34:14,15
35:4,5 38:10
45:6,10,24
47:7 50:10,
17,22 51:1,8
52:1,24 53:1,
7 54:4 57:12
58:15 59:25
60:18,19
62:16,19
63:13 64:2,17
65:7,19 68:21
69:19,20
71:11,14
73:21,24 74:1
76:1 77:1,7,
18,24 78:18
82:12 83:21
84:15,17,22
85:25 87:12
88:14 90:20
91:16 92:20
93:4 94:10,
11,18 97:17
99:1 100:6,

10,14,15,18
101:3
**oral** 100:6
**orally** 100:10
**order** 44:24
**ordered** 103:9
**ordering**
102:3,5
**organization**
80:5
**Oscar** 47:21
**other** 12:24
13:11 17:10
19:11 20:12
23:18 24:20
37:4 40:10
42:19 52:24
55:11,17,20
60:16,19
63:21 68:5,6
73:9 75:3
76:21,23 99:1
101:8
**out** 17:8
19:25 26:19
27:6 29:25
31:1,8 32:25
33:6 37:10
42:19 45:24
49:17 59:1,
20,21 64:12
66:3,11 70:23
74:6 86:22
94:1 99:8
**outside** 14:16
17:18,21,22
18:1 36:5
48:4,5 100:25
**outsourced**
65:9 67:2
**over** 14:10
25:7 103:12
**oversaw** 71:23
**own** 5:16
28:19,20
29:25 32:14
73:23

**owned** 63:18
74:12,13,22
**owner** 80:6,
14,15 81:10

---

**P**

**packet** 22:22
**page** 22:23,24
23:24 33:2
40:21 41:2,3,
4,7 42:18
43:24 44:6
45:24,25
46:14,16 48:8
52:8
**paid** 18:22
29:24 32:4
53:16 77:22
100:18
**paper** 17:7
69:14,21
**paperless**
69:17
**paragraph**
9:20 42:23
**paragraphs**
42:21
**part** 7:16
37:10 71:16
89:23 93:23
**parte** 90:22
**particularly**
20:8 26:18
**parties**
103:25
**party** 36:6,12
**passed** 72:22
**path** 64:10
94:8
**pay** 20:15
21:23 30:16
37:22 53:25
99:1 100:17
101:4
**paying** 18:25
19:7,12 82:9

100:20
payment  54:4
payments
  53:21 54:3,4
pending
  102:12
people  37:11,
  16
perfectly
  49:3
permit  10:1
person  35:13
  36:17,20,23
  41:19
personal
  28:7,13,19
  29:25 32:4
  74:3 75:3,4
personally
  29:22 32:2
  39:7 45:20
  47:2,7 50:7
  66:10 80:14
  96:20
phone  18:20
photograph
  41:8,18,25
  42:4,10,22
  43:3 52:9,17,
  22 53:1,11
photographs
  35:12 36:3,23
  40:5 46:15,
  16,21
photos  36:7
phrase  44:20
  45:5 51:4
phrased  53:23
physical  7:7
  79:16
pick  28:22
pictures  38:9
  53:6
piece  17:7
place  79:23
  86:18,25
  89:17 93:1

95:10
places  51:15
Plaintiff  4:2
plaintiff's
  9:9,11 22:19
  78:4
plans  6:18
play  31:6
please  4:9,22
  9:10 16:13
  20:22
plug  43:15
  44:23
point  28:16
  30:15 32:8
  33:8 42:19
  50:3 62:1,17
  63:24 103:6
poorly-phrased
  83:16
port  4:5
  72:14
portion  97:24
posed  91:5
possession
  10:16
post  33:1
  34:16 35:13
  36:24 41:25
  43:12,20
  44:21 51:9
posted  34:14
  37:3 38:21
  40:17 42:11
  52:2,9 55:1
  96:6
poster  43:14
posting  10:7,
  20 12:16
  13:3,7 33:8,
  18 34:3,15
  38:10 39:7,21
  40:3,13 51:6
  73:7 75:25
potential
  15:5 58:16

potentially
  36:12
preparation
  102:17
prepare  80:22
prepared
  101:20 102:15
presence
  14:16
present  85:24
  88:14
presented
  9:14
preserve  8:12
press  44:23
  101:9
pretty  74:7
  87:24 92:6
prevent  7:8
  70:6
previously
  6:13
price  4:1,16,
  23,24 6:14
  20:4,6 21:2
  29:22 32:19
  45:18 66:10
  80:14 91:15
  94:21 96:1
  99:25 100:4,
  14 101:15,25
  102:1
Price's  28:7,
  13
prior  51:6
  66:14
priority  45:6
private  5:19
privilege
  15:4,6,21,24
  19:16,19
  20:3,25 61:2,
  4,6
privileged
  14:13,25
  15:19 19:15
  21:5 22:3

privileges
  61:16
probably
  13:10 32:7
  34:10 43:5
  69:17 84:14
probe  94:19
problem  50:6
procedure
  92:12
proceed  5:25
proceeding
  20:16 89:6,9,
  24 90:21
  102:12,21,24
proceedings
  55:21 103:22
process  7:16
  29:6 45:2
Production
  9:21
programming
  71:3
promoter
  43:20 44:21
properly  8:12
protest  85:1
provide  36:6,
  23 73:21
provided  36:2
provision
  70:2
pry  72:7
public  4:7
  26:16 34:18
  49:15 62:13
published
  51:14
publishing
  58:4 88:24
pulled  31:20
purchase
  29:13,14
  30:10
purchased
  29:18,20

purely   35:9
  37:4
purports
  80:18
purpose   11:16
purposes   7:14
  26:17 27:5
pursuant   4:1
put   7:9 37:8,
  10 43:13
  53:11 57:13
  62:7 76:8
  77:6 97:8
  102:8
putting   34:3
  35:24,25
  74:25 77:15,
  19,25 82:12
  84:17

---

## Q

Q1   26:12 32:7
  53:16
quarter   27:20
  31:19 33:17
  39:5 49:10,24
  50:4 54:4,5
question   8:2
  11:10,11,19
  13:4,18 15:12
  16:1,3,4,11
  17:3,6 20:14
  21:9 35:3
  36:15 44:16
  47:12 51:4,21
  53:18,23
  55:7,16 58:20
  59:2,14 66:8
  70:15 71:4,7
  73:16,17 76:4
  83:16 86:17
  89:10,22
  90:19 91:4
  92:14 94:23
  95:9 97:23
  98:2,3 100:4,
  9

question's
  87:12
questioning
  56:3
questions   6:6
  7:8,9 11:6
  20:20 31:1,2
  38:18 39:19
  46:25 47:10
  48:25 49:20
  54:25 55:4,21
  58:13 59:6
  72:25 74:18
  75:11,16
  84:15 88:12
  89:15 91:2,7,
  8,11,15 92:10
  93:3,4,17,18
  94:5,13 96:5
  101:8,11,14,
  15
quickly   29:5
  87:25 92:6
  103:11
quiet   90:5
quite   96:5
quote   38:5
  42:25 44:21,
  22 92:9
quote/unquote
  27:11
quotes   38:4

---

## R

R-O-D-R-I-C
  14:20
raise   4:10
rambling
  39:19
reached   100:2
read   8:17
  12:9,13 85:2
  87:15 88:17
  97:22,24
  101:21 102:7,
  8 103:10

reading
  101:18 103:24
ready   54:14
realize   6:7
really   50:17
  56:6 91:23
reason   37:9
  43:17 58:13,
  19
recall   5:24
  7:18,24 13:22
  14:3 31:14
  48:21 49:8
  53:18,20 70:1
  83:20 85:20
  86:2,24 87:1
  95:13 96:4,18
  97:8,15
receive   35:11
  77:13,17
received
  13:24 60:24
receiving
  22:13
recess   54:12
  86:14 93:12
  99:18
recognize
  79:1
recollection
  16:5 27:21
  43:4
record   6:11
  34:25 37:1,2
  47:4 54:18
  72:8 86:10
  88:1 93:11
  97:24 99:6,
  13,16,20,22
  102:11
record's
  21:21 47:15
records   12:6,
  8,9 17:4 54:2
recounted
  85:17
refer   26:22
  27:2,11 38:10

48:7 51:22
  55:7,24
reference
  11:15 18:12
  42:23
referenced
  17:24
referred   23:7
  45:5
referring
  13:19 27:3,13
  48:16 55:8
  63:16 85:6
  87:18
refers   42:24
refresh   43:4
  83:8
regarding
  13:25 14:8,21
  16:15 19:12
  32:10
register
  12:20 28:24
  29:2,8,9 31:9
  81:24
registered
  31:13 32:13,
  21 33:16
  37:24 49:24
  76:6 77:5
registering
  75:17 77:14,
  18 82:7 84:17
registrar
  29:11 30:3,5,
  11 78:10,11,
  16,22
registration
  29:25 30:14
  31:14 53:15,
  17 83:21
registrations
  31:21,25
  33:18
related   6:6
  12:16 13:1,2,
  7 19:14 20:17
  21:24 65:10

77:19 89:3
91:15 100:18
101:2
**relating**
86:21
**relation**
33:17
**relationship**
56:23 57:5,12
58:8,17,18,24
62:2,18 63:12
64:5,12 65:22
66:22 67:17
95:4
**relayed** 87:8
**relevance**
59:3
**relevant**
55:20 59:3
60:15 91:18
**remember**
16:11 62:12
91:25 92:20
**remind** 54:19
**remuneration**
99:1
**renew** 6:1
30:14 31:24
**renewal** 37:22
53:15,17 54:6
**renewed** 31:22
32:10
**rent** 5:16,17
**Repeat** 16:13
**Replacing**
38:8
**report** 68:3
**reported** 4:6
68:17
**reporter** 4:9
11:14 20:21
22:18 38:4
44:13 83:25
86:12 90:14,
24 97:25
101:10,24
102:3,7

103:14,18
**repost** 46:5
**reposted** 52:6
**reposting**
45:1
**representative
s** 9:23
**Republished**
43:19 44:21
**reputable**
51:14 52:24
**request**
10:14,17 17:9
**requested**
17:3 76:1
**requests** 65:3
**require** 8:11
71:9
**required** 7:22
8:15
**reserve** 29:9
**reset** 103:5
**reside** 5:2
**residing** 4:24
**respond** 96:10
**responding**
90:2
**response** 25:1
32:16,18,24
39:10 44:12
54:25 96:4
**responsive**
10:14,17
**restriction**
70:6
**resumed** 54:13
86:15 93:13
99:19
**retained** 7:14
**return** 6:18
**retyping** 46:2
**reup** 30:15
**Richey** 4:5
72:14
**right** 4:10,21
7:6 14:16
16:7 18:15

23:10,16,21
25:3 27:3,10
28:25 29:3,5
30:3 31:18
32:15,19,23
33:1,4 34:2,
14,21 35:10
36:9,12 37:24
38:3 39:8,12,
24 40:21 41:2
43:10 44:15
46:9,13,15,19
52:15 54:24
56:2,16,18
61:22 62:17,
19 63:8,11
65:10 67:3,5,
8,15,23 70:25
71:15 72:10,
21 74:16
78:24 79:16
80:13,15,16,
18 81:2,12,14
82:7,11,13,14
84:25 88:23
90:1 92:23
93:25 96:22
97:19,22 99:5
103:3
**Robins** 7:13
**Rodric** 14:5,
20 15:12
16:15 18:24
19:4,7,12
20:15 22:15
35:20 36:5,
18,21 48:13
51:19 55:3,8,
10,25 56:24
57:5,12,23
59:11 60:3
61:11,24
62:3,9,19
63:13 65:19
68:4,16,17
75:19 76:2,8,
16,21,23
77:13 85:13,
21,25 86:9,20

87:8 88:4,20
89:11,13
91:16,17
92:25 95:7,
15,25 96:3,
16,20 98:5,8,
13,17,20,25
100:14 101:3
**role** 64:25
68:21 71:6,17
87:15
**roughly** 6:23
68:12
**rules** 8:5,11
92:12
**run** 37:21
**Ryan** 16:22
34:6 36:21
64:18,20
65:10,13
81:15,22
83:11,20

---

**S**

**S-I-N-G-H**
84:3
**said** 4:6 8:18
22:7 24:21
35:23 36:18
39:5 42:2
49:23 57:8
59:4 76:14
81:18 83:3,14
92:20 96:7
100:22
**same** 8:16
13:21 14:2
40:22 41:7
43:25 44:7
47:10,12
56:14 57:7
61:24 74:10
76:4
**sampling** 10:2
**Santa** 79:9
81:18

saw 51:11
52:6
say 14:15
17:9 26:22
38:5 42:6
49:3 50:12
51:2 55:10
56:4 57:5
63:15 65:6
92:22 94:17
95:6
says 8:18
9:21,23 22:23
41:15 43:19
80:16
school 56:6,
7,14 61:25
scope 6:3
14:24
search 23:18
37:11
second 36:22
42:23 86:11
93:7
secret 77:7
secrete 77:1
secrets 64:15
70:21
see 9:16,18,
19,21 10:3,10
23:4,10 37:11
38:4 41:10,
13,16 43:1,7,
8,19,20,24
44:2,4,7,10
46:16 75:18
79:24 81:16
seeing 83:6
seeking 48:5
seen 23:21
78:14
self-published
51:13
send 103:16
Senior 65:1
sensitive
103:6

sent 13:19
74:17
sentence
90:8,10,11,12
separate
71:10
separately
29:18
series 20:20
46:24 49:20
59:5
Seriously
31:6 92:2
served 7:17
9:4 61:12
85:12,14,18,
22 86:3,21
87:1
servers
74:12,13,21
services 71:9
set 17:8
32:12 37:7
45:24 49:23
50:11 96:6
102:24
seven 87:16
shall 12:13
16:11
she 39:14
101:23
short 54:19
shortly 62:11
should 6:3,8
48:25 58:8
74:16 85:2
87:24 99:16
show 78:2
showing 81:10
shown 22:22
48:8 83:19
shows 23:9
78:24 80:3,4
shut 92:6
sic 17:19
24:11 30:15
95:24

sign 101:21
102:7 103:10
signing
103:24
silences
87:20
since 17:4
22:11 55:11
60:9 72:22
Singh 36:21
84:2
sir 4:9 9:17
12:10 46:11
90:24
sit 70:4
site 25:8
31:20 34:17
74:1
sites 34:4,
10,16 49:23
55:1 71:15
sits 32:25
slightly 16:1
slip 55:16
smiling 35:1
so 4:13 7:12,
16 8:14
11:18,24 12:6
13:9,18 14:10
15:23 16:11
18:6 20:14
21:21 23:13,
16 24:20 25:2
26:22 27:2,5,
19 28:15
29:8,14,17
30:14 31:1,9,
13,18,20
32:11,13,14
33:4,23 34:25
35:3,8,20
37:1,10,17,22
38:3,10,21
39:4,21,22
40:13 42:8,9
43:22 44:15,
19,23,24,25
45:1,17 47:1,

7 48:13,23
49:9,14 50:8,
9 51:2,14
52:8,22 53:9,
23 54:1,2,24
55:4,7,24
56:2,4,8,11
58:12,17,19,
25 59:4
61:18,22
63:11 64:8,
15,17 65:5,21
66:6,21 67:5,
20,23 68:16
69:3,4,5,13,
18 71:7,13
73:1,3,13,18,
24 74:12,16,
25 75:9
76:24,25
77:12,22
78:13,24
79:5,10,20
81:1,3,24
83:14 86:6
87:6 88:11,
17,22 89:8,
15,25 90:2
91:13 94:7,
20,24 95:6,9
96:15 97:10
98:2,4 99:7,
22 100:2,3,6,
9 101:1,13,22
102:16 103:6,
10
socialize
57:23 59:18,
19
socialized
59:5
socially 58:9
SOHN 5:9,20,
22,25 7:20,25
8:3,9,16,22,
25 10:22 11:1
12:11,19
13:15,21
14:2,12,14,23

15:5,9,14,17,
22,25 16:4
17:14 19:3,
15,18,22,24
20:7,18,23
21:4 22:2
24:1,8,13
25:9,18,22
26:1,6,10
30:19 33:11
34:22,24
35:14,17
36:8,11 37:14
38:14 39:9,25
40:7,22 41:20
42:13,16
45:13 48:10,
17,19 50:13
52:3,12,14,18
53:1,4 54:7,
11 55:10,13
56:25 57:7,14
58:2 59:7,11,
14 60:6,14
61:1,3,5,14,
17,20 66:14
67:12 68:7,24
69:10 70:9,
12,14 71:19
73:12 74:5,10
75:6 76:13,17
77:2,9 80:20
82:22 85:7
86:5,10 87:20
89:4 90:4,6,
9,12,16,25
91:4,20,23,25
92:5 93:7,9,
14,24 94:3,
14,23 95:2,17
96:24 97:3,7,
11,13 98:11,
23 99:10,14
101:16,21
102:5,9,17,21
103:1,3,8
**sole** 89:2
**solely** 40:17

**some** 18:7
23:3,16,18
28:16 30:15
33:8 37:16
38:17 50:10
55:2,4 62:1,
17 63:14
66:1,12 89:5
94:25 99:1
100:2
**somebody** 45:9
**somebody's**
41:10
**someone** 29:8
38:6 74:17
**someone's**
41:11
**something**
17:22 31:11
33:1,2 45:6
94:18 96:21
**sometime**
27:19 31:18
33:16,23 39:6
67:23
**sometimes**
87:20
**Somewhat**
71:20
**sorry** 5:22
20:23 21:7
24:23 88:22
89:7 95:21
**sort** 89:5
**Sound** 54:10
**source** 52:25
**speaking** 8:5
**specificity**
8:12
**speculation**
11:1 68:7
**speculative**
12:19 95:17
**sporting**
59:21
**spouse's** 7:2

**spring** 33:23
76:7
**spring/early**
39:6
**spring/summer**
50:1
**stalking**
48:11
**stands** 37:1,2
**start** 13:4
33:18 39:21
54:14 56:2
**started** 33:8
34:3 39:7
50:2 62:5
64:13 65:23
67:17 86:3
**starting**
97:17
**state** 4:7,21
6:2 21:4
**stated** 59:8
**statement**
11:5
**States** 62:12
**status** 102:17
**stay** 44:25
65:16 93:21
**stayed** 60:10
**steer** 8:7
**step** 99:8
**steps** 29:7
**Steven** 16:19
18:18 48:18
54:16 88:23
102:5
**still** 39:17
54:20 63:8,9
65:14,18 69:7
90:23,25
101:10 102:10
**stop** 21:12
48:3,23 99:6
**stored** 9:25
12:15,25
17:16

**stories** 51:12
**strategy** 71:2
**streaming**
71:2,12 74:1
**streamlining**
26:17
**Studios** 21:6,
12,13,19,22,
23 22:15
28:2,17,18
62:19,22
63:13,16 64:7
65:19 66:10,
12 67:3,18,
20,24 68:5,22
69:2 70:7,8
71:1,5,8,17
72:1,2,9
73:9,20 74:3,
22 75:1,2,4,
14,23 76:4,
11,22 77:18
79:6,23 81:19
100:1,14,15
101:4
**Studios'**
73:10
**stuff** 31:7
35:24 39:21
46:2,11 64:13
73:25 74:1
77:25
**sub-company**
71:11
**subpoena** 6:2
7:17,22 9:3,
15,17 12:10,
18 13:13
14:1,22
16:16,23
17:4,5 19:2
22:1 26:19
40:23 60:24
61:12
**subpoenas**
13:20
**such** 15:2
20:14 30:11

sued  14:9
  18:7 32:9
  85:10
sufficient
  6:9
Suite  4:5
sum  66:24
summer  33:24
  39:6 50:4
  76:7
Support  4:4
  41:16 42:6,12
  52:10,20,22
  53:10
suppose  76:17
sure  16:19
  17:1 21:8
  22:24 33:25
  38:15 45:7,9
  47:14 50:17
  60:7 62:13
  64:14 66:6
  67:13 70:17,
  22 73:20 79:2
  80:17 81:6
  83:3,18 86:13
  88:6 93:8
  94:3 99:10,14
swapping  38:9
swear  4:11
sworn  4:17
Sydney  51:15
  52:23 102:13
system  65:4
systems
  63:14,15
  66:2,12

---

**T**

T-A-R-E-K
  42:25
tagged  48:25
take  11:14
  18:8 39:14
  54:9 72:19
  90:15 91:12

92:5 99:15
taken  4:1
taking  7:15
  93:23
talk  33:4
  34:9 60:16,18
  63:25 64:23
  93:10 99:9
talked  16:18
  72:6 84:22
  85:4
talking  15:2
  41:9,11 53:14
  59:11 62:6
  98:15 102:20
  103:4
Tarek  42:24
teasing  35:2
tech  38:7
techie  17:19
  30:23
technical
  82:1,3,17
  83:12
technology
  28:1,9,11
  63:3,11,18
  64:6,20,24
  65:8,21 66:8,
  24 68:2,19
  69:16 70:25
  73:19,22
  74:17 79:7,
  11,14
tell  5:8,12
  11:20 29:12
  54:20 57:25
  58:11 76:11,
  22 83:10
  84:13 87:4
  91:19 94:8
  95:9 98:17
telling  55:13
  83:21
tells  93:22
ten  44:20
Teresa  4:6

term  33:7
  34:12 38:3,23
  52:24 53:10
  100:16
terms  6:4
testified
  4:18 52:14,16
  53:16 75:10
  99:2
testify  9:15
  97:18
testifying
  7:9 70:7
testimony
  4:11 66:15
  76:14 92:1
testing  10:1
text  16:14,
  18,21 17:9
  60:19
texts  13:11,
  19,24 14:18
  15:13 16:20
than  12:24
  24:20 40:10
  53:23 68:6
  76:23 90:16
Thank  46:9
that  4:25
  6:3,8 7:4,7,
  9,16,18,22,24
  8:9,11,17
  9:3,4,20,21,
  23 10:3,10,21
  11:7,10,20,
  24,25 12:9
  13:2,4,7,22
  14:3,14,24
  15:4,18 16:2,
  20,25 17:2,
  21,22 18:1,3,
  8,9,12,17,19,
  23 19:1,6,13,
  23 20:10,11,
  16,18,19,20
  21:8,20,21,24
  22:2,4,8,14
  23:3,4,11,14,

16 24:24
  26:16 27:15
  28:3,24 29:2,
  5,9,10 30:8,
  16,18 31:8,
  11,18,21 32:6
  33:2,4,10,14,
  17 34:6,13,23
  35:3,6,8,9
  37:3,9,12,24,
  25 38:4,7,12,
  25 40:16,22
  41:4,8,13,15,
  16,18,25
  43:1,3,4,8,
  10,16,17,19,
  20,22,25
  44:10,19,22,
  25 45:2,4,5,
  10,11,15
  46:4,9,15,19
  48:8,12,15,16
  49:17,22,23
  50:3,11
  51:12,17,23
  52:2,9,10,14,
  16,19,23
  53:10,11,16,
  18,23 54:3,5,
  21 55:1,2
  56:3,16 57:8
  58:14,22
  59:8,24 60:1,
  12 61:1,4
  62:5 63:8
  64:10,13,19
  65:20,21
  66:5,7,9,13,
  19 67:11,15
  69:6,19 70:1,
  6,16,23 71:4,
  5,9,16,18
  73:1,8,22,25
  74:1,2,6,12,
  13,21,22,23
  75:14,15,18,
  21,22,23
  76:1,2,12,16,
  23,25 77:5,8,

10 78:14,17,
18 79:1,3,5,
18,19,24
80:1,2,5,6,17
81:16 82:16,
18 83:3,15,
19,24 84:20
85:3,4,6,18,
19,24 86:2,3,
8,18,22,24
87:3,11
88:13,14,20,
25 89:3,12
90:22,23,24,
25 91:8,11,16
92:1,7,13,20,
24 93:3,17,20
94:4,6,11,18
95:3,15 96:1,
3,7,11,13,15,
16,20 97:6,
22,23 98:2,14
100:7,16,17
101:4,13,25
102:2,21,24
103:5,7,11,12

**that's** 7:4
8:18 9:20
14:11,20
15:1,9,18
19:15,20,24
20:7,25 23:7
24:11 28:10
32:14,20,22
34:14 36:8
38:20 39:16,
22 41:6,9
44:23 46:1,3,
20 51:22 57:1
58:19,25
60:14 64:8,15
65:24 70:10,
15 73:16 79:7
81:2,4,5,9,19
83:2 85:11
87:13 89:2
90:21 92:2,
15,18 93:11,
24 95:1,17

101:6 102:21
103:20,21
**their** 47:1
51:13 63:14,
15 66:1 73:10
**them** 16:18
26:20,23 27:6
32:10 47:13
48:7,12 50:17
51:15 52:6
75:13 78:8
79:4,12 91:25
96:10
**then** 10:5,9
16:6 21:9
24:17 29:17
32:25 37:8
38:12 42:9,
10,24 43:23
50:1 53:15
64:5,6 71:4,6
73:19 74:9,19
75:12 76:7
79:22 91:12
101:8 102:7
103:11
**there** 5:4,6
6:8,17 9:17
10:11 12:14,
15 19:6,11,19
21:11,21
23:3,7 26:20
32:25 37:10,
12,25 38:21
39:23 41:8,13
44:20 46:14,
18 48:3 49:17
55:11 70:2,21
76:8 78:25
79:1 80:16
88:13 93:5,19
94:20 95:6
100:13
102:12,20,24
**there's** 8:4
9:20 10:5
15:5 16:19
17:15 19:18
20:8 34:12

38:23 41:15
42:19 46:4
48:11
**THEREUPON**
4:15
**these** 10:21
12:6 13:1
14:10 15:15
17:22 19:14
20:17 21:25
24:20 26:19
27:13,19
28:6,15,21
29:17,20
30:6,25 31:9,
14,24 32:10,
13,22 33:9,
16,19 34:4,
15,17 35:16
36:24 37:3
38:11,13 39:8
40:11 46:21,
25 47:10
49:23 50:11
51:9 55:1
77:6,14,15,
18,20 82:20
83:23 85:22
87:2,20 98:14
**they** 10:25
25:7,14 28:7,
8 30:11 42:9
51:11 53:7
65:3 68:5,12
73:20 74:12,
13,16 78:16,
17,22 81:9
89:16 92:25
100:16 101:4
103:4
**they're** 25:11
**thing** 42:19
97:17
**things** 18:1
37:10 55:2
58:12,14
94:2,4 96:21
**think** 14:23,
24 15:9,18,22

19:11 25:11
28:24 30:2
36:14 39:5
42:9 52:14
57:1,14 59:15
60:15 69:14,
16 72:7 73:17
74:6 78:8
79:15 80:13
81:18 83:15
84:3 87:25
88:7 90:16,19
95:3 99:7
100:2
**third** 35:13
36:5,6,11,17,
20 82:2
**this** 6:3 7:23
9:8 10:14,17
16:8 17:5
19:1,2 23:13,
18 27:5 30:11
31:7 34:3,4
35:24 40:23
42:3,10,11
43:12 44:25
46:2,4,7,10
51:4,6,9,21
56:8 57:4
58:3,11,21
60:24 61:13
62:7,8,23,24
63:1 65:5
67:2 72:4,12
75:9 76:12,
23,25 77:4,6
80:3,18,24
83:6,11 84:14
88:23 89:5,9
90:19,20
92:6,17 93:21
96:6 97:21
100:4 102:4,
15 103:9
**those** 17:24
25:6 26:9
46:16 53:17,
20 54:2 64:18
71:9 73:1

80:15 81:10
89:18 92:24
95:10 103:15
**though** 32:17
66:8 83:14
85:2
**thought** 39:17
46:10 58:3
76:15 88:22
97:20
**threatened**
98:20
**three** 10:9
29:6 31:10
64:2,17 79:15
81:25 93:4
**through** 28:22
47:1 56:6
60:19 61:24
63:11 66:1
73:9
**throughout**
11:6
**Thunder** 21:6,
12,13,19,22,
23 22:15
28:2,17
62:19,21
63:13,16 64:7
65:19 66:9,12
67:3,17,20,24
68:5,21 69:2,
22 70:7,8
71:1,5,8,11,
13,17,25
72:1,9 73:8,
9,10,14,20
74:3,12,22
75:1,4,14,23
76:4,11,22
77:18 79:5,23
81:19 100:1,
14,15 101:4
**Thursday** 4:3
**ticket** 65:3
**tie** 71:6
**time** 11:20
16:12 18:7

27:6,23,25
28:19,20 32:9
48:24 50:3
61:23 62:7
64:1,19 65:5
70:22 88:3
90:15,20
100:7 102:14,
21
**times** 59:25
60:5,21
**title** 67:25
68:1,21
**to** 4:1,12
6:1,5,6,18,
19,21 7:9,22
8:6,7,12,15
9:1,6,9,15,
16,24 10:14,
17 11:4,5,6,
10,14,18,20,
25 12:6,9,16
13:1,2,7,18,
19 14:15
15:3,11 16:9
17:1,2,18,22
18:1,12
19:14,15,24
20:1,2,3,5,9,
11,15,17,23
21:5,17,20,
23,24 22:24
23:7,18 24:15
25:6,7 26:23
27:2,3,5,10,
11,12,13
28:9,23 29:2,
6,8,11,13,14
30:14 31:1,6
33:5,6,7,17,
18 34:12,13,
15,16,20
35:3,4,5,13
36:24 37:9,
11,13,24,25
38:5,6,10,11,
12,17,25
39:18,24
40:14 41:6

42:18,19,23,
24 43:16,22,
23 44:6,15,
16,17,18,19,
20,23,24
45:2,5,7,9,11
46:4,14,24
47:1,14 48:7,
16,23 49:1,3,
12 50:12,17
51:3,6,11,21,
22,25 52:8,24
54:14,20,25
55:7,8,14,20,
21,24 56:14
57:13 58:12,
19,21,22,23
59:20,21,22,
24 60:3,9,16
61:22 62:7,
10,11,24
63:1,16,25
64:6,7,10
65:6,11,25
66:6,7,17,18
67:2,16,20,24
68:3,17
69:13,14,17
70:4,16,23
72:6,9,12,19,
24 73:2,3,4,
19,20,22
74:6,17,21
75:2,13,22
76:2 77:19
78:2 79:25
80:18 81:6
82:7 83:3,15,
18 84:7,20,22
85:3,6,16,21
86:21 87:2,6,
8,18,21,23
88:10,12,25
89:3,5,9,15,
19 90:2,16,
18,20,21
91:9,10,15,19
92:6,8,16,18,
23 93:3,10,

15,16,17,19,
21 94:7,9,12,
18,19,20,23
95:9 96:3,4,
5,10,19,21
97:17 98:5,8,
13,17,25
99:1,5,6,9,
13,16 100:3,
4,15,17,18
101:2,9,18,
20,24,25
102:1,2,8,14,
15 103:1,6,
10,12,17,19
**today** 6:3,9
7:8,10,15 9:4
10:13 16:8
19:2 26:18
40:16 48:5
55:22 61:13
70:5 98:15
102:4 103:15,
19
**together**
14:10 16:19
53:3 58:1
59:20
**told** 51:20
84:22 85:21
89:17 91:20
98:21
**tomorrow**
103:17
**tons** 82:18
**Tony** 25:5
42:25 43:3
47:12 52:9
**Tonykazal.com**
25:17 80:9
**too** 87:23
**took** 51:14
86:18,24
89:16 93:1
95:10
**tool** 74:21
**top** 22:23
41:2,9 42:6

topic   93:22
topics   95:14
torso   41:11
total   6:17
touch   65:16
toward   41:9
  43:25 44:7
  50:22
trade   70:21
transcript
  101:20,25
  102:4,15
  103:19
treated   96:1,
  8
trick   30:25
tricky   44:16
tried   90:18
  94:7
trip   42:24
trouble   48:2,
  6 50:5 51:7
troubles   50:9
true   20:7
  34:21
truth   4:12,13
  25:8 35:5
  54:20 98:18,
  21
try   8:7 35:5
  58:23 62:7,24
  93:1 94:20
  96:21 103:10
trying   31:1,6
  39:18 44:16,
  17 45:7,9
  49:12 59:24
  64:10 66:17,
  18 72:6 81:4,
  6 83:3 92:16,
  18 94:9,12
Tuesday   7:23
  8:15,21
turn   22:24
  43:23 44:6
  52:8

TV   71:11,13
twenty   68:13
two   10:9
  17:24 29:6
  44:6 64:2,17
  84:15 97:17
type   7:11
  17:10 23:16,
  17 29:11
  43:12 58:17
  63:12 65:5,7
  70:5 71:18
  87:22 96:16
  99:1
typed   10:5,10
  42:11 52:10,
  19
types   45:10
  71:9
typewritten
  42:21
Typical   31:17
typing   46:10
typo   24:23

U

U.S.   4:4
Uh-huh   7:19
  11:8 17:25
  18:11 23:20
  27:1 29:1
  30:4,9 33:3
  37:23 40:15
  41:5,14,17
  43:2 44:1,3,
  9,11 46:17
  49:25 56:19
  58:10 63:5
  67:7,10,13
  78:20 81:17
  96:9,12
ultimately
  75:12
under   8:5
  54:20 70:5
  71:23

underneath
  42:22
understand
  8:3 15:10
  27:3,12 44:17
  45:17 46:9,18
  54:21 58:13,
  23 59:10,13
  63:2 66:6,7,
  18 71:7 72:16
  73:20 74:19
  80:3,18 81:6,
  9 82:6 83:15
  90:6 93:20
  100:7
understanding
  7:8 17:2
  46:20 70:4
  85:11
understood
  36:14
unfair   55:2
unfairly
  96:1,8 97:6
unfortunately
  34:24
United   28:1,
  9,11 62:12
  63:3,11,18
  64:5,20,24
  65:8,21 66:8,
  24 73:18
  79:7,11,13
unless   11:9,
  18
until   32:25
  65:6 93:5,22
untruthfully
  99:2
unusual   58:25
up   23:18
  31:20 32:12
  35:24,25 37:7
  44:25 45:11
  49:23 50:2,11
  71:23 76:8
  77:6,15,19,25
  82:12 84:18

87:24 91:12
  93:4 94:21
  96:6 99:17
updating   38:8
uploaded   35:8
uploading
  33:9 34:15
upon   7:17 9:4
upper   41:11
URL   23:8,9,13
URL's   28:22
us   18:20
  19:24 48:5
  58:22 86:1
  102:14
  103:13,17
use   30:5 33:5
  34:12,13
  52:24 100:5,9
used   11:15
  21:17
using   74:21
UTG   75:12

V

vague   12:11,
  19 13:15 36:8
  57:1 73:12
  74:5
very   6:3
  51:13 91:18,
  21 94:12
view   57:4

W

waived   103:25
waiving
  101:18
walk   64:10
want   6:1,5
  17:1 30:21
  33:6 47:14
  50:17 87:2
  90:3 92:8
  101:10,18,25

| | | | |
|---|---|---|---|
| **wanted** 11:25 | 18,22 85:4 | 12:17 13:1,8, | 64:18,20 |
| 69:13 89:2 | 86:10 87:24 | 12,13,20,25 | 65:10,13 |
| 96:10 | 88:22 89:2 | 14:8,10,22 | 81:16,22 |
| **wants** 29:8 | 90:6,23,25 | 15:16 16:16, | 83:21 |
| **was** 4:1,6,17 | 92:15 93:7 | 23 17:13,22 | **went** 28:22 |
| 7:17 9:3,11 | 94:14,20,23 | 18:5 19:14 | 56:14 64:7 |
| 14:14 16:2 | 100:2 102:5, | 20:17 21:25 | 67:20 73:19 |
| 18:9 22:6,19 | 11 103:9,11 | 24:20 25:6,7 | **were** 15:3 |
| 28:16 34:13, | **we'd** 76:15 | 26:9,19,23 | 18:7 27:23,25 |
| 18,23 43:10 | **we'll** 21:20 | 27:2,3,11,12 | 28:7,8,16,18 |
| 47:4,6,8 | 35:3 89:23 | 28:6,16 | 29:18,20 |
| 48:15 51:20 | 91:12 92:15 | 32:10,13 | 31:14 39:17 |
| 53:10 54:12 | 93:11 99:16 | 33:9,19 35:16 | 46:10 50:11 |
| 58:3 64:18,25 | 102:6 103:11 | 36:24 37:4,5, | 51:11,12 |
| 65:24 67:5,25 | **we're** 8:6 | 21 38:11 | 53:7,14 54:3, |
| 68:11,21 | 14:9 19:1 | 39:8,24 40:6, | 5 55:2 56:9 |
| 69:14 71:8, | 31:19 32:22 | 11,17 45:11 | 57:22 60:22 |
| 10,11,16 | 39:22 54:14, | 51:9,23 52:2 | 61:23 63:3 |
| 72:16 74:14, | 18 64:6,8,15 | 58:7 72:25 | 65:2 68:16 |
| 21 75:10,13, | 73:3,4 87:21 | 73:6,8 75:13, | 71:1,6,17,18 |
| 18,22 76:1 | 90:16 92:6,16 | 21 76:1 77:15 | 73:1,8,18,25 |
| 78:4,8 79:18, | 93:15 94:21, | 84:18 85:22 | 74:2,3,20,21, |
| 25 81:14 | 24 99:6,7,20 | 86:4 87:2 | 22,25 75:3 |
| 82:20 83:1 | 101:9 102:10 | 98:14,18,21 | 76:1 84:22 |
| 85:17,24,25 | 103:21 | 99:3 100:19 | 85:10 88:13, |
| 86:1,14,22 | **we've** 7:13 | 101:2 | 22 89:16 95:6 |
| 87:1,3,6 88:1 | 16:18 32:21 | **week** 7:23 | 96:20 103:4, |
| 90:24 91:5 | 34:24 51:23 | 59:25 60:20 | 22 |
| 92:22 93:1,12 | 62:23 98:14 | **well** 8:25 | **weren't** |
| 96:1,7 97:6, | 99:23 | 12:15 13:3 | 45:17,20 |
| 24 99:18 | **web** 23:17,24 | 14:9 15:5,20 | **what** 5:4 8:18 |
| 102:24 103:24 | 30:11 71:16 | 18:8 19:11,22 | 12:8 14:14 |
| **way** 11:20 | **website** 13:9 | 20:1,8 21:6,8 | 15:4 19:16,20 |
| 16:8 37:1,2 | 17:16 23:14, | 28:2 33:14 | 23:7 26:22 |
| 51:4 57:4 | 19 24:5,7,12, | 34:24 48:11 | 27:3 30:5 |
| 65:10 66:7 | 15,18 25:3, | 53:6 55:15 | 32:22 33:6 |
| 75:2,22 77:24 | 15,17,21,25 | 57:4,11 58:11 | 35:4 38:6,7 |
| 81:9 | 26:5 28:3,21 | 59:7 61:8,15 | 42:15 44:20, |
| **we** 5:25 6:8 | 29:8 37:7,8, | 62:1,7,24,25 | 22 49:18 |
| 7:16 8:10 | 11,13,20 | 63:25 65:6 | 51:11,25 |
| 27:5 28:22,23 | 38:6,13 39:21 | 69:13 70:9 | 57:25 58:9 |
| 34:10,25 39:5 | 42:11 43:13, | 73:4 74:5,8 | 59:24 61:4 |
| 43:17,23 | 15 44:23 45:2 | 76:15,17 | 62:12 63:24 |
| 49:10 53:14 | 50:2,11 51:13 | 80:17,22 | 64:13,25 |
| 54:9,24 58:9 | 77:20 86:21 | 82:20 85:17 | 65:2,5,7 |
| 59:3 60:16 | 87:9 88:25 | 88:19 91:6,20 | 67:25 68:21 |
| 65:24 72:6 | 93:18 | 97:5,22 | 70:22 71:1,5, |
| 75:9,10,18 | **websites** 6:6 | **Wells** 16:22 | 6,8,16 73:3,4 |
| 77:12 79:15, | 10:8,10,21 | 34:6 36:21 | 76:9 78:8 |

79:3 80:18 81:2,4 83:10 84:13 86:8 87:17 89:8, 16,17 90:20, 24 91:18 92:15 93:1,22 95:14 97:13 101:17 102:20,23

**what's** 7:2 82:1

**whatever** 11:16 34:15 45:10 60:1 92:8 101:19 103:5

**whatsoever** 84:16

**when** 6:21 12:20 17:21 25:6 26:9,22 28:3,6,15,16, 18,21 30:10 31:9,13 32:6, 10,12 33:18 34:3 37:7 42:3,7 45:9 48:15 53:14 56:9 57:22 60:24 61:12, 23 62:9,15 63:2,15 64:4, 7,12,20,24 72:1 73:18 76:6 79:19 81:24 85:18 86:20 89:16 92:25 94:4 95:10 100:5,9

**where** 5:2 13:12 20:15 27:23,25 34:16 37:10 52:10,15 57:5 64:8,15 65:13,24 80:4 85:21 94:8 99:23 100:16

**wherein** 21:22 100:14

**whether** 16:4 20:14 58:15 89:10

**which** 7:17 17:9 58:25 78:23 79:24 82:5 89:4 100:21,22

**while** 73:8 96:5 102:10

**Whitt** 4:20 5:10,11 6:10, 12 7:12,21 8:1,4,13,19, 23 9:2,8,13 10:24 11:2,4, 9,13,18,24 12:3,5,12,23 13:17,23 14:4,17 15:4, 8,11,15,20,23 16:2,7,10 17:17 19:5, 16,20,23 20:1,8,13,19, 22 21:1,8,10 22:5,17,21 24:3,10,16 25:12,20,24 26:3,8,14 30:22 33:13 34:23 35:1,7, 15,19 36:10, 13,16 37:18 38:16 39:11 40:2,9,25 41:1,21 42:15,17 44:12,14 45:14 47:5 48:14,20 49:4 50:15 52:7, 16,19,21 53:2,8 54:9, 14,18,23 55:12,15,20, 24 56:1 57:3,

10,17 58:5 59:10,13,17 60:8,17 61:2, 4,8,10,15,18, 21 66:16 67:14 68:10, 25 69:12 70:11,13,18 71:21 73:15 74:8,15 75:8 76:15,19,20 77:3,11 78:2, 6 80:21 82:24 83:10,24 84:1 85:8 86:7,13, 16 87:17,24 88:2 89:7,10, 15,21,23 90:2,5,8,10, 13 91:1,6,22, 24 92:3,8,12, 18,23 93:8, 10,20 94:1,4, 16 95:1,3,5, 20 96:25 97:4,9,12,14, 16,22 98:1, 12,24 99:5, 11,15,20 100:9,12 101:8,12,17, 22 102:10,19, 23 103:2,4,9, 16,20

**who** 18:22 37:15 41:18 55:3 68:3 72:22 84:7

**who's** 5:18 18:19,25 38:6

**whole** 4:12 8:4

**whom** 30:5 51:18

**Whose** 41:18

**why** 8:20 35:24 51:8 54:9 55:10 59:3 81:22

82:5 93:9 96:5

**will** 4:12 29:12 44:18 58:11 59:5 92:12,13 101:14,23,24 103:18

**with** 7:13 8:7,11 9:4, 14,24 10:13 11:25 13:10 14:7,18 16:15,18,22 17:4 18:20 19:10,12 21:13 23:4 26:13 30:5 32:23 33:2 36:2 44:8 48:6 49:10 50:6,19 51:8 53:7 56:24 57:5,12 58:8, 24 60:19 61:9,11,12 62:2,14,18 63:13 64:5 65:16 68:21 69:1 71:17 73:21 74:17 75:11 81:16 82:7 83:20 84:14 85:14, 18,19,20,22 86:3,4,9,21 88:4,13,15,16 89:1,11,13,19 91:12,17 92:16,19,25 94:12 95:15, 23,24 96:15, 16 98:9,14 100:6 101:3, 13,23,24 102:1

**withdrawing** 15:23

**within**  14:24
  33:20 39:4
  40:22
**witness**  4:14
  5:21,24 6:4
  8:7,17 9:1
  10:23 11:8,
  12,17,23
  12:2,4,20
  13:16,22
  14:3,13 16:5
  17:15 19:4
  20:2 24:2,9,
  14 25:11,19,
  23 26:2,7,11
  30:20 33:12
  35:18 36:14
  37:15 38:15
  39:10 40:1,8
  42:14 48:11,
  18 50:14
  52:5,13 53:5
  54:8,22
  55:19,23
  57:2,8,16
  58:3 60:7,16
  67:13 68:9
  69:11 70:15
  71:20 73:13
  74:11 75:7
  77:10 82:23
  86:6 87:15,
  19,22 88:23
  91:7,10 92:2,
  22 93:15,16,
  22 95:19
  97:15,18,20
  100:8 103:25
**witness's**
  58:16 59:2
  94:5
**wives'**  60:22
  94:24
**word**  30:8
  33:5 34:14
  44:23 97:17
  100:5,10
**words**  42:11
  52:19 57:13

73:9 75:3
**work**  7:12
  21:17 22:13,
  14 28:17
  30:16 59:21
  62:6 64:7
  65:18,25
  67:2,16,17,
  20,24 70:7
  71:18,25
  73:6,19,22
  74:11,12,20
  75:1,12,13
  92:16,19
**work-related**
  73:24,25 74:2
**worked**  64:24
  74:14
**working**  22:8
  28:17 62:2,18
  63:12 64:5
  65:22,24
**would**  4:9 7:7
  8:9 13:13
  15:4 17:9
  18:19 19:16,
  23 20:3,11
  21:23 23:13
  24:24 28:18
  31:18 32:7
  33:14 37:9
  38:12 40:3
  42:19 43:3
  51:17 54:2
  56:8,20,23
  57:11 58:15,
  18 59:18
  60:12 61:4
  62:15 66:11
  69:16 70:6,
  16,23 71:5,9
  80:6 87:25
  91:8 95:15
  97:5 100:16,
  17 101:4
  102:2,22
  103:17
**wrap**  93:4

**wrapped**  71:23
**writing**  41:15
  100:6,11
**written**  17:10
  18:3 19:6
  34:25 69:4
**www.adamkazal**
  23:10
**www.adamkazal.
com**  28:23
**www.
charifkazal.
com**  24:4
**www.kari**
  24:11
**www.karl**  25:2
**www.
kazalfamilytru
th.com**  24:17
**www.tonykazal.
com**  24:7

---

**X**

---

**XYZ**  35:25

---

**Y**

---

**y'all**  56:18
**Yahoo**  23:17
**yeah**  7:5 10:4
  14:12,18,23
  18:18 20:22
  23:1 26:21
  32:3 36:19
  40:25 42:1,5,
  14 43:9
  49:11,13
  54:11 55:23
  56:7,17,22
  62:20 63:17
  65:1,24 66:20
  68:7,9 69:3,5
  73:18 74:24
  76:21 79:25
  81:13,20
  82:18 83:5

86:6,17,19
  88:17 94:1
  96:14 100:23
  102:6
**year**  31:10,15
  62:14 67:19
  72:4
**years**  6:17
  31:10
**Yep**  18:14
  32:5 39:3
  43:21 44:5
  57:21 72:5,15
  78:12 81:11
  82:15 83:7,17
  86:23
**yes**  5:1,15
  6:15 9:22
  10:12 14:6
  18:21 20:23
  21:15,18
  22:18 23:5,
  12,15,23
  24:2,6,9,19,
  22 25:4,16,
  19,23 26:2,7
  27:4,7,9,22
  28:5,14 29:1,
  4,16,19,21,23
  30:1,17 31:12
  32:1 37:6
  38:2 40:1,8,
  19 43:11
  44:13 45:16
  48:13 50:14
  53:12,19
  54:8,17,22
  56:10,13,15
  57:24 60:4,
  11,23 61:3
  62:4 63:6,7,
  14,20,22
  65:15 68:18,
  20 71:24
  72:11,13
  79:12 80:19
  83:25 84:6
  85:23 100:8
  103:8,20

**yesterday**
43:10,13
45:22 46:10

**you** 4:9,11,
13,24 5:2,6,
8,12,16,20
6:5,7,13,18,
21,25 7:6,8,
10,18,22,24
8:2,3,7,14,
15,20,24 9:3,
4,14,16,21,
23,24 10:3,
10,13,16,19
11:3,9,10,18,
19,20,21,25
12:9,20 13:1,
5,11,18,24
14:5,7,19,23
15:10,11,20,
23,25 16:7,
11,14,21
17:4,7,8,21
18:1,7,12,16,
23 19:7,10,13
20:16,24
21:2,11,17,
22,24 22:6,7,
10,11,13,14,
22,23,24
23:4,10,16,
17,18,21,24
24:4 25:6,7,
10,15,17,21,
25 26:4,9,18
27:2,11,12,
19,23,25
28:3,6,15,16,
18,21,23
29:2,6,10,11,
12,13,14,20,
22,24 30:2,5,
6,10,14,15,21
31:2,9,13,14,
24 32:2,4,6,
9,10,12,14,25
33:1,6,8,15,
16,18 34:2,3,
7,15,16 35:4,

8,11,20,23,24
36:2,6,17,18,
21,23 37:3,4,
7,8,9,10,22
38:6,17,21
39:4,6,7,17,
21 40:10,17,
20 41:2,4,10,
13,16,22,25
42:2,3,7,9,
10,11,20,21,
25 43:6,8,12,
16,20,22,23
44:12,15,25
45:4,5,17,18
46:9,10,13,
16,24 47:2,6,
7,19 48:2,5,
18,21 49:1,3,
4,9,12,23
50:2,3,5,7,9,
16,22,25
51:9,20,22,25
52:2,9 53:11,
16,18,20,23,
25 54:2,16,
19,20,24
55:1,2,3,4,
10,13,21,24
56:4,5,9,20,
23 57:4,5,11,
12,18,22,23,
25 58:11,12
59:1,2,4,5,
18,19,22,23,
24,25 60:3,9,
12,18,24,25
61:2,11,12,23
62:1,2,9,14,
15,17,21,25
63:2,3,8,12,
15,18 64:4,7,
13,17 65:6,7,
11,13,16,18,
22 66:8,9,10,
17,21 67:9,
17,20,23,25
68:3,6,8,16
69:1,6,9,13,

18,23 70:1,4,
5,6,11,13,14
71:7,9,18,25
72:1,7,9,12,
19,25 73:6,8,
18,19,21,25
74:2,3,19,20,
25 75:3,9,12,
22 76:1,6,7,
8,9,11,12,14,
22,23,25
77:1,5,7,12,
14,17 78:2,7,
8,13 79:1,16,
19,24,25
80:2,6,14,22
81:9,10,16,
18,24,25 82:1
83:2,10,14,
19,24 84:2,5,
7,13,20,22
85:2,9,13,18,
20,21,25
86:2,3,8,20,
24 87:4,7,11,
15 88:3,7,10,
12,13,14,15,
20 89:17,21
90:3,6,12,17
91:8,9,10,11,
13,20 92:8,9,
16,18,19,24
94:1,8,9,11,
13,14,24
95:6,7,9,16,
23 96:5,6,7,
10,15,19,20
97:6,16,17
98:2,5,8,13,
17,20,25
99:1,2,8
100:7,13,16,
18 101:1,3,
10,17,18,23,
24,25 102:2,3
103:12,15,16,
19

**you'd** 37:12
85:16

**you'll** 4:21
9:19 20:19
22:24 31:5
43:7,19,24
44:4,7 53:9

**you're** 4:11
20:1 21:13
22:7 30:20
32:8,17,19
35:24 45:7,9,
10 48:16
50:19 54:19
56:11 63:15
70:9 80:14
85:6 87:17
89:23,24,25
91:3 102:20
103:10

**you've** 17:24
24:20,21 25:2
32:13,21
51:4,5 52:10
60:9 74:6
77:22 80:13
84:10 88:8
100:22

**you-all** 62:10

**your** 4:10,21
5:4,22 6:4,
10,19 7:2,15
8:20 9:16,23
10:16 11:5
12:6 15:23
16:8 18:13,
22,25 19:1,8
20:22 22:6
27:10,20
28:7,13,19
29:25 43:4
45:5 47:8
49:1 51:6
52:24 56:14,
23 57:5,11
58:23 59:14
60:22 61:24
66:7,11 67:25
69:9 70:4,7
71:1,6,17
72:16,20 73:2

```
74:3,20 75:3,
4,11 78:24
79:5 80:4
83:8 84:17
87:11 88:11
91:7,13 94:17
95:21,24,25
97:6,10 101:5
102:8
```
**yours**   51:17
```
53:10 55:3
56:4 96:7
```
**yourself**
```
56:20
```

# EXHIBIT B

# United States District Court

## Middle District of Florida

|  |  |  |
|---|---|---|
| CHARIF KAZAL, an individual, | x ) | |
| ADAM KAZAL, an individual, | ) | |
| TONY KAZAL, an individual, | ) | Index No. |
| KARL KAZAL, an individual, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW PRICE, an individual, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | x | |

**AFFIDAVIT OF CHARIF KAZAL**

I, Charif Kazal, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.       I am over the age of 18 and am a resident of Sydney, Australia.  I am a citizen of Australia.  I am a Plaintiff in this matter and have personal knowledge of the facts herein, and, if called as a witness, could testify competently thereto.

2.       My parents and I immigrated to Australia from Lebanon in the early 1980's when I was a child.  We have lived in Australia ever since.  I am in the consulting and hospitality business.

3.       The following websites www.charifkazal.com, www.tonykazal.com, www.adamkazal.com, www.kazalfamilytruth.com, www.karlkazal.com (collectively, the "Websites") have information about me and my family that is false, wrong, and hurtful.  The false information suggests that my family and I are supporting international terrorism and are involved in criminal and fraudulent activities.  The false charge of terrorism is particularly hurtful given my

Lebanese heritage. My family and I abhor terrorism and have never and do not support any terrorist organization.

4.      These false accusations of terrorist and criminal association have caused my family safety concerns and cost my family significant business opportunities.

5.      In an effort to address my safety and security concerns, I have and continue to consult a retired Sydney police official and current owner of a Sydney based private security company, Craig Sheridan, to help us protect our safety as a result of these websites.

6.      On December 5, 2017, at my request (due to my location in Australia), my attorney filed a complaint with Sgt. Sebastiano Pepenella, a Cyber Investigations & Computer Forensics Supervisor of the Pasco County, Florida Sherriff's Office against the Defendant for his publication of the website posts that imply my family supports terrorism and specifically the terrorist organization Hezbollah.

7.      Many banks in Sydney in the past competed to lend money to businesses controlled by my family. But as a result of the false information on the websites some of those banks have recently denied my requests for loans.

8.      Moreover, many business partners have told me that they are unable or unwilling to close business deals with me due to the negative and false information disseminated by the websites.

9.      I have experienced financial hardships due to my difficulties in getting business loans and closing business deals.

10.     In addition, the posts on the websites are being regularly and prolifically republished by "Blog Post Promoter." Therefore, the same false allegations against me and my family appear constantly as if they were new. This worsens the damages done by the websites.

Executed this 7th day of December 2017 in

Doha, Qatar.

Charif Kazal

Sworn to (or affirmed) and subscribed before me this _____ day of _____, 2017.

_____
(Signature of Notary Public)

_____
(Print, Type, or Stamp Commissioned Name of Notary Public)

Personally Known _____ OR Produced Identification _____

Type of Identification Produced _____

# EXHIBIT C

## United States District Court
## Middle District of Florida

|   |   |
|---|---|
| CHARIF KAZAL, an individual,<br>ADAM KAZAL, an individual,<br>TONY KAZAL, an individual,<br>KARL KAZAL, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>MATTHEW PRICE, an individual,<br><br>Defendant. | x<br>)<br>)<br>) Index No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>x |

### AFFIDAVIT OF MANUEL MAGOULIAS

I, Manuel Magoulias, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.      I am over the age of 18 and am a resident of Sydney, Australia. I have personal knowledge of the facts herein, and, if called as a witness, could testify competently thereto.

2. I am a Certified Practising Accountant (CPA) operating my own accounting practice known as "Magoulias & Associates."

3.      I have been the Accountant for Kazal family businesses for the past 20 years.

4.      I am aware of the websites launched in 2016 about Charif, Tony, Adam & Karl Kazal containing false lies and false allegations painting them as terrorists and criminals. Based on my interactions with the Kazal family over the last 20 years, these accusations are not true.

5.      However, the false accusation against the Kazal family have adversely impacted their financial interests and significantly stilted the growth trajectory of their businesses. Banks have refused to lend to the Kazal family as a result of these false accusations. The Kazal family had to sell off a major property asset in 2017 to deal with cashflow difficulties.



Executed this __7th__ day of __December__ 2017 in
1103 George Street
SYDNEY

_(signature)_

Manuel Magoulias

Sworn to (or affirmed) and subscribed before me this _____ day of _____, 2017.

_____

(Signature of Notary Public)

_____

(Print, Type, or Stamp Commissioned Name of Notary Public)

Personally Known _____ OR Produced Identification _____

Type of Identification Produced _____

# EXHIBIT D

# United States District Court
## Middle District of Florida

| | |
|---|---|
| CHARIF KAZAL, an individual,<br>ADAM KAZAL, an individual,<br>TONY KAZAL, an individual,<br>KARL KAZAL, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>MATTHEW PRICE, an individual,<br><br>Defendant. | Commercial Division<br><br>Index No. |

## AFFIDAVIT OF CRAIG SHERIDAN

I, Craig Sheridan, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.    I am over the age of 18 and am a resident of Sydney, Australia. I have personal knowledge of the facts herein, and, if called as a witness, could testify competently thereto.

2.    I am the Managing Director of Sheridan Consulting Group Pty Ltd. (SCG).  SCG offers clients a fully integrated suite of solutions to address strategic risk, counter terrorism, crisis management and other security needs.  The website of my company is www.sheridanconsultinggroup.com.  SGG counts among its clients global blue chip international companies such as Deloitte and the Intercontinental Hotel Group.

3.    Prior to joining SCG, I was employed by the New South Wales Police Force ("NSWPF") for 29 years, retiring at the level of Commander of the State Planning Unit, Major Events & Incidents Group.  NSWPF is the primary law enforcement agency in the most populous state in Australia.

4.     I was responsible for security for a number of well-known national and regional events in Australia, including Ruby League World Cup 2017, Australia Day 2017 and the New Year's Eve Fireworks on Sydney Harbour and the surrounding foreshores.

5.     I am also a media commentator on terrorism issues.  For example, I was interviewed on Australian TV following a recent terrorist incident in the United Kingdom.

6.     I have been friends with various members of the Kazal family for more than 20 years, including in particular Karl, Tony & Charif Kazal.  They are a prominent business family in Australia.

7.     I have been made aware of existence of the websites established about Charif, Tony, Adam & Karl Kazal asserting that they are supporters of Hezbollah and have engaged in criminal conduct.  I know from my experience of interacting with the Kazal family over many years that these charges are false.

8.     I have from time to time provided general advice to different Kazal family members to give them an improved sense of security at home and to minimize any risks of having direct interactions with someone who may pose as a threat.  In particular, the family has had genuine concerns for the safety and wellbeing of young children so we have discussed various strategies to help deal with issues as they arise and the stresses these issues have caused.

9.     I understand that some Kazal children have been harassed in school for having so-called terrorist associations.

10.     Based on my professional experience as a security professional with more than 30 years of experience and based on my understanding of the situation in Australia, it is my opinion that it constitutes a safety risk for a well-known family such as the Kazals to face false accusations of terrorism and criminal conduct in a public forum.  It is my opinion that the safety concern will be alleviated by the removal of the false references from the websites.

11.     I encouraged Charif and Tony to commence formal proceedings in the USA to have false information expunged from the websites and am pleased to see the alleged perpetrator has been identified and the matter is now before the Courts.

Executed this 7th day of December, 2017 in
Sydney, Australia

Craig Sheridan  APM

Sworn to (or affirmed) and subscribed before me this _____ 7th _____ day of _December_, 2017

_____
(Signature of Notary Public)

RICK  W. TRAY
(Print, Type, or Stamp Commissioned Name of Notary Public)

Personally Known _____ OR Produced Identification _____

Type of Identification Produced ___ NSW DRIVERS LICENSE 5922CC

# EXHIBIT E

# United States District Court
## Middle District of Florida

|  |  |  |
|---|---|---|
| | x | |
| CHARIF KAZAL, an individual, | ) | |
| ADAM KAZAL, an individual, | ) | |
| TONY KAZAL, an individual, | ) | Index No. |
| KARL KAZAL, an individual, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW PRICE, an individual, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | x | |

## AFFIDAVIT OF RANIA KAZAL

I, Rania Kazal, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am over the age of 18 and am a resident of Sydney, Australia. I have personal knowledge of the facts herein, and, if called as a witness, could testify competently thereto.

2. I am married to Tony Kazal, a Plaintiff in this Action, and the mother of two young boys still attending primary school in Sydney. They are aged 12 and 9.

3. Ever since the website www.tonykazal.com was established in 2016, our sons have been subjected to harassment at school by other children who have observed the content and told them their father is a terrorist.

4. This website and the subsequent impact on my sons coming home from school upset has taken a substantial toll on me personally. I have had to deal with my children asking why there is a website about their father talking in inflammatory terms suggesting he is a supporter of Hezbollah and a criminal when of course my husband is none of those things.

5.    The frequency with which my boys have been taunted as terrorists has increased in the last few weeks.  I see first-hand that this has caused great stress to my boys.

6.    This website full of hate and ridicule for my husband and similar websites about his brothers are just devastating for our immediate and extended family, especially for the children.

7.    Given that international terrorism is such a major issue these days, it has created a very unsafe environment for my boys and I who are often home alone as Tony spends a great deal of time working in Dubai.

8.    I have had to take advice from security experts on how best to make my family safe by modifying habits and increasing home security as such online attacks and the taunting of my children make me very uncomfortable that someone could be motivated to harm us physically if they genuinely believe we are supporters of Hezbollah or have money or drugs in our house because we have been painted wrongfully as criminals on these websites.

9.    I have personally been very stressed about the situation and commenced seeking a psychiatrist around May 2016 to deal with my situation and the stress it has caused me.

10.   Part of my treatment has included medication that I never previously required and only commenced taking after it was prescribed for me by the psychiatrist.

11.   As a result of the website referred to above, people now look at me differently and I am reluctant to engage in school related activities out of fear for my sons being embarrassed or any of us being subjected to threats and intimidation from someone who may have read the website and seen my family as a target for their aggression towards Hezbollah or for crime related motives.

12.   I implore the Courts to shut down these malicious websites.

Executed this _06_ day of _December_ 2017 in
Suite 5, 3. Macquaerie Street
Sydney, AUSTRALiA

Rania Kazal

Sworn to (or affirmed) and subscribed before me this _6_ day of _December_, 2017.

_____

(Signature of Notary Public)

_____
RICH MITRY
(Print, Type, or Stamp Commissioned Name of Notary Public)

Personally Known _____ OR Produced Identification _____

Type of Identification Produced _____

# EXHIBIT F

**AFFIDAVIT OF**
**TIMOTHY LOWE**

On the 22nd day of November 2017 I TIMOTHY LOWE of 5/235 Macquarie St Sydney 2000 NSW Australia, Company Director solemnly and conscientiously declare AS FOLLOWS:

1.  I am a Director of Macquarie Commercial Finance (North) Pty Ltd (MCFN). MCFN is a finance and mortgage broker and assists its clients to obtain finance for many purposes including real estate acquisitions, machinery and equipment financing, motor vehicle leasing and other commercial borrowings.

2.  Clients of MCFN include Kazal Group of Companies & "The Kazal brothers and their various business interests. I refer to these person as the "Kazal brothers"

3.  MCFN has provided finance and broking services to various business interests associated with the Kazal brothers over the past 15 years.

4.  To my knowledge, the Kazal Brothers and their interests have operated & sub licenced to operators a number of successful Restaurant and Café businesses on Sydney harbour around Circular Quay, The Rocks Sydney and Darling Harbour for the best part of the past 25 years. To my knowledge they have also undertaken a number of commercial property investments and developments up and down the NSW and Queensland Coast.

5.  I am aware that in September 2010, and thereafter, the Sydney Morning Herald published a series of articles about the Kazal brothers. The articles claimed Charif Kazal had bribed a public official in exchange for a favourable property lease deal at 100 George St in The Rocks, Sydney. The articles attracted the attention of the Independent Commission Against Corruption (ICAC) who in April 2011 opened a Public Inquiry into these newspaper claims. The hearings commenced in July 2011.

6.  I was aware similar allegations had previously been made public about the lease of the property at 100 George St approximately 12 months earlier and that following an investigation by the ICAC, the allegations had been dismissed. So, I was surprised the ICAC had closed its first investigation and yet was then launching a fresh public inquiry into the same allegations just a year later.

1

7.  Having known, by reason of my business dealings with the Kazal brothers that they had, through companies associated with them, leased properties in The Rocks for around 25 years from successive government authorities and knowing the family as I did from my interactions with them, I was unable to accept that the allegations made were true or could ever be proven.  In fact, I know that no prosecution ever resulted from either ICAC enquiry against anyone (including, obviously, any of the Kazal brothers).

8.  Tony Kazal also attracted headlines suggesting he was involved in a bribery scandal in Australia (which became known as the "Unaoil scandal"). Tony resided in Dubai and I heard of no evidence that there was any Unaoil related corruption within Australia.

9.  I asked Tony directly about the allegations and he advised me he had consulted once many years earlier to Unaoil on a commodity sale that did not proceed and that was in the Middle East and that so far as he was aware, there was no corruption or bribery involved in the transaction and was unable to explain how the claims about him had arisen.

10.  I am aware that the negative publicity generated by the false claims of corruption and bribery by the Kazal brothers has all had a detrimental effect on various Kazal businesses ability to obtain funding from local banks & finance companies for normal business operations & expansion. I am also aware that this has caused them to miss out on various opportunities at great cost to them. Before these allegations were made public, Banks had competed strongly to be the lender of choice for the Kazal brothers' business given their highly valued properties on Sydney Harbour.

11.  I have been in the finance and mortgage broking business for 25 years and I at all times ensure that I carry out my work locating and structuring finance for my clients not only in a professional manner but also in an ethical and honest manner.  It is my practice to ensure that any transaction in which MCFN is involved is lawful and ethical.  I would not under any circumstances deal with or act for the Kazal brothers, nor permit MCFN to do so, if I had any belief or understanding that the Kazal brothers were in any way involved in any illegal or unlawful activity such as bribery of public officials. I have neither seen nor heard any evidence or material which has persuaded me that the Kazal brothers (or any of them) is involved in any criminal or unlawful activity,

AND I MAKE THIS DECLARATION solemnly and
conscientiously believing the same to be true and by
virtue of the *Oaths Act 1900*

Before me:

................................................

SOLICITOR /JUSTICE OF THE PEACE

)
:
)
:
)
:
)
:

TIM LOWE

Mark Wilson
A Justice of the Peace in and for
the State of New South Wales
Reg No: JP 181777

I, Mark Wilson, a JP for NSW 181777, certify:

1   *I saw the face of the declarant/deponent *OR*
    *I did not see the face of the declarant/deponent because
    he/she was wearing a face covering, but I
    am satisfied that he/she had a special justification for not removing it, and

2   *I have known the person for at least 12 months *OR*
    *I confirmed the person's identity with.................................................

Signature................................................Date.........../20......

3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 14, 2019, I caused a true and correct copy of the foregoing to be served via the U.S. District Court's CM/ECF system, which will provide a copy to all counsel of record registered to received CM/ECF notifications.

_____
Benjamin Taylor

---

FIRST AMENDED COMPLAINT