**STEVEN T. GEBELIN (SBN 261507)**
steven@lawbygl.com
**LESOWITZ GEBELIN LLP**
8383 Wilshire Blvd., Suite 520
Beverly Hills, CA 90211
Telephone:  (310) 341-3072
Facsimile:    (310) 341-3070

Attorneys for Defendants
Matthew Price, Ryan Wells, Michael Hatch, and
Paul Kolesa

## UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISON

| | |
|---|---|
| CHARIF KAZAL; TONY KAZAL; ADAM KAZAL, and KARL KAZAL,<br><br>    Plaintiffs,<br><br>  v.<br><br>MATTHEW PRICE, RYAN WELLS, MICHAEL HATCH, PAUL KOLESA, and DOES 1 through 20, inclusive,<br><br>    Defendants. | **CASE NO.: 2:18-cv-08655 JWH-E**<br><br>Transferred from M.D. Florida:<br>Oct. 11, 2018<br><br>[*Hon. John W. Holcomb, Courtroom 2*]<br><br>**DEFENDANTS' NOTICE OF MOTION AND SPECIAL MOTION TO STRIKE FIRST AMENDED COMPLAINT (Code Civ. Proc. § 425.16); MEMORANDUM IN SUPPORT**<br><br>Date:  Friday, April 30, 2021<br>Time: 9:00 a.m.<br>Ctrm: 2 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

PLEASE TAKE NOTICE that on Friday, April 30, 2021 at 9:00 a.m. in Courtroom 2 of this Court, located at the George E. Brown, Jr. Federal Building and United States Courthouse, 3470 12th St., Riverside, CA 92501, Defendants **MATTHEW PRICE, RYAN WELLS, MICHAEL HATCH, and PAUL KOLESA** ("Defendants"), will and hereby does move this Court, pursuant to California Code of Civil Procedure § 425.16, for an order striking Plaintiffs **CHARIF KAZAL, TONY KAZAL, ADAM KAZAL,** and **KARL KAZAL's** ("Plaintiffs") First Amended Complaint ("FAC") and awarding Defendants their reasonable attorneys' fees and costs in connection with this motion.

This Motion is made on the grounds that the FAC falls squarely within the scope of Code Civ. Proc. § 425.16(e)(3) and (e)(4) because each cause of action therein arises from acts in furtherance of free speech in a public forum on a public issue. The gravamen of each of Plaintiffs' claims arises from the Defendant Price's First Amendment-protected use of the Websites (www.tonykazal.com, www.adamkazal.com, www.charifkazal.com, www.karlkazal.com, and www.kazalfamilytruth.com) to re-publish news articles and government reports already in the public domain concerning Plaintiffs and their family. The Websites thus support speech in a public forum regarding an issue of public concern- the "prominent" Kazal family and its notorious activities.

Consequently, the burden shifts to each of the Plaintiffs to show the sufficiency of each their claims. *See* Code Civ. Proc. § 425.16, subd. (b)(1); *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833 (9th Cir. 2018). Plaintiffs cannot meet their burden.

*First*, **Plaintiffs' claims are barred in their entirety by the Communications Decency Act of 1996 as they arise from content authored by others, particularly the claims against defendants Wells, Kolesa, and Hatch as they did not even participate in the publication of content on the Websites**.

*Second*, as Plaintiffs' causes of action are grounded in allegations of defamation, California law requires that Plaintiffs be able to establish the elements of defamation in order to assert their claims. Plaintiffs cannot do so, as (a) Price is not the original publisher of the allegedly

defamatory articles and the other defendants did not publish them at all; (b) Plaintiffs cannot establish falsity by a preponderance of the evidence; and (c) Plaintiffs cannot establish actual malice for repetition of information from reputable third-party sources.

*Third*, Plaintiffs cannot even establish a probability of success on the elements of their causes of action as asserted.  Plaintiffs' tortious interference claim must fail as Plaintiffs have produced neither evidence of a specific relationship that any Defendants interfered with, nor have they shown that Price's actions were wrongful independent of any interference.  Plaintiffs' Intentional Infliction of Emotional Distress claim also fails, as they have not shown either (a) that the act of republishing third-party articles is "extreme and outrageous"; (b) that Plaintiffs suffered extreme and severe emotional distress as a result; or (c) that Defendants' actions were the actual and proximate cause of any such distress.  And Plaintiffs cannot establish a probability of success on their Injunctive Relief claim, for the same reasons as the Court already detailed in its prior Order Denying Plaintiffs' Request for a Preliminary Injunction. [Dkt. No 4 ("Order Denying PI")].

*Finally*, Plaintiffs cannot establish success on their claims against Defendants Wells, Hatch, or Kolesa, as they are not responsible for the content of the Websites.  Moreover, Plaintiffs' claims against these defendants were belatedly brought via the First Amended Complaint, which Plaintiffs sought leave to bring more than a year after the Websites were taken down, such that the claims are barred by the statute of limitation.

For all of these reasons, Plaintiffs cannot not meet their burden and the FAC and the claims therein should be stricken.

Pursuant to Section 425.16, subdivision (c), Defendant is also entitled to recover their attorney's fees and costs incurred in bringing this motion, and will seek such fees in a subsequent application.

This motion is based on this Notice of Motion and Motion; on the attached Memorandum of Points and Authorities; on the Declarations of Matthew Price, Michael Hatch, and Steven T. Gebelin; on all matters of which this Court may take judicial notice; on all pleadings, files, and records in this action; and on such other argument as may be received by this Court at the hearing on this motion.

1

2      DATED: March 29, 2021          Respectfully submitted,

3                                     **LESOWITZ GEBELIN LLP**

4                                     By: _____

5                                          STEVEN T. GEBELIN

6                                     Attorneys for Defendants *Matthew Price,*
7                                     *Ryan Wells, Michael Hatch, and Paul Kolesa*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2    TABLE OF CONTENTS ........................................................................................i

3    TABLE OF AUTHORITIES .................................................................................ii

4    MEMORANDUM OF POINTS AND AUTHORITIES ...........................................1

5    I.      Introduction. ..........................................................................................1

6    II.     Background Facts. ...................................................................................1

7            A.      The Kazals.    1

8            B.      The Kazal Approach to Negative Publicity:  Threaten, Intimidate,
                     Harass 2
9
             C.      CharifKazal.com and the other Republishing Websites.........................5
10
             D.      The Prior Actions .................................................................................6
11
             E.      The Instant Action ................................................................................7
12
     III.    Legal Standards for Anti-SLAPP. .........................................................8
13
     IV.     Argument...............................................................................................10
14
             A.      Plaintiffs' Claims Arise from Acts in Furtherance of Protected Free
15                   Speech.                 10

16           B.      Plaintiff Cannot Establish a Probability of Prevailing on Thier
                     Claims.                 11
17
                     1.      Plaintiffs' Claims are Barred by 47 U.S.C. § 230 .......................11
18
                     2.      Plaintiffs' Inability to Prove Defamation Defeats
19                   Their Claims            12

20                   3.      Plaintiffs Cannot Establish Tortious Interference with
             Business Relationships. ..............................................................................16
21
                     4.      Plaintiffs Cannot Establish Intentional Infliction of
22           Emotional Distress     17

23                   5.      Plaintiffs Cannot Establish their Claim for Injunctive
                     Relief                  19
24
             C.      Defendants Are Entitled to Recover Their Fees...................................23
25
     V.      Conclusion.............................................................................................23
26

27

28

---

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*AccuImage Diagnostics Corp v. Terarecon, Inc.*,
   260 F. Supp. 2d 941 (N.D. Cal. 2003) ............................................................ 19

*Ampex Corp. v. Cargle*,
   128 Cal. App. 4th 1569 (2005) ................................................................ 16, 17

*Ampex Corp. v. Cargle*,
   128 Cal. App. 4th 1569, 1577 (2005) ............................................................ 15

*Atl. Bus. Sys. Servs., Inc. v. Hitachi Data Sys. Corp.*,
   1995 WL 798935 (N.D. Cal. Mar. 10, 1995) ................................................ 19

*Barrett v. Rosenthal*,
   40 Cal. 4th 33 (2006) .............................................................................. 12, 13

*Blatty v. New York Times Co.*,
   42 Cal.3d 1033 (1986) .................................................................................. 14

*Boss v. City of Mesa*,
   746 F. App'x 692 (9th Cir. 2018) ................................................................ 26

*Bradley v. Google, Inc.*,
   2006 WL 3798134, (N.D. Cal. Dec. 22, 2006) ............................................ 19

*Caraccioli v. Facebook, Inc.*,
   167 F. Supp. 3d 1056 (N.D. Cal. 2016) ........................................................ 13

*Charney v. Standard Gen., L.P.*,
   10 Cal. App. 5th 149 (2017) .......................................................................... 14

*Christian Research Inst. v. Alnor*,
   148 Cal. App. 4th 71 (2007) .......................................................................... 15

*Collier v. Harris*,
   240 Cal. App. 4th 41 (2015) .......................................................................... 12

*Damabeh v. 7-Eleven, Inc.*,
   2013 WL 1915867 (N.D. Cal. May 8, 2013) ................................................ 19

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
   11 Cal. 4th 376 (1995) .................................................................................. 20

*Denney v. Lawrence*,
   22 Cal. App. 4th 927 (1994) .......................................................................... 17

*Fellows v. National Enquirer, Inc.*,
   42 Cal.3d 234 (1986) .............................................................................. 14, 17

*Gilbert v. Sykes*,
   147 Cal.App.4th 13 (2007) .................................................................. 11, 14, 17

*Hughes v. Pair*,
    46 Cal. 4th 1035 (2009) ........................................................................ 20, 21

*Integrated Healthcare Holdings, Inc. v. Fitzgibbons*,
    140 Cal. App. 4th 515 (2006) ................................................................ 15

*Ketchum v. Moses*,
    24 Cal.4th 1122 (2001) .......................................................................... 27

*Krupski v. Costa Crociere S.p.A.*,
    560 U.S. 538, 541 (2010) ...................................................................... 25

*Macias v. Hartwell*,
    55 Cal. App. 4th 669, 675 (1997) .......................................................... 9

*Nygard, Inc. v. Uusi-Kerttula*,
    *159 Cal. App. 4th 1027 (2008)* ............................................................ 9, 11

*Perfect 10, Inc. v. Google, Inc.*,
    653 F.3d 976 (9th Cir. 2011) ................................................................ 23

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
    890 F.3d 828 (9th Cir. 2018) ................................................................ 10

*R Power Biofuels, LLC v. Chemex LLC*,
    2016 WL 6663002 (N.D. Cal. Nov. 11, 2016) ...................................... 18

*Reader's Digest Assn. v. Superior Court*,
    37 Cal. 3d 244 (1984) ............................................................................ 14

*Robertson v. Rodriguez*,
    36 Cal. App. 4th 347 (1995) .................................................................. 10

*Rusheen v. Cohen*,
    *37 Cal.4th 1048 (2006)* ........................................................................ 8

*Salma v. Capon*,
    161 Cal. App. 4th 1275 (2008) .............................................................. 18

*Schiavone v. Fortune*,
    477 U.S. 21 (1986) ................................................................................ 26

*Seelig v. Infinity Broad. Corp.*,
    97 Cal. App. 4th 798 (2002) .................................................................. 11

*Sipple v. Found. For Nat. Progress*,
    71 Cal. App. 4th 226 (1999) .................................................................. 16

*Strick v. Superior Court*,
    143 Cal. App. 3d 916 (Ct. App. 1983) .................................................. 24

*Tamkin v. CBS Broadcasting, Inc.*,
    *193 Cal.App.4th 133 (2011)* ................................................................ 9

*Taus v. Loftus*,
    40 Cal.4th 683 (2007) ............................................................................ 10

*Wilson v. Parker, Covert & Chidester*,
    28 Cal.4th 811 (2002) ........................................................................................... 10

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................................. 22

*Wong v. Tai Jing*,
    189 Cal. App. 4th 1354 .................................................................................... 15, 21

**Statutes**

15 U.S.C. § 1125 ......................................................................................................... 20

47 U.S.C. § 230 ........................................................................................................... 12

Cal. Code of Civil Procedure § 340(c) ....................................................................... 25

California Code of Civil Procedure § 425.16 ..................................................... 8, 9, 27

Civil Code § 3425.3 .................................................................................................... 24

Fed. R. Civ. P. 15(c)(1)(C) ................................................................................... 25, 26

Fed. R. Civ. P. 4(m) .................................................................................................... 26

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Introduction.

This is the Kazals' third bite at the apple.  In 2016, Charif Kazal filed an action in California superior court, asserting various causes of action with the underlying gravamen that the Websites were defamatory.  In response, Defendants filed an anti-SLAPP motion, and in May of 2017, the court issued a tentative ruling *granting the motion and dismissing the Kazals' complaint as a SLAPP*.  Indeed, the only reason the court let the Kazals off the hook was that their counsel begged for a stay of execution to take more discovery.  Of course, once they got that discovery and the second anti-SLAPP hearing approached, the Kazals voluntarily dismissed their claims, and a month later filed this action instead.  Charif Kazal also pursued claims for defamation based on the the Websites against Rodric David, a former business associate of the Kazals and prior employer of Price and other defendants, but dismissed them during trial in Australia in 2020.

It is now 2021.  It has been *almost five years* since the California superior court informed the Kazals that their claims were a meritless SLAPP.  They have had more than *three additional years* in this action to procure evidence to support their claims; indeed, the Kazals took Defendant Price's deposition back in November of 2017 immediately before filing this suit.  Plaintiffs have still failed to produce evidence that would establish a probability of success on the merits.  Indeed, Plaintiffs' claims are ***barred in their entirety*** by 47 U.S.C. § 230, which provides each of the Defendants with ***complete immunity*** for the content of the Websites.  It is time to put an end to this charade.  The purpose of the anti-SLAPP statute is to summarily dispose of meritless lawsuits.  To that end, it is time for Plaintiffs' meritless claims against Defendants to be stricken.

### II.    Background Facts.

### A.    *The Kazals.*

Plaintiffs Charif Kazal, Adam Kazal, Tony Kazal, and Karl Kazal (collectively, "Plaintiffs" or the "Kazals") are members of an infamous – in their words, "prominent" (Dkt. No. 53- First Amended Complaint ("FAC") at ¶ 1) – Lebanese family who have established a business empire of significant notoriety in Australia.  The Kazals have publicly cultivated extensive political connections in Australia, host and attend fund-raisers populated by influential government figures,

and are significant donors to both political parties – or were until such developer donations were banned by the Australian government.  *See* Declaration of Steven T. Gebelin ("Gebelin Decl.") Ex. 1; FAC ¶¶ 19-21.  They reputedly utilize these connections to obtain favorable government treatment, including sweetheart lease deals for their restaurant and real estate projects in Sydney.  *See* Gebelin Decl. Ex. 1-2.  The Kazals are also well-connected outside of Australia, with known connections to the ruling families in Dubai, Abu Dhabi and Libya – including a personal relationship with Saif al-Islam Gaddafi, the playboy son of the late Libyan dictator Muammar Gaddafi – and are reputed to leverage these connections to secure business deals of questionable legitimacy, both in Australia and around the world.  Gebelin Decl. Ex. 3.

Not surprisingly, the Kazals are a frequent topic of Australian news.  Indeed, typing Plaintiffs' names into the search feature on the Sydney Morning Herald's website yields nearly *eighty* results.  *See* Gebelin Decl. ¶ 5, Ex. 4-8.  The corresponding articles run the gamut, reporting on the Kazal family's ties to government corruption, extortion, false criminal complaints, forgery, contempt of court, and willful disregard of the law.  In response to all of this negative publicity, the Kazals have further placed themselves on public display by giving interviews and creating websites such as http://www.kazalfamilystory.com, which contained content intended to shape public opinion and portray the Kazals in a more favorable light.  *See* Gebelin Decl. Ex. 8-9.

## B.   *The Kazal Approach to Negative Publicity:  Threaten, Intimidate, Harass*

Unfortunately, the Kazals' approach to handling negative publicity is not limited to posting a counter-narrative on their website.  Rather, the Kazals have repeatedly used intimidation, harassment and threats to attempt to silence anybody who speaks out against them.  This is perfectly illustrated by the Kazal's dealings with Rodric David ("David"), CEO of Thunder Studios (Price's former employer) and co-defendant in a prior lawsuit, as detailed *infra*.

In 2007, David was approached by the Kazals with a plan for the development of a housing complex in Dubai, and entered into an agreement to co-own the company overseeing the development and equally fund the costs of the estimated $2.6 million housing venture (and other investment opportunities) through an investment company called Emergent Capital.  Gebelin Decl. Ex. 10 (Declaration of Rodric M. David ("David Decl.")) ¶ 5.  David sold his home and moved

from Sydney to the UAE to oversee Emergent Capital.  *Id.*  By mid-2009, David had loaned nearly $6.7 million of his own money to fund the venture – which had run over cost and dropped in value – while the Kazals had failed to fund the venture at all.  *Id.* ¶ 6-7.  By the end of 2009, Charif Kazal had begun demanding that David pay him $1.5 million to make everything "go away;" David refused and instead took steps to protect his investments against the Kazals.  *Id.* ¶ 8.

In retaliation, in May 2010 Charif Kazal made a criminal complaint against David in the UAE, falsely alleging that David had embezzled $939,000 from Emergent Capital, a company that David alone had funded.[1]  *Id.* ¶ 8.  At the same time, Tony Kazal lodged a notice with UAE immigration officials, falsely claiming that David had absconded from his employment and not communicated with the Kazals, the sponsors of his work visa, in over a year.[2]  *Id.* ¶ 11.  As a result of the abscondment notice, David was taken into custody and jailed for days, including time in the notorious Al Awir, Dubai's central prison.  *Id.*  While David was being detained, the Kazals sought to surreptitiously end their joint venture and take all of its assets for themselves, convincing a Cayman Islands judge on an *ex parte* basis David has been jailed for financial crimes in Abu Dhabi and that Emergent Capital had to be wound up immediately.  *Id.* ¶ 12.  David only learned of the application on his release from Al Awir.  *Id.*  A lengthy litigation in the Grand Caymans proceeded for the next several years over the wind-up of the company, resulting in the dissolution of the joint venture.  *Id.*

In 2011, David became involved in an Australia commission's investigation into the Kazals on an entirely different matter.  *Id.* ¶ 13.  The New South Wales Independent Commission Against Corruption ("ICAC") alleged that Charif had struck a corrupt secret deal with Mr. Andrew Kelly, a then NSW government official, who was responsible for the Kazals' six government issued leases in Sydney.  *Id.* According to the ICAC, Charif had secretly promised Kelly a lucrative job with

---

[1] Eventually, the Abu Dhabi court ruled that none of Charif Kazal's criminal allegations against Rodric were true.  David Decl. ¶ 8.  In reaching its conclusion, the UAE Court found that Charif Kazal could not be accepted as a reliable or truthful witness.  *Id.*

[2] In truth, Rodric had been in almost daily contact with Charif and Tony Kazal, but had refused Tony's demand to "hand over" the passports of Rodric and his family and allow the Kazals to cancel Rodric's work visa until the dispute was resolved.  David Decl. ¶ 11.  Ultimately, Rodric was cleared and Tony was fined for making an improper immigration complaint.  *Id.*

their UAE property venture with David; indeed, after the leases were done and Kelly left the government, the Kazals recommended Kelly to David and installed Kelly without mention of their prior dealings. *Id.* David provided the ICAC investigation with digital evidence from the computer used by Kelly while General Manager of the UAE venture. *Id.*

During the ICAC investigation and the aftermath, the Kazals continued to try to extort money from David, his father, and his brothers, and used threats of violence against David's father, brothers, and sisters in law. *Id.* ¶ 14. Adam Kazal even physically assaulted David's father. *Id.* David eventually moved with his wife and children to the United States in 2012 in an unsuccessful attempt to end the Kazals' harassment of his family. *Id.*

In May 2013, the Kazals registered their web domain KazalFamilyStory.com. *Id.* ¶ 15. By July 2013 the Kazals had begun an ongoing campaign of electronic harassment and defamation targeting David and Thunder Studios via false press releases, email, KazalFamilyStory.com, and social media (including Twitter accounts @CharifKazal and @AdamKazal). *Id.* In 2014, Thunder Studios and David brought a civil action against the Kazals in Australia based on their defamatory and harassing online speech. *Id.* ¶ 16. During the pendency of the case, the Kazals organized multi-week public displays in Sydney and Los Angeles alleging that David was a "corporate thief" who had stolen $180 million from the Kazal family. *Id.* The Sydney displays included 15,000 posters on street poles, 35,000 flyers placed in mailboxes and 4 vans with the allegations and David's picture on their sides driving throughout Sydney for weeks. *Id.* The Los Angeles displays included similar displays, flyers, and "protestors" outside David's home, in his neighborhood, at his children's school, and outside Thunder Studios. *Id.* Adam Kazal demanded $666,666.66 to end this ongoing harassment. *Id.* After an Australian court issued orders prohibiting the Kazals from continuing to make defamatory statements against David, Adam Kazal continued the campaign in violation of the orders and in January 2017 was found guilty of multiple counts of contempt and ordered to serve an 18 month prison term. *Id.* The Court's order noted that Adam's harassment of David and his lawyers was an egregious attempt to interfere in Thunder Studios' ongoing civil action and force David to abandon the case. *Id.* This course of conduct led David to

1   pursue a civil harassment case against the Kazals, resulting in $1.1 million verdicts against both

2   Adam and Tony Kazal.  Gebelin Decl. ¶ 25.

3       This remarkable account is corroborated in large part by reporters at the Sydney Morning

4   Herald, which on March 19, 2013 published a blockbuster story on the Kazals' harassment of

5   David entitled "Bad Company."  Gebelin Decl. Ex. 11.  Upon publication, the Kazals immediately

6   went after the journalist responsible for publishing the story.  Gebelin Decl. Ex. 12.  Adam and

7   Oscar Kazal showed up at the Herald, asked to meet with the journalist, and told him that "they

8   knew all about him, they knew he had a young family" and that "You write one more word and I'll

9   make sure you and me are on the front page of every newspaper in the country."  *Id.*  The next day,

10  they came back to the Herald's office several times demanding to see the journalist and making

11  threats; when the journalist refused to meet with them and called the police, they drove to his

12  personal residence and began ringing the doorbell on his wife and children.  *Id.*  Ultimately, the

13  police spoke to the Kazals and the journalist opted not to file an apprehended violence order solely

14  because it would have given the Kazals exactly what they wanted – it would have prevented him

15  from writing about them in the future.  *Id.*

16      The above is merely one example, but it illustrates the character of the Kazals and their

17  approach to free speech.  Clearly, the Kazals will stop at nothing to suppress speech that is critical

18  of their family – particularly if it is true.  It is thus no surprise that they have engaged in this

19  extended campaign of filing meritless claims against Price over a handful of websites that merely

20  republish articles written by others, as detailed below.  By this motion, Defendants ask the court to

21  end the Kazals' campaign of harassment-by-frivolous-litigation against them.

22  **C.   *CharifKazal.com and the other Republishing Websites.***

23      The five websites and domain names at issue in this case were registered in early 2016

24  (FAC¶ 30), years after the Kazals had begun their online harassment of David and well after they

25  published thousands of online attacks against David and Thunder Studios.  *See* Price Decl. ¶ 2.

26      Each of the Websites participated in ongoing public conversations regarding the Kazal

27  Family (a public conversation fueled in no small part by the Kazals' own website and publications)

28  by circulating and republishing reputable third party stories and reports regarding the Kazals by

---

1    copying portions of the third party sources and linking to the originals.  *See* Price Decl. ¶¶ 3-6;

2    Gebelin Decl. Ex. 14-17.  For example, CharifKazal.com was topped by the "Kazal Brothers"

3    graphic from the Sydney Morning Herald that identifies eight of the Kazals, along with their

4    dozens of known aliases and former names, their ages, and their pictures.  Gebelin Decl.  Ex. 14,

5    Price Decl. ¶ 6.  As another example, a March 2017 post to CharifKazal.com copied text from a

6    December 8, 2016 Sydney Morning Herald article regarding the contempt charges against Adam

7    Kazal and provided a link to the original newspaper article at the Sydney Morning Herald website.

8    *Id*. ¶ 8, Exs. 14, 21.  CharifKazal.com's next post pulls a quote from Australian Parliamentary

9    debates regarding the Kazals and their questionable leases, along with a link to the underlying

10   source.  *Id*. Ex. 14.  None of the websites are commercialized, as they do not display advertising or

11   appear to contain other methods for monetization of traffic to the websites.  *Id*. Exs. 14-17, Price

12   Decl. ¶ 10.  Instead, the websites promote and circulate third party speech regarding the Kazals,

13   self-admitted "prominent" persons.

14   ### D.    *The Prior Actions*

15          In 2016, Plaintiff Charif Kazal filed a California state court action based on the Websites'

16   publication (the "California Action"[3]), and after conducting discovery to uncover the identify of

17   "Doe" defendants involved with the Websites, named Price and newly-added Defendant Ryan

18   Wells as defendants in that action, as well as their (then) employer Thunder Studios and its CEO

19   Rodric David.  Gebelin Decl. ¶ 16, Ex. 18.  Plaintiff Thunder Studios and David filed an anti-

20   SLAPP motion in the California Action prior to Price or Wells being served, and the Court issued a

21   tentative ruling granting the motion prior to the hearing on May 19, 2017.  Gebelin Decl. ¶ 17.

22   However, at the hearing, Plaintiff's counsel successfully argued for a stay of execution

23   (purportedly to conduct more discovery), and consequently dismissed the California Action in

24   November 2017, shortly before the re-scheduled hearing on the anti-SLAPP motion.  *Id*. at ¶¶ 17-

25   18.

26

27

28   [3] *Kazal v. Wells, et. al*, Superior Court of the State of California, County of Los Angeles, Case No.
     SC126477.

---

In April 2017, Plaintiff Charif Kazal received leave to bring a cross-claim for defamation based on statements appearing on CharifKazal.com against David and Thunder Studios in the Australian Federal Court case *Thunder Studios Inc (California) v Kazal*, file number NSD 850 of 2014. Gebelin Decl. Ex. 22. Kazal sought to dismiss his claim during the trial of the action, but the Court granted David and Thunder judgment against him. *Id.*

In November 2017, following the dismissal of the California Action, Plaintiff Adam Kazal[4] filed *Adam Kazal v. Matthew Price*, U.S.D.C. for M.D. Fla. Case No. 8:17-cv-02620-VMC-JSS, an application to take discovery from Price regarding the Websites in support of a foreign proceeding (the "Discovery Action"). Gebelin Decl. ¶ 19. In the Discovery Action, over Price's objection, Adam Kazal was granted the ability to take Price's deposition on November 9, 2017. *Id.* During that deposition, Kazal's attorney questioned Price about the development and publication of the Websites. *Id.*

### E. The Instant Action

One month after voluntarily dismissing their California claims to avoid an anti-SLAPP ruling, the Kazals were at it again, filing this action against Price in a Florida district court and asserting claims which – despite a facelift – were based on the same allegations that had been (tentatively) ruled to be a Strategic Lawsuit Against Public Participation in the California Action. *See* Gebelin Decl. ¶ 20.

The original complaint in this action makes claims based on publications on the Websites, organized as three "Counts" against Price by each Plaintiff- Tortious Interference with Business Relationships (Complaint, ¶¶ 47-55), Intentional Infliction of Emotional Distress (*id.* ¶¶ 56-65), and Injunctive Relief (*id.* ¶¶ 66-70). Upon filing the Complaint, Plaintiffs sought a preliminary injunction against Price, which was denied by the Court. Dkt. 4 (the "Order Denying PI"). The

---

[4] Prior to this, in February 2017, Rodric David and Thunder Studios filed *Thunder Studios, Inc. v. Charif Kazal, et al.* U.S.D.C. for the Central District of California Case No. 2:17-cv-00871, alleging causes of action for copyright infringement and harassment under California law against Charif Kazal, Tony Kazal, and Adam Kazal. Gebelin Decl. ¶25. That case went to trial in December 2018, resulting in judgments after Jury Verdicts of $1.1 million each against Tony Kazal and Adam Kazal on David's harassment claims and $2,600 against Charif Kazal on Thunder's copyright claims. *Id.*

court denied the motion for "at least six reasons" including that Plaintiffs failed to demonstrate a likelihood of success on their claims, which arose out of the publication of allegedly "defamatory" and "untrue" content on the Websites, which "mostly re-publish news articles from the Australian media" about the "tumultuous history between the Kazal brothers and David." Order Denying PI at 1, 6, 11. Despite the denial of the preliminary injunction, by January 12, 2018 Price caused the Websites to go into "maintenance mode", which made them stop showing any content apart from indicating the site "is currently undergoing scheduled maintenance." Gebelin Decl. ¶ 21, Exs. 19-20. In October 2018, the parties stipulated to a transfer of the matter to the Central District of California, as it was the location where the websites at issue "were created" and would be convenient for discovery and the majority of witnesses. Dkt. No. 34. On January 16, 2019, Plaintiffs filed their motion for leave to file an amended complaint. Dkt. No. 46. Other than adding jurisdictional facts about the New Defendants (FAC at ¶¶ 25-27) and amending factual allegations formerly made against Price alone to be against Price and the New Defendants (*e.g. id*. at ¶¶ 35-43), the Proposed Amended Complaint made no substantive changes to the facts or claims alleged. Compare Dkt. Nos. 1 and 46-3.

## III.    Legal Standards for Anti-SLAPP.

California Code of Civil Procedure § 425.16 "provide[s] a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights." *Rusheen v. Cohen*, 37 Cal.4th 1048, 1055–1056 (2006). The statute – enacted in 1992 to combat "a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech" – aims to "encourage continued participation in matters of public significance." CCP § 425.16 (a). Consequently, the California Legislature has declared that CCP § 425.16 "shall be construed broadly." *Id.*

"To determine whether a lawsuit or cause of action should be disposed of as a SLAPP suit, section 425.16 establishes a two-part test. Under the first part, the party bringing the anti-SLAPP motion has the initial burden of showing that the lawsuit, or a cause of action in the lawsuit, arises from an act in furtherance of the right of free speech or petition—i.e., that it arises from a protected activity. Once the defendant has met its burden, the burden shifts to the plaintiff to demonstrate a

1   probability of prevailing on the lawsuit or on the cause of action. Only a cause of action that

2   satisfies both parts of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning

3   and lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." *Tamkin v.*

4   *CBS Broadcasting, Inc.*, 193 Cal. App. 4th 133, 142 (2011) (citations omitted).

5       Prong 1:   The moving defendant must first show that the challenged cause of action is

6   predicated upon conduct that is (1) "in furtherance of the person's right of petition or free speech"

7   and (2) "in connection with a public issue."  CCP § 425.16(b)(1) .  The statute defines an "act in

8   furtherance of a person's right of petition or free speech … in connection with a public issue" as,

9   *inter alia*, "any written or oral statement or writing made in a place open to the public or a public

10   forum in connection with an issue of public interest" as well as "any other conduct in furtherance

11   of the exercise of … the constitutional right of free speech in connection with a public issue or an

12   issue of public interest."  CCP § 425.16(e) .  An "issue of public interest" is, simply enough, "any

13   issue in which the public is interested."  *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027,

14   1042 (2008) (emphasis in original).

15       Prong 2:  Once a defendant has established that plaintiff's cause of action arises from

16   protected activity, the burden shifts to plaintiff to present admissible evidence showing it has a

17   probability of success on the merits of its action.  CCP § 425.16 (b)(1); *Macias v. Hartwell*, 55 Cal.

18   App. 4th 669, 675 (1997).  To meet its burden, plaintiff must show both that the complaint is

19   legally sufficient and that it is "supported by sufficient prima facie showing of facts to sustain a

20   favorable judgment if the evidence submitted by the plaintiff is credited." *Taus v. Loftus*, 40

21   Cal.4th 683, 713–714 (2007).  Plaintiff must also "show[] the defendant's purported constitutional

22   defenses are not applicable to the case as a matter of law or by a prima facie showing of facts

23   which, if accepted by the trier of fact, would negate such defenses." *Robertson v. Rodriguez*, 36

24   Cal. App. 4th 347, 359 (1995).  "In deciding the question of potential merit, the trial court

25   considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§

26   425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative

27   strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's

28   evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for

1    the claim." *Wilson v. Parker, Covert & Chidester*, 28 Cal.4th 811, 821 (2002) (emphasis in

2    original).

3         Special procedural rules apply when an anti-SLAPP motion to strike is brought in federal

4    court.  When the anti-SLAPP motion to strike challenges on the legal sufficiency of a claim, a

5    district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider

6    whether a claim is properly stated.  *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med.*

7    *Progress*, 890 F.3d 828, 834 (9th Cir. 2018).  However, when an anti-SLAPP motion to strike

8    challenges the factual sufficiency of a claim, the Federal Rule of Civil Procedure 56 standard will

9    apply.  *Id.*  Here, Defendants' Special Motion to Strike focuses on Plaintiffs' failure to provide

10   evidence establishing a probability of prevailing on its claims; consequently, the summary

11   judgment standard applies.

12   **IV.   Argument.**

13   ***A.   Plaintiffs' Claims Arise from Acts in Furtherance of Protected Free Speech.***

14        To carry its initial burden, Defendants must show that Plaintiffs' claims are predicated upon

15   alleged conduct in furtherance of the right of free speech in connection with a public issue.  Here,

16   that is indisputably the case.  The Websites republish – in a forum open to the public – articles

17   relating to the Kazals and their businesses, which is clearly a matter of public interest.  Thus,

18   Plaintiffs' Claims arise from acts in furtherance of protected free speech.

19        **The Business Affairs of the Kazals are Matters of Public Interest**.  Plaintiffs

20   characterize themselves as a "prominent Australian family."  FAC ¶ 1.  Whether prominent of

21   infamous, there is no question that the Kazals are the subject of substantial media coverage in

22   Australia.  *See* Gebelin Decl. ¶¶ 2-7, 9-10, Exs. 2-9, 11-12.  Indeed, this Court has conservatively

23   recognized that "[a]t least half a dozen newspaper stories published by several newspapers report

24   the information about which the plaintiffs sue[.]"  Order Denying PI at 7.  Additionally, Plaintiffs

25   made themselves into topics of public concern through their giving of interviews and publishing of

26   press releasing and a website at KazalFamilyStory.com.  *See, e.g.* Gebelin Decl. Ex. 11 (2017-04-

27   17 Declaration of R. David) at ¶ 19.

28        There is no question this qualifies as a matter of public interest.  *See Nygard*, 159 Cal. App.

4th at 1042  (evidence of public interest in prominent Finnish businessman and celebrity among Finish public sufficient to establish article about his "famous Bahamas residence" to relate to "issue of public interest); *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 807–08 (2002) (radio commentary regarding *Who Wants to Marry a Millionaire* – which had a significant viewership and was plainly of significant interest to the public and media – related to an "issue of public interest").

**The claims arise from Public Speech or Actions Supporting Public Speech on the Matter of Public Interest**.  Each of Plaintiffs' claims arise from the Websites' republishing of third-party news articles and other publicly available content relating to the public figure Kazals' business affairs.  *See* FAC ¶¶ 30-32, 34-43, 44-48, 50.  As established above, this means the Websites concern a matter of Public Interest.  They are also "writing(s) made in a place open to the public or in a public forum;" the California Supreme Court has clearly and plainly held that "Web sites accessible to the public … are 'public forums' for purposes of the anti-SLAPP statute." *Barrett v. Rosenthal*, 40 Cal. 4th 33, 41 n.4 (2006).

Thus, Defendants met their burden to show that Plaintiffs' claims are predicated upon conduct in furtherance of his right of free speech, and in connection with a public issue. Consequently, Plaintiffs' claims must be stricken unless they can each establish a probability of prevailing on their claims against each Defendant.

**B.**   ***Plaintiff Cannot Establish a Probability of Prevailing on Their Claims.***

*1.*    *Plaintiffs' Claims are Barred by 47 U.S.C. § 230*

The Communications Decency Act of 1996 (the "CDA") provides as follows: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  The CDA later states: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  *Id.* § 230(e)(3) .  This language has been interpreted to confer absolute immunity upon Internet Service Providers, individual users and distributors who host or republish – on the internet – statements that originated with others.  *See Barrett v. Rosenthal*, 40 Cal.4th at 39-40, 62-63  (holding that the CDA confers broad immunity

upon internet users who republish information from an original source, and that "plaintiffs who contend they were defamed in an Internet posting may only seek recovery from the original source of the statement.").

The CDA requires dismissal of state law claims if: (1) the defendant is a provider or user of an interactive computer service; (2) the information for which plaintiff seeks to hold defendant liable is information provided by another content provider; and (3) the complaint seeks to hold defendant liable as the publisher or speaker of that information.  *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1065 (N.D. Cal. 2016).

Here, each prong is easily satisfied.  As detailed in § II.C *supra*, Price registered the Websites at issue in this action, which provided internet users with access to various articles of public interest relating to the Kazals and their international escapades.  Price Decl. ¶¶ 3-6.  The Websites did not create or publish original content; rather, they republished news articles about issues of public interest regarding the Kazals.  *See id.*; *see also* Order Denying PI at 1 (recognizing that the websites "mostly re-publish news from the Australian media"); *compare, e.g.*  Gebelin Decl. Exs. 14 and 21.  Notwithstanding this fact, the causes of action asserted in the complaint seek to hold Price responsible for the *content* of the articles he republished.  *See* Order Denying PI at 6 (noting that "the crux of plaintiffs' claims is defamation" and that, excluding jurisdictional and prefatory paragraphs, "more than half of the complaint alludes to Price's allegedly "false" "untrue" or "defamatory" statements).  Such claims are barred by the CDA.  *See Rosenthal*, 40 Cal. 4th at 62–63  (CDA provides complete immunity to internet user who re-posted third-party article to website).

Truly, the analysis need proceed no further; Plaintiffs have not evidence showing a probability of success on the merits.  As a result, the FAC must be struck as a SLAPP.  Yet even if their claims were not barred pursuant to the CDA, Plaintiffs would remain unable to establish a probability of success on their claims.

### 2.    *Plaintiffs' Inability to Prove Defamation Defeats Their Claims*

The Complaint pleads claims for (1) Tortious Interference with Business Relationship (Complaint ¶¶ 47-54), (2) Intentional Infliction of Emotional Distress (Complaint ¶¶ 56-65), and

1  (3) Injunctive Relief (Complaint ¶¶ 66-70).  However, as the court previously told Plaintiffs, the

2  gravamen of each of these claims is defamation:

3
> Although the plaintiffs nominally sue for intentional infliction of
> emotional distress and for tortious interference with a business
4
> relation, the crux of the plaintiffs' claims is defamation.  Excluding
> jurisdictional and prefatory paragraphs, more than half of the
5
> complaint alludes to Price's allegedly "false," "untrue," or
> "defamatory" statements.  (Doc 1 at ¶¶ 1, 2, 6, 23, 31, 32, 34, 35, 36,
6
> 37, 38, 39, 40, 41, 42, 45, 46, 48, 50, 57, 58, 59, 61, 67, and 70)
> Order Denying PI at 6.

7  Because "[t]he constitutional privilege applies not merely to defamation but to 'all claims whose

8  gravamen is the alleged injurious falsehood of a statement'," Plaintiffs' causes of action must be

9  stricken unless their allegations could support a defamation claim.  *Gilbert v. Sykes*, 147 Cal. App.

10  4th 13, 34 (2007) (quoting *Blatty v. New York Times Co.*, 42 Cal.3d 1033, 1042 (1986)).  As the

11  California Supreme Court has observed: "to allow an independent cause of action … based on the

12  same acts which would not support a defamation action, would allow plaintiffs to do indirectly

13  what they could not do directly.  It would also render meaningless any defense of truth or

14  privilege."  *Fellows v. National Enquirer, Inc.*, 42 Cal.3d 234, 245 (1986); *see also Reader's

15  Digest Assn. v. Superior Court*, 37 Cal. 3d 244, 265 (1984) (plaintiffs' failure to show a triable

16  issue of fact as to actual malice required summary judgment not merely on libel claim, but on

17  every claim based upon the publication of the article at issue, including IIED claim); *Charney v.

18  Standard Gen., L.P.*, 10 Cal. App. 5th 149 (2017) (granting motion to strike all claims in complaint

19  – including tortious interference claims – where plaintiff could not prove defamatory nature of

20  underlying press release).

21      Thus, Plaintiffs much show the elements of a defamation claim, to wit: (1) a publication

22  that is (2) false,[5] (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes

23  special damage. *Wong v. Tai Jing*, 189 Cal. App. 4th 1354, 1369 (2010).  Moreover, public figures

24  must prove actual malice; in other words, they must "prove by clear and convincing evidence that

25

26

[5] A plaintiff must prove falsity as part of his affirmative defamation claim either where plaintiff is
27   a public figure, or where the statement in question relates to an issue of public concern.
   *Integrated Healthcare Holdings, Inc. v. Fitzgibbons*, 140 Cal. App. 4th 515, 529 (2006).  Here,
28   both are true; *see supra* § IV.A (issue of public concern) and *infra* (public figure).

1  an allegedly defamatory statement was made with knowledge of falsity or reckless disregard for

2  truth." *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1577 (2005).

3      Plaintiffs cannot establish defamation as a matter of law.  First, Plaintiffs cannot establish

4  the "publication" element; as established above, the CDA precludes Plaintiffs from holding Price

5  responsible as a publisher for third-party news articles and other content he merely republished on

6  the Websites.  *See* § IV.B.1 *supra.*  Nor can Plaintiffs provide any evidence that any of the other

7  Defendant published the content appearing on the Websites.  Price Decl. ¶¶ 8-9.  Second, Plaintiffs

8  cannot establish by a preponderance of the evidence – as they must – that the complained-of

9  statements are false.  *See Christian Research Inst. v. Alnor*, 148 Cal. App. 4th 71, 82 (2007).

10  Plaintiffs have put at issue numerous articles republished on the Websites, which were written by

11  various authors representing apparently unbiased third-party media sources, and which tend to

12  substantiate each of the other articles.  Yet Plaintiffs have submitted no credible evidence as to the

13  falsity of these articles – indeed, as the Court in this action previously noted, Plaintiffs have

14  submitted little more than "an unverified complaint, the Price deposition, and several conclusory

15  affidavits that deny the newspaper reports."  Order Denying PI at 6; Gebelin Decl. ¶ 23.  This

16  sparse record, the court correctly determined, precluded any finding that the plaintiffs were likely

17  to succeed on the merits."  *Id.* Here too, the conclusory affidavits remain inadequate to prove, by a

18  preponderance of the evidence, that the complained-of content on the Websites is false.

19      Third, public figures are required to prove "actual malice" in order to prevail on a

20  defamation claim.  *Ampex*, 128 Cal. App. 4th at 1577.   There are two-types of public figures; the

21  first are all-purpose public figures who have achieved such fame and notoriety that they become a

22  public figure for all purposes and in all contexts.  *Sipple v. Found. For Nat. Progress*, 71 Cal. App.

23  4th 226, 247 (1999).  Plaintiffs' own pled admissions clearly establish they are all-purpose public

24  figures.[6]  There are also limited-purpose public figures; these are individuals who have voluntarily

25

26  [6] *See, e.g.* Complaint ¶ 1 (Kazals are a "prominent Australian family"); *id.* ¶ 16 (Kazals "have
    operated a number of successful restaurant and café businesses on Sydney Harbour … for the

27  past twenty-five years.  They have also undertaken a number of commercial property and
    investments up and down the New South Wales and Queensland coasts that have generated

28  jobs and economic growth in those areas.  The Kazal Brothers are also active in political and
    charity causes in Australia."); *id.* ¶¶ 40-41 (the Kazals have "various successful businesses in

injected themselves into a public controversy and attempted to influence the resolution of the public issues involved. *Id.* Plaintiffs are also limited-purpose public figures, having given interviews and created an entire website – www.kazalfamilystory.com – as well as countless social media posts specifically to influence public opinion on these issues. *See, e.g.*, *Ampex*, 128 Cal. App. 4th at 1577 (company that injected itself into debate by issuing online press releases became a limited-purpose public figure); *Denney v. Lawrence*, 22 Cal. App. 4th 927, 934-936 (1994) (plaintiff who gave press interviews promoting brother's version of the facts was limited-purpose public figure as to public controversy surrounding arrest, trial and conviction of brother).

As public figures, Plaintiffs are required to prove "actual malice" to succeed on their defamation claim. The test for actual malice is subjective, and focuses on the defendant's actual attitude toward the veracity of the published material, as opposed to his attitude toward plaintiff. *Ampex*, 128 Cal. App. 4th at 1578-79. Further, Plaintiffs must prove "actual malice" by a rigorous *clear and convincing* standard. *Id*. Yet here, Plaintiffs have not produced evidence to establish "actual malice" by *any* standard – indeed, despite having taken Price's deposition, they have not submitted *any* evidence demonstrating that Price actually believed the articles republished on the Websites to be false. This is because there is no such evidence; in fact, Price believed and believes that the Websites facilitate the spread of truthful information. Price Decl. ¶ 10. Plaintiffs have produced no evidence to the contrary. Price did not act with actual malice in republishing news articles on the Websites.

For each of these reasons, Plaintiffs have failed to present evidence showing a probability of success on the merits. As a result, each of Plaintiffs' claims must be stricken, as the claims are grounded in the allegedly defamatory nature of the Websites. *See Fellows v. National Enquirer, Inc.*, 42 Cal.3d 234, 245 (1986); *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 34 (2007).

Yet even if this were not so, Plaintiffs would remain unable to establish a likelihood of success on their individual causes of action.

---

Australia" and "banks had competed vigorously to be the lender of choice for the Kazal Brothers' businesses, given their impeccable reputations and highly-valued business locations on the Sydney Harbour.").

*3.*     *Plaintiffs Cannot Establish Tortious Interference with Business Relationships.*

The elements of tortious interference with prospective business relations in California are: The elements of the tort of interference with prospective economic advantage are "(1) a relationship between the plaintiff and some third party with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) a wrongful act, apart from the interference itself, by the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *E.g. Salma v. Capon*, 161 Cal. App. 4th 1275, 1290 (2008).

Plaintiffs have failed to establish a likelihood of success on their tortious interference claim for at least two reasons.  First, a plaintiff must allege a specific relationship with specific parties, defendant's knowledge of that relationship and intention to disrupt it, actual disruption of the relationship and resulting harm.  *See R Power Biofuels, LLC v. Chemex LLC*, 2016 WL 6663002, at *16–17 (N.D. Cal. Nov. 11, 2016) (noting that multiple district courts have set aside tortious interference claims where no specific parties were alleged).  Here, Plaintiffs have neither pled nor produced any evidence as to a specific relationship which has been disrupted by Defendants, nor as to their knowledge of that specific party and intention to disrupt that specific relationship.  *See* FAC ¶ 50 (Kazals had "numerous fruitful and ongoing business dealings" and "banks in Australia" competed to lend to them); ¶ 51 (Price "was aware of the Kazal Brothers and their business operations in Australia"); ¶ 53 (Kazals "have been denied loans by local banks and finance companies"); ¶ 54 (Kazals "lost opportunities to consummate new business deals"); etc.; Gebelin Decl. ¶ 23.  These allegations are insufficient to support a tortious interference claim.  *See, e.g.*, *Chemex LLC*, *supra*, 2016 WL 6663002, at *16–17 (granting motion to dismiss where plaintiff alleged defendant interfered with economic relationship with "major consumers of biofuel" but did not provide details of specific companies); *Damabeh v. 7-Eleven, Inc.*, 2013 WL 1915867, at *10 (N.D. Cal. May 8, 2013) (granting motion to dismiss where plaintiff alleged defendant interfered "with [Plaintiff's] employees and customers" but did not specifically identify anyone); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *4 (N.D. Cal. Dec. 22, 2006) (granting motion to dismiss where plaintiff alleged that defendant "damaged her relationships with third parties" but never

1 | identified any specific third parties); *AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp.

2 | 2d 941, 956–57 (N.D. Cal. 2003) (granting motion to dismiss where complaint which fails to allege

3 | a specific existing or prospective relationship and instead relies on conclusory language and vague

4 | allegations does not satisfy federal pleading requirements because defendants are not on notice of

5 | which relationships they allegedly disrupted).

6 | Further, because the motive or purpose to disrupt an ongoing business relationship is of

7 | central concern to tortious interference cases, a strong showing of such intent is required. *See Bell*

8 | *Atl. Bus. Sys. Servs., Inc. v. Hitachi Data Sys. Corp.*, 1995 WL 798935, at *9–10 (N.D. Cal. Mar.

9 | 10, 1995). However, just as Plaintiffs have failed to submit any evidence as to a specific business

10 | relationship that was disrupted, they have failed to provide evidence that Defendant Price had

11 | knowledge of and intended to disrupt that specific relationship, let alone any other defendant.

12 | Finally, to make out a tortious interference claim, a plaintiff must establish that the

13 | defendant "not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct

14 | that was wrongful by some legal measure other than the fact of the interference itself." *Della*

15 | *Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995). Here, Plaintiffs have

16 | provided no evidence suggesting how exactly Price's use of the Websites or the other defendant's

17 | actions were wrongful, even if they did in fact interfere with Plaintiffs' business relationships. To

18 | the contrary, Price's behavior was in no way forbidden by any legal standard and the other

19 | defendants actions, if any, are explicitly protected. *See supra* § IV.B.1 (47 § U.S.C. 230 provides

20 | immunity for internet republishing of third party articles); § IV.B.2 (no liability for defamation).

21 | For each of these reasons, Plaintiffs have failed to present evidence showing a probability

22 | of success on the merits. As a result, this cause of action must be stricken.

23 | *4.    Plaintiffs Cannot Establish Intentional Infliction of Emotional Distress*

24 | The elements of the tort of intentional infliction of emotional distress are: (1) extreme and

25 | outrageous conduct by the defendant with the intention of causing, or reckless disregard of the

26 | probability of causing, emotional distress; (2) the plaintiff's suffering severe or

27 | extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the

28 | defendant's outrageous conduct....' *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (2009). "A defendant's

1  conduct is 'outrageous' when it is so 'extreme as to exceed all bounds of that usually tolerated in a

2  civilized community.'"  *Id.*   Plaintiffs cannot establish even a single prong of this claim.

3       First, Plaintiffs cannot establish that Price engaged in "extreme and outrageous conduct"

4  nor that he did so "with the intention of causing, or reckless disregard of the probability of causing,

5  emotional distress."  This is because Price did not *draft* the complained-of content on the Websites;

6  the Websites merely ***republished*** articles written by Australian media sources.  As this court

7  previously noted, the republishing of articles hardly constitutes "extreme and outrageous" conduct.

8  *See* Order Denying PI at 6 ("nothing appears 'extreme' or 'outrageous' about a defendant's re-

9  publishing an accurate news story (even though the story publicizes unflattering information)").

10  As this court recognized, unless Plaintiffs can establish the falsity of the articles, this cause of

11  action is a non-starter.  And Plaintiffs cannot do so, as explained in § IV.B.2, *supra*.  Nor can

12  Plaintiffs establish that any of the other defendants' conduct (not having been involved in the

13  content on the Websites) rose to the level of "extreme and outrageous conduct."

14       Second, Plaintiffs have not submitted evidence that they have suffered severe or extreme

15  emotional distress.  The California Supreme Court has set a "high bar" for what can constitute

16  severe distress.  *See Hughes*, 46 Cal. 4th at 1051  ("Severe emotional distress means 'emotional

17  distress of such substantial quality or enduring quality that no reasonable [person] in civilized

18  society should be expected to endure it.'").  Here, the only evidence of emotional distress

19  submitted by Plaintiffs is contained in the Affidavit of Rania Kazal, wife of Tony Kazal (Ex. E to

20  Complaint) wherein she states that her children were under "great stress" as a result of taunts from

21  their fellow schoolchildren, and that she has been "very stressed" and is now "seeking a

22  psychiatrist" and taking "medication that I never previously required" at the prescription of her

23  psychiatrist.  *Id.* at ¶¶ 5, 9-10.  This evidence is *manifestly* insufficient to support a finding of

24  "severe or extreme emotional distress."  *See Hughes*, 46 Cal. 4th at 1051 (2009)  (assertions that

25  plaintiff suffered discomfort, worry, anxiety, upset stomach, concern and agitation do not comprise

26  severe or extreme emotional distress); *Wong v. Jing*, 189 Cal. App. 4th 1354, 1377 (2010)

27  (assertions that allegedly false online review "was very emotionally upsetting to me, and has

28  caused me to lose sleep, have stomach upset and generalized anxiety" insufficient to establish

---

severe emotional distress.  This is especially true in light of the fact that the Websites have since been taken down.  *See id.* (subsequent removal of allegedly defamatory online posting weighs against a finding of severe emotional distress).

Third, even if Price's republishing or the other defendant's non-publishing acts were deemed to be extreme and outrageous conduct – they are not – and even if Plaintiffs had demonstrated severe and extreme emotional distress – they have not – Plaintiffs' claim would still fail, as Plaintiffs have failed to demonstrate that the Websites – which merely republish the complained-of articles– are the actual and proximate cause of Plaintiffs' alleged emotional distress, rather than the original Australian sources.  This court has already honed in on this point in denying the Plaintiffs' request for a preliminary injunction:

> Plaintiffs fail to explain the mechanism by which an injunction against Price's re-publishing news stories from the press remedies the plaintiffs' alleged injuries.  At least half a dozen newspaper stories published by several newspapers report the information about which the plaintiffs sue … Even if an injunction prohibits Price's speaking about the Kazal family, the information about the Kazal family remains easily accessible elsewhere on the internet.

Order Denying PI at 7-8.  This is exactly correct.  Again, the Websites do not create *original* content.  They merely *republish* articles created by other sources.  Plaintiffs complain as to the *content* of the Websites, but that *content* would exist even if the Websites did not.  Plaintiffs cite absolutely no evidence explaining why their emotional distress is proximately caused by the Websites, and not by the actual stories themselves.

For each of these reasons, Plaintiffs have failed to present evidence showing a probability of success on the merits.  As a result, this cause of action must be stricken.

### 5.  *Plaintiffs Cannot Establish their Claim for Injunctive Relief*

A plaintiff seeking a preliminary injunction must establish: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest.  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008).  The requirements for a permanent injunction are essentially the same, except that the moving party

1    must demonstrate ***actual success*** on the merits.  *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976,

2    979-80 (9th Cir. 2011).

3         This Court has already denied Plaintiffs' Motion for a Preliminary Injunction, finding that

4    Plaintiffs established <u>none</u> of the required elements.  Order Denying PI at 11.  On likelihood of

5    success, the Court noted that Plaintiffs' claims are grounded in defamation, but that Plaintiff had

6    not provided any evidence as to falsity (*id.* at 6); this remains true, as noted in § IV.B.2, *supra*.  On

7    irreparable harm, the Court noted that Plaintiffs waited nearly two years to sue, and failed to

8    explain why an injunction as to Price's re-publishing Websites would remedy their alleged injuries

9    given that the original sources of those articles would not be enjoined and the articles themselves

10   would remain in the public domain.  *Id.* at 7-8.  Plaintiffs have not submitted any further evidence

11   on the proximate cause issue, as noted in § IV.B.4, *supra*.  On the balance of the harms, the court

12   noted that Plaintiffs' conclusory affidavits – which merely alleged generalized stress and failed to

13   note a specific business transaction that failed as a proximate result of the Websites – demonstrated

14   little evidence of harm as opposed to the Supreme Court's clear guidance as to the severity of a

15   prior restraint on speech.  *Id.* at 8-9.  Here too, Plaintiffs have provided no additional evidence as to

16   specific relationships that have been disrupted, nor evidence as to actual severe emotional distress

17   caused by the Websites.  *See* § IV.B.3, *supra*.

18        Plaintiffs cannot establish a probability of prevailing on their Injunctive Relief claim for the

19   same reasons as the court explained in its Order Denying PI, none of which they have remedied.

20   As a result, the Injunctive Relief claim must be stricken.

21        *6.     Plaintiff's Claims Against Defendants Wells, Hatch, and Kolesa are Time-Barred*

22        In addition to not being able to meet their burden to establish their claims against

23   Defendants Wells, Hatch, and Kolesa as set forth above, Plaintiffs' claims against them are

24   untimely and barred by the applicable one year statute of limitation, as the allegedly wrongful

25   content on the Websites was removed more than a year before they were added as parties.

26             (a)     The Causes of Action are Subject to a One Year Statute of Limitation.

27        California's Civil Code section 3425.3 provides: [¶] "No person shall have more than one

28   cause of action for damages for libel or slander or invasion of privacy *or any other tort* founded

---

1   upon any single publication or exhibition or utterance, such as any one issue of a newspaper or

2   book or magazine or any one presentation to an audience or any one broadcast over radio or

3   television or any one exhibition of a motion picture. Recovery in any action shall include all

4   damages for any such tort suffered by the plaintiff in all jurisdictions." (Emphasis added.)

5          Where "the *harm* (damage) allegedly sustained by" Plaintiffs "is the same as that which

6   could be caused by '*libel or slander or invasion of privacy,*" Civil Code section 3425.3 applies to

7   all tort causes of action "based on the *contents* of the *mass publication* of an article" and the one-

8   year statute of limitations for libel or slander. *Strick v. Superior Court*, 143 Cal. App. 3d 916, 925

9   (Ct. App. 1983) (because "the requisite elements of the 'tort'," alleged by Plaintiff "includes

10  'resulting damage'—[harm], proof of which is *inextricably linked* to the entire *contents* of the

11  m*ass communication*" allowing "plaintiffs to pursue an independent tort claim based on fraud and

12  deceit, the proof of a requisite element (damage)—[harm] which must resort to the *contents* of the

13  same allegedly mass communicated libelous article would nullify the clear language and

14  applicability of section 3425.3, in contravention of legislative policy concerning mass

15  communications as enunciated by the Legislature by enacting the Uniform Single Publication

16  Act.")  Here, Plaintiffs' claims (as existed in the original Complaint and as set forth in the FAC) all

17  arise from one or more "mass publication" Price placed on the Websites prior to the filing of the

18  complaint in December 2017.  *Compare, e.g.* Complaint [Dkt. No. 1 - filed December 7, 2017];

19  and FAC at ¶¶ 1 ("[Price/Defendants] accomplished this purpose by creating, maintaining, and

20  publicizing five websites on which [Price/Defendants] posted incendiary, false, and misleading

21  information about Plaintiffs"); 48/50 (Tortious Interference claim based on alleged "publication of

22  untrue, disparaging, and highly offensive information  on [Price's/Defendants'] Websites"); 50/52

23  ("Through the publication of the disparaging, false and vilifying statements on the Websites,

24  without justification or privilege, [Price has/Defendants have] intentionally and unjustifiably

25  interfered with, and still is intentionally and unjustifiably interfering with, the business

26  relationships of the Kazal Brothers"); 57/58 (Intentional Infliction of Emotional Distress based on

27  allegation that "[Defendant Price/Defendants] acted intentionally, or in the alternative recklessly,

28  when [he/they] published false and disparaging statements as described above in order to inflict

mental distress on the Kazal Brothers); 67 (Request for Injunctive relief based on allegation that "[Defendant has/Defendants have] repeatedly and wrongly made false statements through the Websites, intentionally inflicted emotional distress on Plaintiffs and their family members, and interfered with Plaintiffs' ongoing business relationships to the significant financial detriment of the Kazal family.")  As such, and in accordance with prior findings of the Court in this matter that "the crux of the plaintiffs' claims is defamation" (*e.g.* Dkt. No. 4 at 6), the statute of limitations applicable to each and every one of Plaintiffs' claims is the one year statute of limitations for defamation.  *See, e.g.* Cal. Code of Civil Procedure § 340(c).

(b)      Plaintiffs' Claims Do Not Relate Back and Are Time Barred.

Rule 15(c)(1)(C) provides the federal standard for whether a pleading relates back.  *See Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 541 (2010) ("Rule 15(c) of the Federal Rules of Civil Procedure governs when an amended pleading 'relates back' to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations.").  In order for an amended complaint to relate back under Rule 15(c)(1)(C), the following conditions must be met: "(1) the basic claim must have arisen out of the conduct set forth in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party must or should have known that, but for a mistake concerning identity, the action would have been brought against it."  *Schiavone v. Fortune*, 477 U.S. 21, 29 (1986).  Additionally, the second and third requirements must have been fulfilled within 90 days after the original complaint is filed, as prescribed by Federal Rule of Civil Procedure 4(m).  Fed. R. Civ. P. 15(c)(1)(C)  and 4(m) ; *see also Boss v. City of Mesa*, 746 F. App'x 692, 694 (9th Cir. 2018) (claims against defendants added in amendment filed more than 90 days after prior complaint was filed do not "relate back.")

Here, the Complaint was filed on December 7, 2017.  For an amendment to relate back, Plaintiffs were required to file the amendment within 90 days of the complaint.  Instead, they filed the motion to amend more than thirteen months after filing the complaint, preventing relation back of the claims.  Nor could Plaintiffs present facts to show the other factors for relation back are met.

The Websites's content was removed from publication before January 12, 2018, more than a year before the FAC was filed and defendants Wells, Kolesa, and Hatch became parties to the action.  Gebelin Decl. ¶ 20, Price Decl. ¶ 11, Dkt No. 53 (FAC, filed 3.14/2019).  There was no mistake by Plaintiffs- they knew of (and even sued upon) claims related to the content on the Websites in 2016, including naming Thunder Studios, the employer of the New Defendants, in their prior action.  Gebelin Decl. ¶ 15.  Indeed, Thunder Studios was even mentioned in the original complaint in this action.  *See* Complaint at ¶¶ 20, 21.  Plaintiffs did not name any "Doe Defendants" in this action (not that it would allow for a relation back) and apparently chose not to sue any other person in this action (or even in a California action) over the Websites within the statute of limitations.  *See generally*, Complaint. Moreover, as set forth in Plaintiffs' Complaint, the allegedly defamatory remarks were first published by Price in 2016.  Complaint at Ex. A, p 26:9-13, 33:16-25.  As such, all the claims against the defendants Wells, Kolesa, and Hatch are time barred under the applicable statute of limitations.

## C.    *Defendants Are Entitled to Recover Their Fees.*

The California Supreme Court has made clear that the successful defendant on an anti-SLAPP motion is "entitled to recover his or her attorney's fees and costs" as a matter of right. Code Civ. Proc., § 425.16 (c); *Ketchum v. Moses*, 24 Cal.4th 1122, 1131 (2001).  Defendants are therefore entitled to recover their fees and costs as a matter of right, and will make a separate fee application to the Court upon entry of an order striking Plaintiffs' claims.

## V.    Conclusion

As shown above, Plaintiffs have not and cannot show any probability of success on their claims.  Defendants respectfully request that the court GRANT this motion and strike Plaintiffs' First Amended Complaint as a SLAPP.

DATED: March 29, 2021                    Respectfully submitted,

**LESOWITZ GEBELIN LLP**

By: _____

STEVEN T. GEBELIN
Attorneys for Defendants Matthew Price, Ryan Wells,

1   Michael Hatch, and Paul Kolesa

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28